**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| YUECHUAN SUN, derivatively on behalf of CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, | Case No. _____ |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| VIVEK GARIPALLI, JOSEPH WAGNER, ANDREW TOY, NATHANIEL S. TURNER, LEE SHAPIRO, CHAMATH PALIHAPITIYA, STEVEN TRIEU, IAN OSBORNE, JACQUELINE D. RESES, JAMES RYANS, | |
| Defendants, | |
| and | |
| CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Yuechuan Sun ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Clover Health Investments, Corp. ("Clover" or the "Company") f/k/a Social Capital Hedosophia Holdings Corp. III ("SCH"), [1] files this Verified Shareholder Derivative Complaint against Individual Defendants Vivek Garipalli ("Garipalli"), Joseph Wagner

_____
[1] References herein to the Company, Clover, and SCH are used interchangeably.

– 1 –

("Wagner"), Andrew Toy ("Toy"), Nathaniel S. Turner ("Turner") (collectively, the "Clover Health Defendants"), and Lee Shapiro ("Shapiro"), and against Chamath Palihapitiya ("Palihapitiya"), Steven Trieu ("Trieu"), Ian Osborne ("Osborne"), Jacqueline D. Reses ("Reses"), and James Ryans ("Ryans"), (collectively, the "SCH Defendants," together with the Clover Health Defendants, the "Individual Defendants," and together with Clover the "Defendants"), for breaches of their fiduciary duties, unjust enrichment, waste of corporate assets, and/or violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Exchange Act, and against the Clover Health Defendants for abuse of control, gross mismanagement, and for aiding and abetting the SCH Defendants' breaches of their fiduciary duties as directors and/or officers of SCH. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clover, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Clover's directors and officers from October 6, 2020 through February 4, 2021, both dates inclusive (the "Relevant Period").

2.      Based in Franklin, Tennessee, Clover touts itself as a next-generation Medicare Advantage insurer that leverages its software platform, the Clover Assistant, to provide America's seniors with highly affordable Preferred Provider Organization ("PPO") and Health Maintenance Organization ("HMO") health insurance plans with wide network access and equal cost-sharing for in- and out-of-network providers.

3.      In October 2020, Clover Health (defined below) sought to go public by merging with a special purpose acquisition company, SCH. Prior to the reverse merger with SCH, which closed on January 7, 2021, the Company functioned as a private company bearing its same name ("Clover Health") (the "Merger"). Clover Health was founded in 2014. SCH's common stock began publicly trading on the New York Stock Exchange ("NYSE") in June 2020 and then, following the Merger, Clover's common stock began publicly trading on The Nasdaq Stock Market LLC ("NASDAQ") under a new ticker symbol, "CLOV." Prior to the Merger, SCH's common stock traded under the ticker symbol "IPOC."

4.      In preparation for the Merger, the SCH Defendants filed the Merger Filings (defined below), which touted the functionality of the Company's software and characterized the Clover Assistant as "delight[ful]" for healthcare providers to use. Notably, the Merger Filings also assured investors that the Company was not subject to any legal proceeding that might have a material adverse effect on Clover's business, operating results, cash flows or financial condition

- 3 -

and also that the Company maintained internal controls designed and implemented to prevent violations of applicable law.

5. About a week after the Merger closed, on January 13, 2021, the Company filed the SPO Registration Statement (defined below) in connection with a secondary public offering and the resale of, *inter alia*, shares of Class A Clover common stock and warrants to purchase shares of Class A Clover common stock, by "Selling Securityholders," which, among others, included Defendants Garipalli, Palihapitiya, Wagner, Toy, Osborne, Reses, Ryans, and Turner. The SPO Offering Documents (defined below) made many of the same representations as the Merger Filings regarding, *inter alia*, regulatory and legal proceedings and also continued to tout the Clover Assistant.

6. Unbeknownst to investors, however, those statements, among others in the Company's press releases, presentations, and SEC filings, and also made during interviews, omitted certain crucial details throughout the Relevant Period. In particular, the U.S. Department of Justice ("DOJ") had commenced an investigation into certain issues of misconduct and had issued a Civil Investigative Demand to Clover. The DOJ investigation sought information on whether the Clover Health Defendants had engaged in and/or permitted and caused the Company to engage in kickbacks, improper marketing practices, and undisclosed related party transactions prior to and throughout the Relevant Period.

7. However, the truth emerged on February 4, 2021, when *Hindenburg Research* published a report (the "Hindenburg Report") detailing that Clover was the subject of a DOJ investigation and that prior to and throughout the Relevant Period, the Clover Health Defendants caused Clover Health and the Company to, *inter alia*: (i) make improper payments to healthcare

- 4 -

providers and their staff in violation of federal anti-kickback laws and Medicare Communications and Marketing's Guidelines; (ii) develop and utilize software that aided Clover's practice of defrauding the federal government by illegally overbilling; (iii) engage in and/or permit deceptive marketing practices of a subsidiary to mislead and induce seniors to purchase a Company healthcare plan; and (iv) engage in undisclosed related party transactions with a field marketing organization which was responsible for a majority of Clover's sales (collectively, the "Deceptive Sales Misconduct").

8.    On this news, the Company's share price closed on February 4, 2021 at $12.23 per share, a $1.72 drop, or approximately 12.3%, from its closing price of $13.95 per share on February 3, 2021. Additionally, the Company's warrant price closed on February 4, 2021 at $3.39 per warrant, a $0.18 drop, or approximately 5%, from its closing price of $3.57 per warrant on February 3, 2021.

9.    On February 5, 2021, prior to the market's open, the Company announced that the SEC had opened an investigation and requested document and data preservation for the period from January 1, 2020, to the present, relating to the Deceptive Sales Misconduct, among other issues revealed in the Hindenburg Report.

10.    On this news, the Company's share price fell an additional $0.53 per share in intraday trading on February 5, 2021, or approximately 4.3%. Additionally, the Company's warrant price fell an additional $0.28 per warrant in intraday trading on February 5, 2021, or approximately 8.2%.

11.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and

- 5 -

misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact to the investing public that failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) a significant amount of Clover's (and Clover Health's) sales had been driven by a related party transaction that the Company intentionally obscured; (4) Clover's subsidiary, Seek Insurance Services, Inc. ("Seek Insurance"), kept its relationship with the Company from consumers so that it could misleadingly market to seniors; (5) the Clover Assistant software was rudimentary; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

13. In breach of their fiduciary duties, the Clover Health Defendants engaged in, permitted, and caused the Company to engage in the Deceptive Sales Misconduct.

14.     During the Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

15.     Nonetheless, throughout the Relevant Period, several of Clover Health's and SCH's joint press releases and SEC filings failed to disclose the Deceptive Sales Misconduct and therefore contained serious errors that rendered them unreliable. Further, Clover Health's and SCH's SEC

- 6 -

filings issued throughout the Relevant Period maintained, *inter alia*, that Clover maintained adequate control over its financial reporting.

16.     As a result of the Individual Defendants' misconduct, which has subjected Clover, and the Company's Chief Executive Officer ("CEO") to being named as defendants in three federal securities fraud class action lawsuits pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Actions"), SCH's former CEO and Company advisor, Clover's Chief Financial Officer ("CFO"), and its Chief Technology Officer ("CTO") to being named as defendants in two of the Securities Class Actions, and SCH's former CFO, former President and two former directors as defendants in one of the Securities Class Actions, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, and the aiding and abetting thereof.

18.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and President and CTO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being

- 7 -

disinterested and/or independent directors, a majority of Clover's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

20. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

22. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23. Venue is proper in this District because Clover is headquartered in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

## PARTIES

### Plaintiff

24. Plaintiff is a current shareholder of Clover common stock. Plaintiff has continuously held Clover common stock at all relevant times.

- 8 -

**Nominal Defendant Clover**

25.     Nominal Defendant Clover is a Delaware corporation with its principal executive offices at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067. Clover stock trades on the NASDAQ under the ticker symbol "CLOV." Clover's warrants, each redeemable to acquire one share of Clover Class A common stock, trade on the NASDAQ under the ticker symbol "CLOVW."

26.     Prior to the Merger, Clover's stock, units, and warrants traded on the NYSE under the ticker symbols "IPOC," "IPOC.U," and "IPOC.WS," respectively.

**Defendant Garipalli**

27.     Defendant Garipalli is the co-founder of Clover Health and has served as Clover's CEO and as a Company director since the Merger in January 2021. He also serves as a member of the Audit Committee. Prior to the Merger, Defendant Garipalli served as Clover Health's President from July 2014 until March 2019. According to the Company's final prospectus filed with the SEC on January 29, 2021 on Form 424B3 (the "SPO Prospectus"), on January 7, 2021, Defendant Garipalli beneficially owned 83,584,543 shares of the Company's Class B stock, which represented 32.0% of the Company's outstanding Class B stock and 30.4% of the total voting power as of that date.[2] Given that the price per share of the Company's Class A stock at the close

---

[2] Each share of Class A common stock entitles its holder to one vote. Each share of Class B common stock entitles its holder to 10 votes. All the outstanding shares of Class B common stock will convert automatically into one share of Class A common stock upon the earliest of (i) the date that is ten (10) years from the filing date of the amended and restated certificate of incorporation; (ii) the separation date of the last to separate of Vivek Garipalli and Andrew Toy (the "Founders"); (iii) the date that is one (1) year after the death or permanent disability Founders of the last to die or become disabled of the Founders; and (iv) the date specified by the affirmative vote of the holders of our Class B common stock representing not less than two-thirds (2/3) of the voting power of the outstanding shares of our Class B common stock, voting separately as a single class.

of trading on January 7, 2021 was $16.02, Defendant Garipalli owned over $1.3 billion worth of Clover stock.

28. The SPO Prospectus stated the following about Defendant Garipalli:

***Vivek Garipalli.*** Vivek Garipalli has served as our Chief Executive Officer and as a member of our board of directors since the Closing and previously held the same positions with Clover, which Mr. Garipalli co-founded, since July 2014. Previously, Mr. Garipalli also served as Clover's President from July 2014 to March 2019. Mr. Garipalli holds a B.B.A. in entrepreneurship from Emory University.

We believe that Mr. Garipalli is qualified to serve as a member of our board of directors due to the perspective and experience he brings as Clover's co-founder and Chief Executive Officer and due to his extensive experience managing healthcare companies.

**Defendant Wagner**

29. Defendant Wagner has served as Clover's CFO since the Merger in January 2021. Prior to the Merger, he held the same position with Clover Health from January 2020 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Wagner beneficially owned 642,514 shares of the Company's Class B stock as of that date. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Wagner owned approximately $10.3 million worth of Clover stock.

30. The SPO Prospectus stated the following about Defendant Wagner.

***Joseph Wagner.*** Joseph Wagner has served as our Chief Financial Officer since the Closing and previously held the same position with Clover since January 2020. Prior to joining Clover, Mr. Wagner served as a Regional Chief Financial Officer at UnitedHealth Group Incorporated, a healthcare organization, from February 2016 to December 2019. Mr. Wagner served as the Chief Financial Officer for Healthcare Interactive, a middleware healthcare company, from October 2014 to January 2016. Mr. Wagner holds a B.B.A. in accountancy from the University of Notre Dame and is a certified public accountant (inactive).

- 10 -

**Defendant Toy**

31.    Defendant Toy has served as Clover's President and CTO, and as a Company director since the Merger in January 2021. Prior to the Merger, he held those same positions with Clover Health from March 2019, February 2018, and November 2018, respectively, until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Toy beneficially owned 12,790,323 shares of the Company's Class B stock, which represented 4.7% of the Company's outstanding Class A stock and 4.4% of the total voting power as of that date. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Toy owned approximately $10.3 million worth of Clover stock.

32.    For the fiscal year ended December 31, 2020, Defendant Toy received $8,617,885 in compensation from the Company. This included $415,385 in salary, $8,190,695 in option awards, and $11,805 in all other compensation.

33.    The SPO Prospectus stated the following about Defendant Toy:

*Andrew Toy.* Andrew Toy has served as our President, our Chief Technology Officer and as a member of our board of directors since the Closing and previously held the same positions with Clover since March 2019, February 2018 and November 2018, respectively. Prior to joining Clover, Mr. Toy served as a Product Director at Google LLC, a multinational technology company, from May 2014 to February 2018. Mr. Toy holds a B.S. and an M.S. in computer science from Stanford University.

We believe that Mr. Toy is qualified to serve as a member of our board of directors due to the perspective and experience he brings as Clover's President and Chief Technology Officer and due to his extensive experience overseeing technology and analytics at other companies.

**Defendant Turner**

- 11 -

34.     Defendant Turner has served as a Company director since the Merger in January 2021. He also serves as a member of the Audit Committee and as a member of the Talent and Compensation Committee. Prior to the Merger, he served as a Clover Health director from April 2015 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Turner beneficially owned 2,565,954 shares of the Company's Class B stock. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Turner owned approximately $41.1 million worth of Clover stock.

35.     For the fiscal year ending December 31, 2021, Defendant Turner is entitled to receive at least $50,000 for serving as a Company director and an additional $10,000 for serving as a member of the Audit Committee. Moreover, Defendant Turner is entitled to at least a grant of restricted stock units valued at $400,000 multiplied by the anticipated number of whole months from the closing of the Merger until the Company's 2022 annual meeting divided by 24.

36.     The SPO Prospectus stated the following about Defendant Turner:

***Nathaniel S. Turner.*** Nathaniel S. Turner has served as a member of our board of directors since the Closing and previously held the same position with Clover since April 2015. Mr. Turner co-founded and has served as the Chief Executive Officer of Flatiron Health, Inc., a cancer research and data collection software company, since June 2012. From June 2010 to June 2012, Mr. Turner served as a Product Manager at Google Inc. Mr. Turner holds a B.S. in economics from the Wharton School of the University of Pennsylvania.

We believe that Mr. Turner is qualified to serve as a member of our board of directors because of his extensive experience as an investor in many technology, high-growth, healthcare companies, his experience as an executive at a healthcare company, and his knowledge of our industry.

**Defendant Shapiro**

- 12 -

37.     Defendant Shapiro has served as a Company director since the Merger in January 2021. He also serves as the Chair of the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee.

38.     For the fiscal year ending December 31, 2021, Defendant Shapiro is entitled to receive at least $50,000 for serving as a Company director, an additional $25,000 for serving as Chair of the Audit Committee, and an additional $15,000 for serving as Chair of the Nominating and Corporate Governance Committee. Moreover, Defendant Shapiro is entitled to at least a grant of restricted stock units valued at $400,000.

39.     The SPO Prospectus stated the following about Defendant Shapiro:

*Lee A. Shapiro.* Lee A. Shapiro has served as a member of our board of directors since the Closing. Mr. Shapiro co-founded and has served as the Managing Partner at 7Wire Ventures, an early-stage healthcare venture fund, since June 2013. Mr. Shapiro previously served as Chief Financial Officer of Livongo Health, Inc., a mobile health monitoring technology company, from December 2018 to November 2020. Mr. Shapiro served as a director from August 2013 until April 2019. Mr. Shapiro joined Allscripts Healthcare Solutions, Inc., a provider of electronic prescribing, practice management and electronic health record technology, in April 2000 and served as President from April 2002 to December 2012. He previously served as a director of Tivity Health, Inc., a provider of fitness and health improvement programs, from May 2015 to May 2020 and a director of Medidata Solutions, Inc., a global provider of cloud-based solutions for life sciences, from June 2011 to October 2019. He also serves as a director of some of the 7Wire Ventures portfolio companies. He serves on the National Board of the American Heart Association and the advisory board of the Gastro-Intestinal Research Foundation. Mr. Shapiro holds a B.S. in accountancy from the University of Illinois Urbana-Champaign and a J.D. from The University of Chicago Law School.

We believe that Mr. Shapiro is qualified to serve as a member of our board of directors because of his extensive finance background, including service as a chief financial officer of a public company, his experience as a director of a public company, and his knowledge of our industry.

**Defendant Palihapitiya**

- 13 -

40.     Defendant Palihapitiya served as SCH's CEO and as the Chairman of the Board from October 2019 until the Merger in January 2021. Since the Merger, Defendant Palihapitiya has served as a senior advisor to Clover's management. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Palihapitiya beneficially owned 20,500,000 shares of the Company's Class A stock held by SCH Sponsor III LLC ("SCH Sponsor") by virtue of his shared voting and investment control over SCH Sponsor with Defendant Osborne, and 10,000,000 shares of the Company's Class A stock held by CHACHACHA SPAC C LLC ("ChaChaCha") by virtue of his voting and investment control over ChaChaCha. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Palihapitiya owned over $488.6 million worth of Clover stock.

41.     The Company's Schedule 14A filed on Form DEFM14A with the SEC on December 14, 2020 (the "2020 Proxy Statement") stated the following about Defendant Palihapitiya:

> Mr. Chamath Palihapitiya has been SCH's Chief Executive Officer and the Chairman of SCH's board of directors since October 2019. Mr. Palihapitiya served as the Chief Executive Officer and the Chairman of the Board of Directors of IPOA from May 2017 until the consummation of its business combination with Virgin Galactic in October 2019, and continues to serve as the Chairman of the Board of Directors of Virgin Galactic. Mr. Palihapitiya also served as a director of Slack Technologies Inc. from April 2014 until October 2019. Prior to founding Social Capital in 2011, Mr. Palihapitiya served as Vice President of User Growth at Facebook, and is recognized as having been a major force in its launch and growth. Mr. Palihapitiya was responsible for overseeing Monetization Products and Facebook Platform, both of which were key factors driving the increase in Facebook's user base to more than 750 million individuals worldwide. Prior to working for Facebook, Mr. Palihapitiya was a principal at the Mayfield Fund, one of the United States' oldest venture firms, before which he headed the instant messaging division at AOL. Mr. Palihapitiya graduated from the University of Waterloo, Canada with a degree in electrical engineering.

**Defendant Trieu**

42.     Defendant Trieu served as SCH's CFO from January 2020 until the Merger in January 2021.

43.     The Company's registration statement, filed with the SEC on October 20, 2020 on Form S-4, as amended (the "Registration Statement") stated the following about Defendant Trieu:

> Mr. Steven Trieu has been the Chief Financial Officer of SCH since January 2020. Mr. Trieu is a Partner and the Chief Financial Officer of Social Capital, an affiliate of the Company's sponsor, since October 2017 and is responsible for overseeing the operations of Social Capital's family of funds, management company and related entities. Mr. Trieu served as the Chief Financial Officer of IPOA from March 2019 until the consummation of its business combination with Virgin Galactic in October 2019. Prior to joining Social Capital, Mr. Trieu was VP of Finance at Quora, Inc. from October 2011 to June 2016, where he was responsible for its day-to-day finance and legal operations. Prior to that, Mr. Trieu was Director, Finance and Business Operations at Facebook, Inc. from August 2007 to October 2011. Mr. Trieu led the formation of its initial business operations and sales finance teams. Mr. Trieu also previously held a similar role at Yahoo!, Inc., supporting its local markets and commerce divisions. Before that, Mr. Trieu spent time on Wall Street both as an investment banking and alternative investments associate. Mr. Trieu graduated from the University of Massachusetts, Amherst with a degree in finance and economics.

**Defendant Osborne**

44.     Defendant Osborne served as SCH's President from January 2020 and as a director of the Company from October 2019 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Osborne beneficially owned 20,500,000 shares of the Company's Class A stock held by SCH Sponsor by virtue of his shared voting and investment control over SCH Sponsor with Defendant Palihapitiya, and 5,000,000 shares of the Company's Class A stock held by Hedosophia Public Investments Limited ("Hedosophia") by virtue of his voting and investment control over Hedosophia. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Osborne owned over $408.5 million worth of Clover stock.

- 15 -

45.     The Registration Statement stated the following about Defendant Osborne:

Mr. Ian Osborne has been a director of SCH since October 2019 and the President since January 2020. Mr. Osborne is the Co-founder and Chief Executive Officer of Hedosophia, an investment firm, which has invested in leading Internet and technology companies since 2012. Mr. Osborne served as a director of IPOA from May 2017 until the consummation of its business combination with Virgin Galactic in October 2019. Mr. Osborne has advised leading Internet and technology companies, their founders and CEOs, since 2009. Mr. Osborne is also the indirect controlling shareholder and a director of Connaught, a financial advisory firm. From 2010 to 2012, Mr. Osborne was a Partner and Managing Director at DST Global, a family of funds investing in Internet companies, which was established in 2009 and which has notable successes including Alibaba, Airbnb, Facebook, Spotify and Twitter. Mr. Osborne was educated at St Paul's School, King's College London, and the London School of Economics.

**Defendant Reses**

46.     Defendant Reses served as a director of SCH from April 2020 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Reses beneficially owned 300,000 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Reses owned over $4.8 million worth of Clover stock.

47.     The Registration Statement stated the following about Defendant Reses:

Ms. Reses has been a director of SCH since April 2020. Ms. Reses served as a director of IPOA from September 2017 until the consummation of its business combination with Virgin Galactic in October 2019. Ms. Reses has served as Square Capital Lead since October 2015, and continues to serve as Square Capital Lead, and previously served as People Lead of Square, Inc. from February 2016 to July 2018. From September 2012 to October 2015, Ms. Reses, served as Chief Development Officer of Yahoo! Inc. In this role, she focused on leading partnerships, acquisitions and investments, significant corporate tax transactions, as well as human resources. Prior to joining Yahoo, Ms. Reses led the U.S. media group as a Partner at Apax Partners Worldwide LLP, a global private equity firm, which she joined in 2001. Ms. Reses previously served on the board of directors of Alibaba Group Holding Limited and is currently on the board of National Public Radio and the Economic Advisory Council of the Federal Reserve Bank of San

- 16 -

Francisco. Ms. Reses holds a BS in Economics with honors from the Wharton School of the University of Pennsylvania.

**Defendant Ryans**

48.    Defendant Ryans served as a director of SCH from 2020 until the Merger in January 2021. He also served as the Chair of the Company's Audit Committee from 2020 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Ryans beneficially owned 100,000 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Ryans owned over $1.6 million worth of Clover stock.

49.    The Registration Statement stated the following about Defendant Ryans:

Dr. Ryans served as a director and the chairman of the audit committee of IPOA from September 2017 until the consummation of its business combination with Virgin Galactic in October 2019, and continues to serve as a member of Virgin Galactic's board of directors. Dr. Ryans is a professor of accounting at London Business School since 2016 and teaches financial accounting at the graduate and post-graduate levels and directs an executive education program on mergers and acquisitions. His current research focuses on topics in mergers and acquisitions, firm disclosure and government oversight of financial reporting. From 2012 until 2016, Dr. Ryans was a graduate student instructor at the University of California Berkeley. From 2003 to 2011, Dr. Ryans oversaw investments and business development at Chelsea Rhone LLC and its affiliate HealthCap RRG, a mutual insurance company. From 1999 until 2001, Dr. Ryans was a consultant with Deloitte & Touche. Dr. Ryans is a CFA charterholder and holds a Ph.D. in business administration from the University of California Berkeley, an MBA from the University of Michigan and a BASc in electrical engineering from the University of Waterloo.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.    By reason of their positions as officers, directors and/or fiduciaries of Clover and because of their ability to control the business and corporate affairs of Clover, the Individual Defendants owed Clover and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Clover

- 17 -

in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Clover and its shareholders so as to benefit all shareholders equally.

51.     Each director and officer of the Company owes to Clover and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Clover, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the officers and directors of Clover were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Clover, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company

- 18 -

has been ratified by the remaining Individual Defendants who collectively comprised Clover's Board at all relevant times.

55.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE and then the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

56.     To discharge their duties, the officers and directors of Clover were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Clover were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, the United States, and pursuant to Clover's own internal guidelines, including its Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- 19 -

(c)     remain informed as to how Clover conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Clover and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Clover's operations would comply with all laws and Clover's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

- 20 -

(i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

57.     Each of the Individual Defendants further owed to Clover and the shareholders the duty of loyalty requiring that each favor Clover's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Clover and were at all times acting within the course and scope of such agency.

59.     Because of their advisory, executive, managerial, and directorial positions with Clover, each of the Individual Defendants had access to adverse, non-public information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Clover.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

- 21 -

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act, and the aiding and abetting thereof; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

63. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Clover was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Clover, and was at all times acting within the course and scope of such agency.

**CLOVER'S CODE OF CONDUCT**

- 22 -

66.     The Code of Conduct provides that the Company has "adopted this Code to set expectations and provide guidance applicable to all members ('directors') of the Company's Board of Directors (the 'Board') and officers, employees, independent contractors and consultants of the Company (all such persons for purposes of this Code, 'employees')" and that "[a]ll employees are responsible for reading and understanding this Code, and using it as a guide to the performance of their responsibilities for the Company."

67.     The Code of Conduct further states that the Company "expects all of its directors, executive officers, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of commitment to this Code among its employees and foster a culture of fairness, honesty and accountability within the Company." Additionally, the Code of Conduct states that the Company "expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf."

68.     The Code of Conduct states that the Company is "committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations."

69.     The Code of Conduct provides, in the section titled, "Legal Compliance," that:

> All directors and employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. In addition, each employee is expected to comply with all other Company policies and procedures that may apply to employees, many of which supplement this Code by providing more detailed guidance. It is essential that all employees know and understand the legal and regulatory requirements and other standards that apply to the Company's business and to their specific area of responsibility. To ask questions about whether or how any law applies to Company conduct, employees should contact the legal department.

- 23 -

\* \* \*

Directors and employees are expected to comply with all applicable laws wherever they travel on Company business, including laws prohibiting bribery, corruption or the conduct of business with specified individuals, companies or countries.

70. The Code of Conduct provides, in the section titled, "Competition and Fair Dealing," in relevant part, that:

> The Company strives to compete vigorously and to gain advantages over its competitors through superior business performance, not through unethical or illegal business practices. No employee may through improper means acquire proprietary information from others, possess trade secret information or induce disclosure of confidential information from past or present employees of other companies. If an employee becomes aware of the improper acquisition of this type of information, the employee should report it immediately.

> Employees are expected to deal fairly and honestly with anyone with whom they have contact in the course of performing their duties to the Company and not engage in unfair business practices. Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on typical commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors. Employees involved in sales have a special responsibility to abide by all Company policies regarding selling activities, including Company policies relevant to revenue recognition. Further, no employee may take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

71. The Code of Conduct provides, in the section titled, "Gifts and Entertainment," in relevant part, that:

> Business gifts and entertainment are meant to create goodwill and sound working relationships and not to gain improper advantage with customers or facilitate approvals from government officials. All employees must be careful to avoid even the appearance of impropriety in giving or receiving gifts and entertainment. In general, an employee cannot offer, provide or accept any gifts or entertainment in connection with an employee's service to the Company except in a manner consistent with customary business practices, such as customary and reasonable meals and entertainment. Gifts and entertainment must not be excessive in value,

- 24 -

in cash, susceptible of being construed as a bribe or kickback, or in violation of any laws. This principle applies to the Company's transactions everywhere in the world, even if it conflicts with local custom. Under some statutes, such as the U.S. Foreign Corrupt Practices Act, giving anything of value to a government official to obtain or retain business or favorable treatment is a criminal act subject to prosecution and conviction. For additional information, please see the Company's Anti-Corruption Policy. Additionally, employees should not accept gifts or entertainment that may reasonably be deemed to affect their judgment or actions in the performance of their duties.

72.     The Code of Conduct provides, in the section titled, "Conflicts of Interest," in

relevant part, that:

In order to make good decisions for the Company, directors and employees need to be aware of []their own biases and make sure they counter them. Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict.

A "conflict of interest" occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole. Sometimes conflicts of interest arise when an employee takes some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company.

73.     In a section titled, "Financial Integrity; Public Reporting," the Code of Conduct

states the following:

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly

- 25 -

reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

- no entry be made in the Company's books and records that is intentionally false or misleading;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

- employees comply with the Company's system of internal controls and be held accountable for their entries;

- any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- 26 -

● no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

● all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

● no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

● act honestly, ethically, and with integrity;

● comply with this Code;

● endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

● raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

● act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

● comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction or

- 27 -

development that the employee believes may require disclosure, the employee should report the matter immediately.

74. The Code of Conduct provides, in the section titled, "Conduct of Senior Financial Employees," in relevant part, that:

The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. As such, the Board requires that the Chief Executive Officer and senior personnel in the Company's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Director of Actuary and Vice President of Finance and any other persons performing similar functions ("Senior Financial Employees"):

● Act with honesty and integrity and use due care and diligence in performing their responsibilities to the Company.

● avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company, and disclose promptly to the Audit Committee and the Corporate Compliance Officer, any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict. Without limiting the foregoing, and for the sake of avoiding an implication of impropriety, Senior Financial Employees shall not:

o accept any material gift or other gratuitous benefit from a business partner, supplier or vendor of products or services, including professional services, to the Company (this prohibition is not intended to preclude ordinary course entertainment or similar social events);

o except with the approval of the disinterested members of the Board, directly invest in any privately-held company that is a business partner, supplier or vendor of the Company where the Senior Financial Employee, either directly or through people in such Senior Financial Employee's chain of command, has responsibility or ability to affect or implement the Company's relationship with the other company; or

- 28 -

      o      maintain more than a passive investment of greater that 1% of the outstanding shares of a public company that is a business partner, supplier or vendor of the Company.

●      Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

●      Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

●      Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

75.      The Code of Conduct provides, in the section titled, "Protection and Proper Use of Company Assets," in relevant part, that: "[a]ll employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes."

76.      The Code of Conduct provides, in the section titled, "Compliance Standards and Procedures," in relevant part, that: "[i]f an employee is aware of a suspected or actual violation of this Code by him/herself or others, it is the employee's responsibility to report it."

It is Corporation policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Corporation. As a Senior Officer, you are required to promote compliance with this policy by all employees and to abide by Corporation standards, policies and procedures designed to promote compliance with this policy.

77.      The Individual Defendants violated the Code of Conduct by engaging in or permitting the Deceptive Sales Misconduct and the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of

- 29 -

control, gross mismanagement, and violations of the Exchange Act, aiding and abetting thereof, and failing to report the same.

**INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Background**

78.     Based in Franklin, Tennessee, Clover touts itself as a next-generation Medicare Advantage insurer that leverages its software platform, the Clover Assistant, to provide America's seniors with highly affordable PPO and HMO health insurance plans that have wide network access with equal cost-sharing for in- and out-of-network providers. The Company's purported mission is to improve clinical decision-making and building a technology-centric ecosystem. Mainly, Clover sells Medicare insurance plans to seniors and provides physicians with software that is supposed to help aggregate data on patients who are a part of the Clover network. The Company claims to have the highest membership growth rate among Medicare Advantage plans in the United States with more than 50,000 members. Since inception of Clover's business, i.e., the business that Clover Health previously operated, in 2012, the Company has incurred significant net losses on an annual basis and has accumulated a deficit of approximately $901.6 million as of September 30, 2020.

79.     SCH was initially incorporated in the Cayman Islands in October 2019 as a special purpose acquisition company. SCH was a "blank check" company that formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with other businesses. On April 24, 2020, SCH went public after completing its initial public offering ("IPO"). In the IPO, SCH raised $720 million after pricing 72 million units at $10 each. Each unit consisted of one share of Class A common stock and one-third of one

- 30 -

redeemable warrant, the holder of which is entitled to purchase one share of Class A common stock at an exercise price of $11.50 per share. The units sold in the IPO were listed on the NYSE under the ticker symbol IPOC.U. The Class A shares and warrants were listed on the NYSE under the ticker symbols IPOC and IPOC WS, respectively. After increasing the size of the IPO, SCH had issued 82.8 million shares of its Class A common stock.

80. Prior to the Merger, Clover Health was a San Francisco-based company that was co-founded in 2012 by Defendant Garipalli. Previously, Defendant Garipalli also founded CarePoint Health System ("CarePoint"), a for-profit, privately held, healthcare system that operated at least three hospitals in New Jersey.

81. According to the Hindenburg Report, under Defendant Garipalli's leadership, CarePoint had a reputation for charging excessive rates as one of its hospitals had the highest billing rates in the country. Indeed, CarePoint eventually settled a probe by the New Jersey Medicaid Fraud Division for $1 million following an investigation into billing claims that lacked adequate documentation that led to Medicaid's overpaying the company. Moreover, according to a report released by the New Jersey Commission of Investigations in March 2019, Defendant Garipalli, among others, managed to syphon more than $157 million from CarePoint through a series of management fees and allocations paid by CarePoint hospitals to related parties.

***Clover's Merger and Secondary Public Offering***

82. In May 2020, SCH's management team began holding weekly meetings regarding SCH's initial business combination. In June 2020, SCH entered into discussions with Clover Health relating to a proposed business combination and began its extensive due diligence process shortly thereafter before issuing a joint press release announcing that they had entered into the

- 31 -

merger agreement in October 2020. Upon the Merger's closing, SCH reincorporated as a Delaware company and renamed itself Clover.

83.     Specifically, on October 6, 2020, the Company filed a current report on Form 8-K announcing that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"). On October 20, 2020, the Company filed the Registration Statement. On November 20, 2020, December 9, 2020, and December 10, 2020, the Company filed amendments to the Registration Statement on Form S-4/A with the SEC. The Registration Statement was declared effective on December 11, 2020.

84.     Subsequently, on December 14, 2020, the Company filed with the SEC a prospectus/proxy statement on both Form 424B3 (the "Prospectus" and, together with the 2020 Proxy Statement, Registration Statement, and the Prospectus, the "Merger Filings") and Form DEFM14A. The Company's stock began trading publicly on the NASDAQ under its new ticker symbol, "CLOV" on January 8, 2021.

85.     On January 13, 2021, the Company filed a registration statement on Form S-1 with the SEC (the "SPO Registration Statement"). The SPO Registration Statement was declared effective on January 27, 2021. Subsequently, on January 29, 2021, the Company filed the SPO Prospectus (together with the SPO Registration Statement, the "SPO Offering Documents").

**The Deceptive Sales Misconduct**

86.     Prior to and during the Relevant Period, the Clover Health Defendants allowed multiple violations of Clover's corporate governance policies and applicable laws to occur that have injured the Company. These violations included, but were not limited to, engaging in or allowing the Deceptive Sales Misconduct and widespread violations of the Company's Code of

- 32 -

Conduct. As a result, the Clover Health Defendants caused the Company and enabled the SCH Defendants to engage in the Deceptive Sales Misconduct by failing and allowing the Company to fail to take meaningful action in response to the aforementioned violations and to take wrongful action in response. The Deceptive Sales Misconduct resulted in, among other things, adverse news reports, including the Hindenburg Report, costly litigation, including the Securities Class Actions, costly investigations commenced by the DOJ and SEC, and consequently, a decline in the value of the Company.

### Hidden Payments to Healthcare Providers

87.    According to the Hindenburg Report, Clover and Clover Health paid healthcare providers $200 per visit to use the Clover Assistant platform so that the Company and Clover Health could upcode or increase diagnosis codes (portraying the patient as sicker than they really are) to maximize reimbursement payments from the government.

88.    Former employees of Clover and Clover Health referenced in the Hindenburg Report came forward to reveal that the Company and Clover Health were making these and other illegal payments to healthcare providers to generate patient leads. Specifically, the Company and Clover Health would distribute untraceable gift cards to healthcare providers to induce them to direct their patients toward Clover and Clover Health healthcare plans. Clover's and Clover Health's gift card payments were in direct violation of Medicare Communications and Marketing's Guidelines, which explicitly prohibits a provider from "urg[ing]" or "attempt[ing] to persuade" their patients to enroll in a specific Medicare Advantage plans based on "financial" or "any other interests" of the provider.

- 33 -

89.     Moreover, according to the Hindenburg Report, Clover and Clover Health also made under the table payments to healthcare provider staff, i.e., front-desk employees, in exchange for referrals to patients to promote the Company's and Clover Health's healthcare plans to senior citizens.

***Illegal Overbilling Fraud***

90.     According to the Hindenburg Report, the Company and Clover Health also took advantage of the Medicare Advantage payment model to illegally engage in overbilling practices. Specifically, Clover's and Clover Health's software was designed so that it could upcode, i.e., recognize patients to seem as sick as possible in order to earn a higher payment rate in accordance with the Centers for Medicare & Medicaid Services' ("CMS") practice of increasing payments for patients with a higher "risk assessment" score.

91.     In fact, according to the Hindenburg Report, a former employee stated that the "core feature" of the Clover Assistant platform was to "increase revenue by identifying chronic conditions that people have and CMS will pay…"

92.     The Hindenburg Report notes that the Clover Assistant platform often "recaptures" old and irrelevant diagnoses and then makes it "difficult" for doctors to remove them. According to the Hindenburg Report, multiple doctors found that the diagnoses in Clover's and Clover Health's system were often inaccurate since the software "limits their ability to remove an inapplicable diagnoses." In fact, one doctor that *Hindenburg Research* interviewed noted "[y]our patients don't necessarily fit into one of their boxes, but you have to click a box to get to the next screen."

***Deceptive Marketing Practices***

- 34 -

93.     During the Relevant Period, Clover's wholly owned subsidiary, Seek Insurance misleadingly advertised itself to unwitting consumers, while failing to disclose its connection to Clover. This practice continues today. Specifically, Seek Insurance's website holds itself out as an "independent" and "unbiased" source of information concerning the selection of Medicare plans. In fact, the website specifically states that it is "privately owned and operated" and makes no mention of the fact that it is really owned by Clover. Instead, Seek Insurance deceptively markets to seniors that it is "ready to help you compare your options and find the best Medicare plan – no matter which insurance company offers it." Notably, despite Clover's ownership of it, Seek Insurance's website explicitly states "[w]e don't work for insurance companies. We work for you."

94.     Astonishingly, Seek Insurance's website even has a blog post criticizing other insurance brokers as "incentivized to steer clients towards a plan that is tied to their own financial interest" while characterizing itself as remaining "neutral" and its approach as "impartial" before it implores consumers to "trust" them to be "objective[.]"

### *Undisclosed Related Party Transactions*

95.     A significant amount of the Company's and its predecessor's sales was and remains attributable to an undisclosed relationship the Company has with an outside insurance brokerage firm, B & H Assurance, LLC ("B&H"), controlled by the Company's Head of Sales, Hiram Bermudez ("Bermudez"). Although Bermudez supposedly left his position as VP of Sales Operations with B&H in September 2012, Bermudez is still listed as B&H's sole agent according to the most recent New Jersey corporate records.

96.     One former employee that *Hindenburg Research* interviewed explained that Bermudez never left B&H, but rather, Clover Health brought him on to use his field marketing

- 35 -

organization, which is designed to negotiate sales deals with insurers that a network of brokers can then offer and sell to customers, to grow its sales. According to another former employee that *Hindenburg Research* interviewed, Bermudez took steps to actively conceal the relationship by "hand[ing] his business over to a partner," i.e., his wife.

97.     Although B&H lists Clover as a partner on its website, it does not list Clover under its formal relationship disclosures with the National Association of Insurance Commissioners ("NAIC"). Notably, NAIC records indicate that the only business entity affiliation listed for B&H is with Yesenia Rivera, who is Bermudez's wife.

### *Investigations*

98.     According to the Hindenburg Report, and as the Company later admitted in an article published on *Medium* on February 5, 2021, Clover is the subject of an DOJ inquiry resulting from the Deceptive Sales Misconduct discussed above. The Hindenburg Report further detailed that the DOJ had issued a Civil Investigative Demand to Clover.

99.     On February 5, 2021, the Company filed a current report on Form 8-K with the SEC disclosing that Clover had received a letter from the SEC indicating that it commenced an investigation into the Deceptive Sales Misconduct, as detailed herein and in the Hindenburg Report, and requested that the Company preserve documents and data for the period from January 1, 2020 to the present.

### **The Individual Defendants' Duty to Disclose**

100.     SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Clover's, with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that registration statements filed either on S-1 or S-4 filed with the SEC

- 36 -

include a "Management's discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3)(ii) provides that the MD&A section must:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

101.    Additionally, Item 503 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Merger Filings "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

102.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the Deceptive Sales Misconduct and the DOJ investigation, as these facts constituted: (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Clover speculative or risky.

**False and Misleading Statements**

***October 6, 2020 Press Release, CNBC Interview, and Form 425 Prospectus***

103.    On October 6, 2020, Clover Health issued a joint press release which announced its plans for going public by way of reverse merger with SCH at a $3.7 billion valuation. The press release characterized Clover as "a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses" with a "unique model in health insurance," that "partners with

- 37 -

primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care."

104.    Regarding, among other things, the Merger, Clover Health's business, and the Clover Assistant, the press release highlighted the following:

• Clover is a next-generation Medicare Advantage insurance company offering ***best-in-class plans*** that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses

• A unique model in health insurance, Clover partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care

• The transaction is expected to fuel Clover's trajectory as one of the nation's fastest growing Medicare Advantage plans

• Transaction values Clover at an enterprise value of $3.7 billion and is expected to provide up to $1.2 billion in cash proceeds, including a fully committed PIPE of $400 million and up to $828 million of cash held in the trust account of Social Capital Hedosophia Holdings Corp. III ("SCH")

• PIPE led by $100 million from Chamath Palihapitiya, Founder and CEO of SCH, and $50 million from Hedosophia, as well as commitments from Fidelity Management & Research Company, LLC., and funds affiliated with Jennison, Senator Investment Group LP, Casdin and Perceptive Advisors

• Clover is expected to receive up to $728 million of transaction proceeds, and up to $500 million of cash proceeds is expected to be allocated to existing Clover shareholders

. . . Clover Health Investments, Corp. ("Clover" or "the Company"), which operates next-generation Medicare Advantage plans, has entered into a definitive agreement to become publicly traded via a merger with Social Capital Hedosophia Holdings Corp. III ("SCH")(NYSE: IPOC), a special purpose acquisition company. Upon closing, the transaction will support Clover's ***mission to improve every life***, providing significant capital for the Company to scale and improve health outcomes for seniors across the United States.

(Emphasis added.)

- 38 -

105.     The press release continued to tout Clover Health's focus on "affordability" and

its achievement of the "best possible health outcomes," stating:

**Company Overview**

Founded in 2013, Clover has pioneered a fundamentally different approach to Medicare Advantage *that focuses on driving affordability* and partnering closely with physicians to deliver the *best possible health outcomes* for members. The Company offers affordable Medicare Advantage plans to eligible individuals, giving consumers access to broad and open healthcare networks, rich supplemental benefits and low out-of-pocket expenses.

(Emphasis added.)

106.     The press release also continued to flaunt the Clover Assistant and the benefits

Clover Health's technological approach provides, stating:

*Technology is at the core of Clover's business – the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software to assist physicians with clinical decision-making at the point of care.*

Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes.

The Clover Assistant enables a *virtuous growth cycle*, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. In turn, the Company believes its *best-in-class* plans will continue to deliver market-leading growth, allowing the Clover Assistant to capture and synthesize more data and *ultimately drive better care*.

Medicare Advantage is one of the largest and fastest growing markets in the U.S. healthcare system – but it is one that has seen little innovation and remains ripe for disruption. Worth $270 billion today and with an estimated value of $590 billion by 2025, the Medicare Advantage market provides a tremendous opportunity for growth.

Today, Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than

- 39 -

57,000 members in 34 counties across 7 states. ***Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach***, Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables ***efficient expansion into new markets***, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare-eligibles in eight Georgia counties.

Clover's management team, led by CEO and Co-Founder Vivek Garipalli and President and Co-Founder Andrew Toy, will continue to lead Clover following the transaction. Chamath Palihapitiya, Founder and CEO of SCH, will act as a senior advisor to the Company's management.

(Emphasis added.)

107. Also in the press release, Defendants Garipalli, Toy, and Palihapitiya provided reaction to the news and took the opportunity to relentlessly tout Clover Health's many purported virtues. The press release stated the following, in relevant part:

**Management Comments**
"I launched Clover eight years ago ***to fix fundamental flaws in our healthcare system***, including unequal access, abysmal customer service and wasteful spending. Chamath and the SCH team are fervent believers and true champions of Clover's ***mission to improve every life***," said Garipalli. "***Our philosophy is that everyone should be able to afford great healthcare***. The Clover team empowers physicians to deliver the ***best possible outcomes*** for our members, and ***the Clover Assistant does just that*** by delivering vital clinical insights to physicians at the point of care."

"***We have made it our business to make healthcare affordable***. Our technology helps doctors, ***leading to better outcomes*** and lower out-of-pocket expenses for members," said Toy. "***I believe that more and more doctors are embracing the Clover Assistant because it allows them to focus on what they want to do, which is to look after patients***. Importantly, the platform is powered by a closed feedback loop, linking clinical data and physician action, which improves continuously as membership grows, allowing us to constantly evolve new ways of helping physicians and their patients."

Palihapitiya said, "***We need companies like Clover to help fix our broken healthcare system. The Company's rapid growth is a testament to the effectiveness of its tech-enabled approach***, which resonates powerfully with

- 40 -

consumers and physicians alike. I believe Clover is uniquely positioned to disrupt the entire Medicare Advantage market as well as expand into new and exciting opportunities in Original Medicare. I am proud to partner with Vivek, Andrew and the entire Clover team on the next phase of their mission to improve lives across the country."

(Emphasis added.)

108.    During an interview on *CNBC*'s "Squawk Box" later that same day, October 6, 2020, Defendant Palihapitiya touted Clover Health's "transparency," stating, in relevant part, that the Company "create[s] transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid."

109.    The same day, Clover Health, together with SCH, also filed a prospectus on Form 425 with the SEC that attached the Merger Agreement as an exhibit. The Merger Agreement was signed by Defendants Garipalli and Palihapitiya and stated the following with regard to "Healthcare Compliance": "[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program [.]" Notably, "Health Care Laws," is defined within the Merger Agreement to include, Federal False Claims Act, the Federal Anti-Kickback Law, and many other related laws.

110.    Additionally, the Merger Agreement stated, "[s]ince January 1, 2018 … (iii) each of [Clover] and its Subsidiaries has implemented and maintained a compliance program, including policies, procedures and training, intended to ensure compliance with all applicable Health Care Laws…"

***October 20, 2020 Registration Statement***

- 41 -

111.     On October 20, 2020, Clover filed the Registration Statement with the SEC in connection to the Merger. Defendants Palihapitiya, Trieu, Osborne, Reses, Ryans signed or authorized the signing of the Registration Statement. In relation to the Merger, the Registration Statement asserted that Clover Health had discussions with SCH regarding "typical due diligence" and that between August 25th and 28th of 2020, the two companies, together with legal counsel, "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business." Moreover, the Registration Statement provided that on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover" and that several other discussions regarding, among other things, due diligence in connection to the Merger took place.

112.     The Registration Statement provided the following concerning the results of SCH's due diligence, stating:

> The SCH board of directors considered the scope of the due diligence conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to Clover, including: (a) extensive virtual meetings and calls with Clover's management team regarding its operations, projections and the proposed transaction; and (b) review of materials related to Clover and its business, made available by Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

113.     Pertaining to Clover Health's business model, the Registration Statement highlighted the following:

> At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and

- 42 -

deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next-generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable – offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets – and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

\* \* \*

We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

\* \* \*

As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans. We strive to continuously lower our members' out-of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits. . . .

- 43 -

114.    Regarding Clover Health's growth, the Registration Statement also stated the following, in relevant part:

> We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

* * *

> As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase. During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19.

* * *

- 44 -

We've already seen a glimpse of what's possible. Clover currently offers Medicare Advantage plans in 7 states and 34 markets. Our "obvious" plans are among the most affordable in their markets. They generally offer the widest physician networks. As a result, they benefit from industry-leading organic growth, with a 38% annual growth rate compared to an 8% industry average.

115. Regarding doctor usage of the "Clover Assistant," the Registration Statement

stated, in pertinent part, that:

The Clover Assistant delights and engages physicians. We are focused on empowering and delighting physicians that use our platform. Physicians are highly satisfied with the Clover Assistant platform, as evidenced by our platform's positive NPS of 64 for the three months ended June 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic and NextGen. Onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

116. The Registration Statement also pushed Clover Health's purported "best-in-class"

healthcare plans, stating:

The SCH board of directors believes that Clover provides a fundamentally different approach to insurance, offering highly affordable, best-in-class plans that combine wide access to healthcare and supplemental benefits with low outof-pocket expenses. Clover designs its plans to provide the access of a PPO at lower than HMO costs. Most of its members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with wide network access and with the same in-and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long-term care services in 2016. The SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care.

- 45 -

117.     In a section titled, "Government Regulation," the Registration Statement stated that "[w]e work diligently to ensure compliance with all applicable laws and regulations." The Registration Statement further stated:

> Our operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.

118.     Regarding "Legal Proceedings," the Registration Statement stated, in relevant part, that at that time the Company was "not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

119.     Concerning "Litigation and Proceedings," the Merger Agreement, which was attached to the Registration Statement, stated the following:

> Section 4.10. <u>Litigation and Proceedings</u>. Except as set forth on Section 4.10 of the Company Disclosure Letter, as of the date hereof, (a) there are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions (including any investigations or inquiries initiated, pending or threatened) by any Governmental Authority, or other proceedings at law or in equity (collectively, "Legal Proceedings"), against the Company or any of the Company's Subsidiaries or their respective properties or assets; and (b) there is no outstanding Governmental Order imposed upon the Company or any of the Company's Subsidiaries; nor are any properties or assets of the Company or any of the Company's Subsidiaries' respective businesses bound or subject to any Governmental Order, except in the case of each of clauses (a) and (b), as would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole.

120.     The Merger Agreement, which was made a part of and attached to the Registration Statement as Annex A, also stated, in relevant part, that the disclosure letters referenced in Section

- 46 -

4.10 above "are not publicly filed," and that the Company "did not believe that the disclosure letters contain information that is material to an investment decision."

121.    Concerning "Legal Compliance" in connection to Clover Health (referred to therein as "the Company," the Merger Agreement stated the following:

Section 4.11. <u>Legal Compliance</u>.

(a) Each of the Company and its Subsidiaries is, and for the prior five (5) years has been, in compliance in all material respects with applicable Law.

(b) The Company and its Subsidiaries maintain a program of policies, procedures, and internal controls reasonably designed and implemented to (i) prevent the use of the products and services of the Company and its Subsidiaries in a manner that violates applicable Law (including money laundering or fraud), and (ii) otherwise provide reasonable assurance that violations of applicable Law by any of the Company's or its Subsidiaries' directors, officers, employees or its or their respective agents, representatives or other Persons, acting on behalf of the Company or any of the Company's Subsidiaries, will be prevented, detected and deterred.

(c) Neither the Company nor any of its Subsidiaries or any of the officers, directors or employees thereof acting in such capacity has received any written notice of, or been charged with, the violation of any Laws, except where such violation has not been, individually or in the aggregate, material to the Company and its Subsidiaries.

122.    Under "Risk Factors," the Registration Statement stated the following as to Clover's risk of litigation:

From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range

- 47 -

of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

123. The "Risk Factors" section of the Registration Statement stated the following, in relevant part, in regards to the threat of government scrutiny and litigation, particularly regarding anti-kickbacks, to the Company:

> There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "Risk factors—Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

* * *

- 48 -

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

124.    The "Risk Factors" section of the Registration Statement also stated the following,

in relevant part, regarding the threat of government scrutiny and litigation related to the submission

of false claims to the federal government:

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly

- 49 -

presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

125. Regarding "Sales and Marketing," the Registration Statement stated the following:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

126. Regarding the "risk adjustment model," the Registration Statement stated:

When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays

- 50 -

for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer-oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

### November 19, 2020 Presentation

127. On November 19, 2020, the Company filed a current report on Form 8-K which contained an analyst presentation titled, "Clover Health A Deeper Dive," as an exhibit. The presentation touted Clover Health's "Virtuous Growth Cycle" and proclaimed that "Physicians value the Clover Assistant." The presentation stated, "[i]n ~2 years since product launch, we've built a broad base of engaged physicians. Given our software-driven approach, we believe we can scale these results rapidly within existing and new markets." The presentation further stated that physicians were "[i]ncentivized to use [Clover's] highly delightful tech platform . . . that suggests personalized care recommendations at the point of care" and that the Clover Assistant was "[d]esigned to work with any PCP and remove financial concerns from clinical decision-making."

### December 14, 2020 Proxy Statement

128. On December 14, 2020, the Company filed the 2020 Proxy Statement for the purposes of soliciting shareholder approval of the Merger. Defendants Palihapitiya, Osborne, Reses, and Ryans solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to

- 51 -

129.     The 2020 Proxy Statement called for shareholder approval of, among other things:
(1) the Merger; (2) the election of five directors, including Defendants Garipalli, Toy, Turner, and
Shapiro, and non-party Chelsea Clinton ("Clinton"); and (3) the issuance of shares of Clover Class
A or Class B common stock pursuant to the Merger agreement; (4) the 2020 Equity Incentive Plan,
which provided that Class A common stock shares of up to 5.5% of the total outstanding capital
stock of the Company could be issued, increasing each fiscal year beginning with 2022, so that the
Company may attract and retain the best available personnel and incentivize employees, directors,
and contractors with long-term equity-based compensation to align their interest with shareholders;
(5) the 2020 Management Incentive Plan, which provided that Class B common stock shares of up
to 6% of the total outstanding common stock of the Company could be issued to award Defendants
Garipalli and Toy with grants of time-based and performance-based restricted stock units to
enhance the Company's ability to incentivize them and promote success of the Company's
business; and (6) the 2020 Employee Stock Purchase Plan, which provided that Class A common
stock shares of up to 0.5% of the total outstanding capital stock of the Company could be issued
to grant a series of purchase rights to eligible employees and service providers to incentivize and
retain both new and old eligible employees and service providers (collectively, the "Proposals").

130.     With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated
that Clover "will have a code of ethics that applies to all of its executive officers, directors and
employees, including its principal executive officer, principal financial officer, principal
accounting officer or controller or persons performing similar functions."

---

any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

131. The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

132. The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's valuation was artificially inflated as a result of false and misleading statements alleged herein.

133. Regarding Clover Health's growth, the 2020 Proxy Statement stated the following, in relevant part:

> We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.
>
> * * *
>
> As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period.
>
> * * *
>
> We've already seen a glimpse of what's possible. Clover currently offers Medicare Advantage plans in 7 states and 34 markets. Our "obvious" plans are among the most affordable in their markets. They generally offer the widest physician networks. As a result, they benefit from industry-leading organic growth, with a 38% annual growth rate compared to an 8% industry average.

- 53 -

134. Regarding doctor usage of the "Clover Assistant" platform, the 2020 Proxy Statement stated, in pertinent part, that:

> [T]he Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

135. The 2020 Proxy Statement also pushed Clover Health's purported "best-in-class" healthcare plans, stating:

> The SCH board of directors believes that Clover provides a fundamentally different approach to insurance, offering highly affordable, best-in-class plans that combine wide access to healthcare and supplemental benefits with low out-of-pocket expenses. Clover designs its plans to provide the access of a PPO at lower than HMO costs. Most of its members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with wide network access and with the same in-and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long-term care services in 2016. The SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care.

136. Under "Risk Factors," the 2020 Proxy Statement stated the following as to Clover's risk of litigation:

> From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from

- 54 -

time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

\* \* \*

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "Risk factors— Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

- 55 -

* * *

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly

- 56 -

avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

137.    Regarding "Sales and Marketing," the 2020 Proxy Statement stated the following:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

138.    In regard to the "risk adjustment model," the 2020 Proxy Statement stated:

When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also

- 57 -

adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer-oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

139.    The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the 2020 Proxy Statement failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) a significant amount of Clover's (and Clover Health's) sales had been driven by a related party transaction that the Company intentionally obscured; (4) Clover's subsidiary, Seek Insurance, kept its relationship with the Company from consumers so that it could misleadingly market to seniors; (5) the Clover Assistant software was rudimentary; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *January 7, 2021 Press Release*

140.    On January 7, 2021, the Company issued a press release announcing the closing of the Merger. In the press release, Defendant Garipalli stated that "[a]s a public company, we will continue to pioneer a fundamentally different approach in the Medicare Advantage and Medicare space – investing in technology and partnering closely with physicians to help them make critical decisions for their patients at the point of care – with an overarching commitment to creating value for all stakeholders."

### *January 13, 2021 SPO Registration Statement*

141.    On January 13, 2021, the Company filed the SPO Registration Statement on Form S-1 with the SEC in connection to the resale of 303,904,202 shares of Class A Clover common stock, 10,933,333 warrants to purchase shares of Class A Clover common stock, and 38,533,271 shares of Class A Clover common stock underlying warrants by "Selling Securityholders," which, among others, included Defendants Garipalli, Palihapitiya, Wagner, Toy, Osborne, Reses, Ryans, and Turner. The SPO Registration Statement stated the following regarding the Company's business strategy and prospects, including Clover's focus on "improv[ing] every life" by way of its technological approach to providing "highly affordable" healthcare plans to seniors at scale:

> At Clover Health, ***we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on*** building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next-generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, ***to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers***. We call our plans "Obvious" because ***we believe they are highly affordable*** – offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets – and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we ***believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale***, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. ***We believe our growth potential in existing and future markets is high***.

(Emphasis added.)

142.    The SPO Registration Statement also touted the Clover Assistant and the advantage that it provides the Company. The SPO Registration Statement stated the following, in relevant part:

- 59 -

*We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding*. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

\* \* \*

*As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans*. We strive to continuously lower our members' out-of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits…

(Emphasis added.)

143.    The SPO Registration Statement advertised Clover's "organic membership growth," and its newly developed "infrastructure" which, together with a decrease in healthcare utilization, yielded "improved results." The SPO Registration Statement stated the following, in pertinent part:

*As a result of our "Obvious" plans, we have achieved significant organic membership growth*. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. *This expansion has largely been driven by our nation-leading established market take rate*, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members

- 60 -

gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase. ***During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members***, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. ***Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19***.

(Emphasis added.)

144.    Pertaining to the Company's business model, the SPO Registration Statement

highlighted the following:

At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next-generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable—offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets—and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare

- 61 -

Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

* * *

We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of - 44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

* * *

As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans. We strive to continuously lower our members' out-of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits. . . .

145.    Regarding Clover's growth, the SPO Registration Statement stated the following,

in relevant part:

We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.

* * *

- 62 -

As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period. Established market take rate is derived from publicly available CMS data and represents the number of members gained by an insurer as a percentage of the total number of incremental MA members added to comparable plans in established markets. This rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase. During 2018 and 2019, we also built the infrastructure to deliver on a more efficient healthcare experience for our members, resulting in net losses of $(201.9) million and $(363.7) million for the years ended December 31, 2018 and 2019. For the years ended December 31, 2018 and 2019, our adjusted EBITDA was $(177.1) million and $(175.5) million, respectively, and our Adjusted EBITDA Margin was (50.1)% and (38.3)%, respectively. For the nine months ended September 30, 2020, our net loss was $(10.0) million, our adjusted EBITDA was $(11.0) million and our Adjusted EBITDA Margin was (2.2)%. Our improved results in the current year were the result of operational execution as well as reduced utilization of healthcare services as a result of COVID-19.

146. Regarding doctor usage of the Company's "Clover Assistant" platform, the SPO

Registration Statement stated, in pertinent part, that:

The Clover Assistant delights and engages physicians. We are focused on empowering and delighting physicians that use our platform. Physicians are highly satisfied with the Clover Assistant platform, as evidenced by our platform's positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic and NextGen. Onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

- 63 -

147. In a section titled, "Government Regulation," the SPO Registration Statement stated that "[w]e work diligently to ensure compliance with all applicable laws and regulations." The SPO Registration Statement further stated:

> [The Company's] operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.

148. Regarding "Legal Proceedings," the SPO Registration Statement stated, in relevant part, that at that time the Company was "not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition."

149. Under "Risk Factors," the SPO Registration Statement stated the following as to Clover's risk of litigation:

> From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims

- 64 -

Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV"), audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

\* \* \*

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

\* \* \*

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject

- 65 -

to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the

- 66 -

FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

150.    Regarding "Sales and Marketing," the SPO Registration Statement stated the following:

> We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

151.    In regard to Clover's "risk adjustment model," the SPO Registration Statement stated:

> When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer-oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

***January 27, 2021 Form 8-K and Conference***

- 67 -

152.     On January 27, 2021, the Company filed a current report with the SEC on Form 8-K. The current report annexed a copy of a presentation titled "Insurance & Retail: Healthcare's Odd Couple," and stated that Clover had "prepared slides for use in connection with its presentation at an industry conference on January 27, 2021." The presentation contained slides that touted the Company's business operations and financial prospects including that "Clover lowers barriers to care" by capping costs of care and utilizing "broad and open networks." Moreover, the presentation's slides also stated that the "Clover Assistant gives providers a holistic view of a patient's health."

153.     The statements and omissions referenced in ¶¶ 103–127 and 140–152 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) a significant amount of Clover's (and Clover Health's) sales had been driven by a related party transaction that the Company intentionally obscured; (4) Clover's subsidiary, Seek Insurance, kept its relationship with the Company from consumers so that it could misleadingly market to seniors; (5) the Clover Assistant software was rudimentary; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

- 68 -

**The Truth Emerges**

154.    On February 4, 2021, *Hindenburg Research* published the Hindenburg Report titled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation." The report indicated that after a four-month long investigation of the Company that included "more than a dozen interviews with former employees, competitors, and industry experts, dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials," *Hindenburg Research* had concluded that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

155.    The Hindenburg Report stated that "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained" and that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor." The Hindenburg Report stated that based on it its research, "the [DOJ] investigation has merit."

156.    According to the partly redacted version of the Civil Investigative Demand issued by the DOJ to Clover, access to which was provided in the Hindenburg Report, the DOJ had commenced a "False Claims Act investigation" generally regarding "whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services

- 69 -

paid for by Federal agencies." According to the Civil Investigative Demand, the DOJ requested information from Clover and Clover Health[4] in connection to, *inter alia*: (i) Clover's and Clover Health's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans; (ii) Clover's and Clover Health's activities intended to encourage providers to refuse to accept patients with non-Clover and non-Clover Health coverage; (iii) the Company's and Clover Health's payments to providers' staff and employees . . . for conveying any information relating to Clover and Clover Health plans to patients in providers' offices; (iv) Clover's and Clover Health's payments related to Clover Assistant; (v) Clover's and Clover Health's patient recruitment efforts; (vi) the Company's and Clover Health's activities relating to matching patients with Medicare Advantage plans; and (vii) the "Seek Medicare" online platform.

157.    The Hindenburg Report further states that:

> Clover claims that its best-in-class technology fuels its sales growth. We found that much of Clover's sales are driven by a major undisclosed related party deal and misleading marketing targeting the elderly. These practices should not come as a surprise, given that in 2016, Clover was fined for misleading marketing practices by the Centers for Medicare & Medicaid Services (CMS). The fine was issued after Clover's repeated failure to amend misleading statements about its plan offerings. A former employee told us the fine was so small it just emboldened Clover to push the envelope further.

158.    The Hindenburg Report also revealed that Seek Insurance, the Company's "thinly-disclosed subsidiary" makes "no mention of its relationship with Clover on its website yet misleadingly advertises to seniors that it offers 'independent' and 'unbiased' advice on selecting Medicare plans." The Hindenburg Report continued that Seek Insurance claims, "'We don't work for insurance companies. We work for you', [sic] despite literally being owned by Clover, an

---

[44]  The Civil Investigative Demand defines "Clover" to mean "Clover Health Investment Corporation, Clover Health LLC, Clover Health Corp., Clover Insurance Company, and Clover health Holdings, Inc., including their affiliates, subsidiaries, predecessors, and successors."

- 70 -

insurance company. The report also noted that Seek Insurance's activities are also "under investigation by the DOJ."

159.    The Hindenburg Report further stated that multiple former Clover Health employees explained that, "much of Clover's sales are (and Clover Health's sales were) fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez." Specifically, one former employee that *Hindenburg Research* interviewed estimated that "Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship." According to the report, another former employee that *Hindenburg Research* had interviewed explained that "Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name 'for compliance purposes'. Insurance filings confirm this. The Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement."

160.    According to the Hindenburg Report, a former Clover Health employee explained that "the DOJ is specifically asking about upcoding, or the practice of overbilling Medicare." In fact, according to the Hindenburg Report, "[m]ultiple former employees explained that Clover's software is primarily a tool to help the company increase coding reimbursement."

161.    Moreover, the Hindenburg Report asserted that "according to doctors and former employees we interviewed, [physicians] use [Clover's software] because Clover pays them extra to use it. Physicians are paid $200 per visit to use the software, twice the normal reimbursement rate for a Medicare visit." Hindenburg Research's investigation also turned up that "[d]octors at key Clover providers described the software as 'embarrassingly rudimentary', 'a waste of my time' and as just another administrative hassle to deal with."

- 71 -

162.     On this news, the Company's share price dropped $1.72 drop, or approximately 12.3%, from its closing price of $13.95 per share on February 3, 2021, to close on February 4, 2021 at $12.23 per share. Additionally, the Company's warrant price closed on February 4, 2021 at $3.39 per warrant, a $0.18 drop, or approximately 5%, from its closing price of $3.57 per warrant on February 3, 2021.

163.     On February 5, 2021, prior to the market's open, Clover filed a current report on Form 8-K with the SEC which disclosed the SEC had commenced an investigation and requested that the Company preserve documents and data for the period from January 1, 2020, to the present, pertaining to certain issues referenced in the Hindenburg Report.

164.     On this news, the Company's share price fell an additional $0.53 per share in intraday trading on February 5, 2021, or approximately 4.3%. Additionally, the Company's warrant price fell an additional $0.28 per warrant in intraday trading on February 5, 2021, or approximately 8.2%.

## DAMAGES TO CLOVER

165.     As a direct and proximate result of the Individual Defendants' conduct, Clover will lose and expend many millions of dollars.

166.     Such expenditures include, but are not limited to costs associated with the costs of legal fees associated with the Securities Class Actions and other lawsuits filed against the Company, its CEO, CFO, President and CTO, SCH's former CEO and Company advisor, SCH's former CFO, SCH's former President, and two former SCH directors and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

- 72 -

167. Such expenditures include, but are not limited to costs associated with the costs of defending lawsuits arising out of and/or investigations of the Deceptive Sales Misconduct, including investigations conducted by the DOJ and SEC, and for fines paid in connection thereto.

168. Such expenditures include, but are not limited to costs arising out of the Deceptive Sales Misconduct, including but not limited to payments made to healthcare providers and related parties.

169. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

170. As a direct and proximate result of the Individual Defendants' conduct, Clover has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

171. Plaintiff brings this action derivatively and for the benefit of Clover to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Clover, waste of corporate assets, unjust enrichment, the Clover Health Defendants' gross mismanagement and abuse of control, the SCH Defendants' violations of the Exchange Act, as well as the Individual Defendants' aiding and abetting thereof, and against Defendants Garipalli, Palihapitiya, Wagner, Trieu, Osborne, Reses, and Ryans for contribution under Section 11(f) of the Securities Act and against Defendants Garipalli,

- 73 -

Palihapitiya, Wagner, Toy, Trieu, Osborne, Reses, and Ryans for contribution under Section 21D of the Exchange Act.

172. Clover is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

173. Plaintiff is, and has been at all relevant times, a Clover shareholder. Plaintiff will adequately and fairly represent the interests of Clover in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

174. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

175. A pre-suit demand on the Board of Clover is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Garipalli, Toy, Turner, and Shapiro (the "Director-Defendants") along with non-parties Clinton, William G. Robinson, Jr., and Demetrios L. Kouzoukas (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who were on the Board at the time this action was commenced.

176. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

- 74 -

177.   Demand is also excused as to all of the Director-Defendants because the Deceptive Sales Misconduct was an unlawful business strategy that the Company and Clover Health engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company and Clover Health, the Board made and/or allowed the Company and Clover Health to engage in the schemes outlined herein.

178.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein including, *inter alia*, by breaching their fiduciary duties to the Company and also aiding and abetting the SCH Defendants' breaches of their fiduciary duties to the Company. The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

179.   Demand is also excused as to the Director-Defendants because pursuant to the 2020 Proxy Statement, shareholders were asked to approve their compensation through approving the 2020 Equity Incentive Proposal, which reserved shares of the Company's common stock for their own benefit and the 2020 Management Incentive Plan Proposal, which reserved shares of the Company's common stock for the benefit of Defendants Garipalli and Toy. These financial incentives have precluded the Director-Defendants from acting in the best interests of the shareholders, as they have failed to correct the false and misleading statements and omissions contained in the 2020 Proxy Statement, the solicitation of which they materially benefited from since it resulted in, their election as Company directors and also shareholder approval of the 2020 Equity Incentive Proposal and the 2020 Management Incentive Plan Proposal. The Director-

- 75 -

Defendants are thus conflicted from considering a demand against them based on these circumstances as well.

180.    Demand is also excused as to the Defendants Garipalli, Toy, and Turner because they were fully aware of the Deceptive Sales Misconduct during the Relevant Period. Nonetheless, the Director-Defendants caused the Company and Clover Health to disseminate the false and misleading statements described herein. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

181.    Additional reasons that demand on Defendant Garipalli is futile follow. Defendant Garipalli is Clover Health's co-founder and has served as Clover's CEO and as a Company director since the Merger in January 2021. He also serves as a member of the Audit Committee. Prior to the Merger, Defendant Garipalli served as Clover Health's President from July 2014 until March 2019. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Garipalli with his principal occupation, and, upon information and belief, he is entitled to and receives handsome compensation. As the Company provides Defendant Garipalli with his primary occupation and means of livelihood, it is unlikely he would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining his compensation and evaluating his continued employment with Clover. Defendant Garipalli was ultimately responsible for many of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Deceptive Sales Misconduct (which Defendant Garipalli engaged in and permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading

- 76 -

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Garipalli is a defendant in the Securities Class Actions. For these reasons, too, Defendant Garipalli breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Toy is futile follow. Defendant Toy has served as Clover's President and CTO, and as a Company director since the Merger in January 2021. Prior to the Merger, he held those same positions with Clover Health from March 2019, February 2018, and November 2018, respectively, until the Merger in January 2012. Thus, as the Company admits, he is a non-independent director. Defendant Toy has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Deceptive Sales Misconduct (which Defendant Toy permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Toy is a defendant in two of the Securities Class Actions. For these reasons, too, Defendant Toy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Turner is futile follow. Defendant Turner has served as a Company director since the Merger in January 2021. He also serves as a member of the Audit Committee and as a member of the Talent and Compensation Committee.

- 77 -

Prior to the Merger, he was a Clover Health director from April 2015 until the Merger in January 2021. Defendant Turner has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Deceptive Sales Misconduct (which Defendant Turner permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Turner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Shapiro is futile follow. Defendant Shapiro has served as a Company director since the Merger in January 2021. He also serves as the Chair of the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee. As a Company director he conducted little, if any, oversight of the Deceptive Sales Misconduct (which Defendant Shapiro permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Shapiro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.    Additional reasons that demand on the Board is futile follow.

186.    Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, one of whom is a defendant in the Securities Class Actions,

and one of whom is a defendant in two of the Securities Class Actions, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

187.   Defendants Garipalli, Turner, and Shapiro (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

188.   Clover has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Clover any part of the damages Clover suffered and will continue to suffer thereby. Thus, any demand on the Director-Defendants would be futile.

189.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal Deceptive Sales Misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

190.   The acts complained of herein constitute violations of fiduciary duties owed by Clover's officers and directors, and these acts are incapable of ratification.

191.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Clover. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Clover, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand,

- 80 -

if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

192. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Clover to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

193. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, certainly at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Defendants Palihapitiya, Osborne, Reses, and Ryans for Violations of Section 14(a) of the Exchange Act**

194. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

- 81 -

196. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

197. Under the direction and watch of the Defendants Palihapitiya, Osborne, Reses, and Ryans, the 2020 Proxy Statement failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) a significant amount of Clover's (and Clover Health's) sales had been driven by a related party transaction that the Company intentionally obscured; (4) Clover's subsidiary, Seek Insurance, kept its relationship with the Company from consumers so that it could misleadingly market to seniors; (5) the Clover Assistant software was rudimentary; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

198. Defendants Palihapitiya, Osborne, Reses, and Ryans also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ performance based compensation elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on the Deceptive Sales Misconduct and misrepresented as a result of false and misleading statements, causing the Company's share price and financial performance to be artificially inflated and allowing the

- 82 -

Defendants Palihapitiya, Osborne, Reses, and Ryans to wrongfully benefit from the fraud alleged herein.

199.    Moreover, the 2020 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Defendants Palihapitiya, Osborne, Reses, and Ryans' failures to abide by them and their engagement in or tolerance of the Deceptive Sales Misconduct and the scheme to issue false and misleading statements and omissions of material fact.

200.    Defendants Palihapitiya, Osborne, Reses, and Ryans also caused the 2020 Proxy Statement to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Deceptive Sales Misconduct.

201.    In the exercise of reasonable care, the Defendants Palihapitiya, Osborne, Reses, and Ryans should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval the Proposals.

202.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the Proposals who would not have approved, among other things, the 2020 Equity Incentive Plan and the 2020 Management Incentive Plan, had they been informed about the Deceptive Sales Misconduct.

- 83 -

203.    The false and misleading elements of the 2020 Proxy Statement led to, among other things, the approval of the Proposals and the election of the Directors, which allowed them to breach their fiduciary duties to Clover.

204.    The Company was damaged as a result of the Defendants Palihapitiya, Osborne, Reses, and Ryans' material misrepresentations and omissions in the 2020 Proxy Statement.

205.    Plaintiff, on behalf of Clover, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Clover's business and affairs.

208.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

209.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Clover.

210.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

211.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Deceptive Sales Misconduct.

- 84 -

212.	Also in breach of their fiduciary duties owed to Clover, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) a significant amount of Clover's (and Clover Health's) sales had been driven by a related party transaction that the Company intentionally obscured; (4) Clover's subsidiary, Seek Insurance, kept its relationship with the Company from consumers so that it could misleadingly market to seniors; (5) the Clover Assistant software was rudimentary; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

213.	The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

214.	The Individual Defendants also breached their fiduciary duty to the Company by causing the Company to pay the Individual Defendants their annual bonuses and/or stock awards each year that they violated the Company's policies.

215.	The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Clover's securities.

- 85 -

216.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Clover's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

217.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Clover has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219.    Plaintiff on behalf of Clover has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

220.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Clover.

- 86 -

222.     The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Clover that was tied to the performance or artificially inflated valuation of Clover, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

223.     Plaintiff, as a shareholder and a representative of Clover, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

224.     Plaintiff on behalf of Clover has no adequate remedy at law.

## FOURTH CLAIM

### Against Clover Health Defendants for Abuse of Control

225.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.     The Clover Health Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Clover, for which they are legally responsible.

227.     As a direct and proximate result of the Clover Health Defendants' abuse of control, Clover has sustained significant damages. As a direct and proximate result of the Clover Health Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Clover has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Clover Health Defendants are liable to the Company.

228.     Plaintiff on behalf of Clover has no adequate remedy at law.

- 87 -

## FFITH CLAIM

### Against Clover Health Defendants for Gross Mismanagement

229.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.    By their actions alleged herein, the Clover Health Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Clover in a manner consistent with the operations of a publicly-held corporation.

231.    As a direct and proximate result of the Clover Health Defendants' gross mismanagement and breaches of duty alleged herein, Clover has sustained and will continue to sustain significant damages.

232.    As a result of the misconduct and breaches of duty alleged herein, the Clover Health Defendants are liable to the Company.

233.    Plaintiff, on behalf of Clover, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

234.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Clover to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

- 88 -

236.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

237.     Plaintiff, on behalf of Clover, has no adequate remedy at law.

## SEVENTH CLAIM

**Against the Defendants Garipalli, Palihapitiya, Wagner, Trieu, Osborne, Reses, and Ryans for Contribution Under Section 11(f) of the Securities Act**

238.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein**.**

239.     As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Actions brought on behalf of Clover shareholders in at least one of which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

240.     Federal law provides Clover with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

241.     The plaintiffs in the Securities Class Actions allege that the Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

242.     Clover is the registrant for the Merger. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

243.     As issuer of the shares, Clover is strictly liable to plaintiff and the class for the misstatements and omissions alleged in the Securities Class Actions.

244.     The plaintiff in one of the Securities Class Actions alleges that none of Defendants Garipalli, Palihapitiya, Wagner, Trieu, Osborne, Reses, and Ryans named therein made a

- 89 -

reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

245.    Defendants Garipalli, Palihapitiya, Wagner, Trieu, Osborne, Reses, and Ryans, because of their positions of control and authority as officers and directors of Clover, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Clover, including the wrongful acts complained of herein and in the Securities Class Actions.

246.    Accordingly, Defendants Garipalli, Palihapitiya, Wagner, Trieu, Osborne, Reses, and Ryans are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

247.    As such, Clover is entitled to receive all appropriate contribution or indemnification from Defendants Garipalli, Palihapitiya, Wagner, Trieu, Osborne, Reses, and Ryans.

## EIGHTH CLAIM

**Against Defendants Garipalli, Palihapitiya, Wagner, Toy, Trieu, Osborne, Reses, and Ryans for Contribution Under Sections 10(b) and 21D of the Exchange Act**

248.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.    Clover, along with Defendants Garipalli, Palihapitiya, Wagner, Toy, Trieu, Osborne, Reses, and Ryans are named as defendants in at least one of the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the

- 90 -

Company's liability will be in whole or in part due to Defendants Garipalli, Palihapitiya, Wagner, Toy, Trieu, Osborne, Reses, and Ryans' willful and/or reckless violations of their obligations as officers and/or directors of Clover, and Individual Defendants' aiding and abetting thereof.

250.     Defendants Garipalli, Palihapitiya, Wagner, Toy, Trieu, Osborne, Reses, and Ryans, because of their positions of control and authority as officers and/or directors of Clover, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Clover, including the wrongful acts complained of herein and in the Securities Class Actions.

251.     Accordingly, Defendants Garipalli, Palihapitiya, Wagner, Toy, Trieu, Osborne, Reses, and Ryans are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

252.     As such, Clover is entitled to receive all appropriate contribution or indemnification from Defendants Garipalli, Palihapitiya, Wagner, Toy, Trieu, Osborne, Reses, and Ryans.

### NINTH CLAIM

**Against the Clover Health Defendants for Aiding and Abetting
Breach of Fiduciary Duty**

253.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

254.     The Clover Health Defendants aided and abetted the SCH Defendants who breached their fiduciary duty to Clover.

- 91 -

255.    The Clover Health Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

256.    Specifically, the Clover Health Defendants engaged in the Deceptive Sales Misconduct and also promoted the Merger by issuing false and misleading statements concerning Clover's operations and business prospects, the status of regulatory and legal proceedings against Clover Health and the Clover Assistant. Moreover, the Clover Health Defendants controlled and operated Clover Health, Clover's functional and operational predecessor, and caused Clover Health to jointly issue press releases and file SEC filings which contained materially false and misleading statements promoting Clover's future operations and prospects.

257.    The Clover Health Defendants are jointly and severally liable to the same extent as the SCH Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

258.    As a direct and proximate result of the Clover Health Defendants' aiding and abetting of the SCH Defendants' breaches of duty alleged herein, Clover has sustained and will continue to sustain substantial damages.

259.    Plaintiff on behalf of Clover has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Clover, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and

- 92 -

abetted the breach of their fiduciary duties to Clover;

(c)     Determining and awarding to Clover the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Clover and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Clover and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.     a provision to permit the shareholders of Clover to nominate at least three candidates for election to the board; and

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Clover restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

- 93 -

Plaintiff hereby demands a trial by jury.

Dated: April 19, 2021

Respectfully submitted,

Wade B. Cowan (SC#9403)
P.O. Box 50617
Nashville, Tennessee 37205
Telephone: (615) 352-2331
Email: wcowan@dhhrplc.com

*Attorney for Plaintiff*

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

## **VERIFICATION**

I, Yuechuan Sun am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __th day of 4/16/2021_____, 2021.

Yuechuan Sun

AB8A5098640F421...

Yuechuan Sun