**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| YUECHUAN SUN, derivatively on behalf of CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III,<br><br>     Plaintiff,<br><br>     vs.<br><br>VIVEK GARIPALLI, JOSEPH WAGNER, ANDREW TOY, NATHANIEL S. TURNER, LEE SHAPIRO, CHAMATH PALIHAPITIYA, STEVEN TRIEU, IAN OSBORNE, JACQUELINE D. RESES, JAMES RYANS,<br><br>     Defendants,<br><br>     and<br><br>CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III,<br><br>     Nominal Defendant. | Lead Case No. 3:21-cv-00311<br><br>Judge Aleta A. Trauger<br><br>**LEAD CASE**<br><br>**DEMAND FOR JURY TRIAL** |
| MANTEG LUTHRA, derivatively on behalf of CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III,<br><br>     Plaintiff,<br><br>     vs.<br><br>VIVEK GARIPALLI, JOSEPH WAGNER, ANDREW TOY, NATHANIEL S. TURNER, LEE SHAPIRO, CHAMATH PALIHAPITIYA, STEVEN TRIEU, IAN OSBORNE, JACQUELINE D. RESES, JAMES RYANS,<br><br>     Defendants, | Case No. 3:21-cv-0320<br><br>Judge Trauger<br><br>**MEMBER CASE** |

– 1 –

and

CLOVER HEALTH INVESTMENTS, CORP.
f/k/a SOCIAL CAPITAL HEDOSOPHIA
HOLDINGS CORP. III,

      Nominal Defendant.

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiffs Yuechuan Sun and Manteg Luthra ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Clover Health Investments, Corp. ("Clover" or the "Company") f/k/a Social Capital Hedosophia Holdings Corp. III ("SCH"),[1] files this Verified Consolidated Shareholder Derivative Complaint against individual defendants Vivek Garipalli ("Garipalli"), Joseph Wagner ("Wagner"), Andrew Toy ("Toy"), Nathaniel S. Turner ("Turner") (collectively, the "Clover Health Defendants") and Lee Shapiro ("Shapiro"), and against Chamath Palihapitiya ("Palihapitiya"), Steven Trieu ("Trieu"), Ian Osborne ("Osborne"), Jacqueline D. Reses ("Reses"), and James Ryans ("Ryans"), (collectively, the "SCH Defendants," together with the Clover Health Defendants and Defendant Shapiro, the "Individual Defendants," and together with Clover the "Defendants"), for breaches of their fiduciary duties, unjust enrichment, waste of corporate assets, and/or violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), against the Clover Health Defendants for abuse of control, gross mismanagement, and for aiding and abetting the SCH Defendants' breaches of their fiduciary duties as directors and/or officers of SCH, and against Defendants Garipalli, Toy, Wagner, and Palihapitiya for contribution under Sections 10(b) and 21D of the Exchange Act. As

---

[1] References herein to the Company, Clover, and SCH are used interchangeably.

for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of internal corporate documents produced to Plaintiffs by Defendants, the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clover, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Clover's directors and officers from October 6, 2020 through February 3, 2021, both dates inclusive (the "Relevant Period").

2. Based in Franklin, Tennessee, Clover touts itself as a next-generation Medicare Advantage insurer that leverages its software platform, the Clover Assistant, to provide America's seniors with highly affordable Preferred Provider Organization ("PPO") and Health Maintenance Organization ("HMO") health insurance plans with wide network access and equal cost-sharing for in- and out-of-network providers.

3. In October 2020, Clover Health Investments, Corp., then operating as a private company (referred to prior to going public herein as "Clover Health") sought to go public by merging with a special purpose acquisition company, SCH (the "Merger"). In the October 6, 2020 press release announcing this Merger, Clover Health was described as "a next-generation Medicare

Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses" and part of its appeal was purportedly derived from partnering "with primary care physicians using *its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care.*" (Emphasis added.)

4.     However, undisclosed at this time, and throughout the Relevant Period, was that the Clover Assistant software was rudimentary, was designed to assist Clover in defrauding the government by improperly driving up the reimbursements paid to Clover under Medicare, and was largely not utilized in the manner described by the Company.

5.     In preparation for the Merger, the SCH Defendants filed the Merger Filings (defined below), which touted the functionality of the Company's software and characterized the Clover Assistant as "delight[ful]" for healthcare providers to use. Notably, the Merger Filings also assured investors that the Company was not subject to any legal proceeding that might have a material adverse effect on Clover's business, operating results, cash flows or financial condition and also that the Company maintained internal controls designed and implemented to prevent violations of applicable law.

6.     About a week after the Merger closed, on January 13, 2021, the Company filed the SPO Registration Statement (defined below) in connection with a secondary public offering and the resale of, *inter alia*, shares of Class A Clover common stock and warrants to purchase shares of Class A Clover common stock, by "Selling Securityholders," which, among others, included Defendants Garipalli, Palihapitiya, Wagner, Toy, Osborne, Reses, Ryans, and Turner. The SPO Offering Documents (defined below) made many of the same representations as the Merger Filings regarding, *inter alia*, regulatory and legal proceedings and also continued to tout the Clover

Assistant.

7.      Unbeknownst to investors, however, those statements, among others in the Company's press releases, presentations, and SEC filings, and also made during interviews, omitted certain crucial details throughout the Relevant Period. In particular, the U.S. Department of Justice ("DOJ") had commenced an investigation into certain deceptive sales practices of the Company and had issued a Civil Investigative Demand to Clover Health in late October 2020. The DOJ investigation sought information on whether the Clover Health Defendants had engaged in and/or permitted and caused the Clover Health and/or the Company to engage in kickbacks, improper marketing practices, and undisclosed related party transactions prior to and throughout the Relevant Period. These practices, their improper effect on the Company's financial results, and the DOJ investigation itself were not disclosed to investors despite the Individual Defendants' knowledge of these facts.

8.      However, the truth emerged on February 4, 2021, when *Hindenburg Research* published a report (the "Hindenburg Report") detailing that Clover was the subject of a DOJ investigation and that prior to and throughout the Relevant Period, the Clover Health Defendants caused Clover Health and the Company to, *inter alia*: (i) make improper payments to healthcare providers and their staff in violation of federal anti-kickback laws and Medicare Communications and Marketing's Guidelines; (ii) develop and utilize software, Clover Assistant, that aided Clover's practice of defrauding the federal government by illegally overbilling; (iii) engage in and/or permit deceptive marketing practices of a subsidiary to mislead and induce seniors to purchase a Company healthcare plan; (iv) engage in undisclosed related party transactions with a field marketing organization which was responsible for a large percentage of Clover's sales (collectively, the "Deceptive Sales Misconduct"). Moreover, the Company failed to comply with Generally

Accepted Accounting Practices ("GAAP") by failing to disclose the Deceptive Sales Misconduct's effects on the Company's financial statements

9. On this news, the Company's share price closed on February 4, 2021 at $12.23 per share, a $1.72 drop, or approximately 12.3%, from its closing price of $13.95 per share on February 3, 2021. Additionally, the Company's warrant price closed on February 4, 2021 at $3.39 per warrant, a $0.18 drop, or approximately 5%, from its closing price of $3.57 per warrant on February 3, 2021.

10. On February 5, 2021, prior to the market's open, the Company announced that the SEC had opened an investigation and requested document and data preservation for the period from January 1, 2020, to the present, relating to the Deceptive Sales Misconduct, among other issues revealed in the Hindenburg Report.

11. On this news, the Company's share price fell an additional $0.53 per share in intraday trading on February 5, 2021, or approximately 4.3%. Additionally, the Company's warrant price fell an additional $0.28 per warrant in intraday trading on February 5, 2021, or approximately 8.2%.

12. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact to the investing public that failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare Advantage plans; (3) Clover's growth

figures were artificially inflated by the Deceptive Sales Misconduct; (4) the Clover Assistant software was rudimentary, aided Clover in committing fraud, and was not as widely used as the Company publicly maintained; (5) the Company's consolidated financial statements did not accord with GAAP and improperly omitted related party transactions; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

14.     In breach of their fiduciary duties, the Clover Health Defendants engaged in, permitted, and caused the Company to engage in the Deceptive Sales Misconduct.

15.     Moreover, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

16.     As a result of the Individual Defendants' misconduct, which has subjected Clover, and the Company's Chief Executive Officer ("CEO"), Chief Technology Officer ("CTO"), former Chief Financial Officer ("CFO"), and SCH's former CEO to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee (the "Securities Class Action"), and further subjected Clover to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, and the aiding and abetting thereof.

18.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CTO's, former CFO's, and SCH's former CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Clover's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 promulgated under the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

20.    Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action.

21.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District because Clover is headquartered in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

## PARTIES

### Plaintiffs

24.     Plaintiffs are current shareholders of Clover common stock. Plaintiffs have continuously held Clover common stock at all relevant times.

### Nominal Defendant Clover

25.     Nominal Defendant Clover is a Delaware corporation with its principal executive offices at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067. Clover stock trades on the NASDAQ under the ticker symbol "CLOV." Clover's warrants, each redeemable to acquire one share of Clover Class A common stock, trade on the NASDAQ under the ticker symbol "CLOVW."

26.     Prior to the Merger, Clover's stock, units, and warrants traded on the New York Stock Exchange under the ticker symbols "IPOC," "IPOC.U," and "IPOC.WS," respectively.

### Defendant Garipalli

27.     Defendant Garipalli is the co-founder of Clover Health and has served as Clover's CEO and as a Company director since the Merger in January 2021. He also serves as a member of the Audit Committee. Prior to the Merger, Defendant Garipalli served as Clover Health's President from July 2014 until March 2019. According to the Company's prospectus filed with the SEC on January 29, 2021 on Form 424B3 (the "SPO Prospectus"), on January 7, 2021, Defendant Garipalli beneficially owned 83,584,543 shares of the Company's Class B stock, which represented 32.0%

of the Company's outstanding Class B stock and 30.4% of the total voting power as of that date.[2]

Given that the price per share of the Company's Class A stock at the close of trading on January

7, 2021 was $16.02, Defendant Garipalli owned over $1.3 billion worth of Clover stock.

28. The SPO Prospectus stated the following about Defendant Garipalli:

***Vivek Garipalli.*** Vivek Garipalli has served as our Chief Executive Officer and as a member of our board of directors since the Closing and previously held the same positions with Clover, which Mr. Garipalli co-founded, since July 2014. Previously, Mr. Garipalli also served as Clover's President from July 2014 to March 2019. Mr. Garipalli holds a B.B.A. in entrepreneurship from Emory University.

We believe that Mr. Garipalli is qualified to serve as a member of our board of directors due to the perspective and experience he brings as Clover's co-founder and Chief Executive Officer and due to his extensive experience managing healthcare companies.

**Defendant Wagner**

29. Defendant Wagner served as Clover's CFO from the Merger in January 2021 until

August 13, 2021. Prior to the Merger, he held the same position with Clover Health from January

2020 until the Merger in January 2021. According to the Company's SPO Prospectus, on

January 7, 2021, Defendant Wagner beneficially owned 642,514 shares of the Company's Class B

stock as of that date. Given that the price per share of the Company's Class A stock at the close of

trading on January 7, 2021 was $16.02, Defendant Wagner owned approximately $10.3 million

worth of Clover stock.

---

[2] Each share of Class A common stock entitles its holder to one vote. Each share of Class B common stock entitles its holder to 10 votes. All the outstanding shares of Class B common stock will convert automatically into one share of Class A common stock upon the earliest of (i) the date that is ten (10) years from the filing date of the amended and restated certificate of incorporation; (ii) the separation date of the last to separate of Vivek Garipalli and Andrew Toy (the "Founders"); (iii) the date that is one (1) year after the death or permanent disability of the last to die or become disabled of the Founders; and (iv) the date specified by the affirmative vote of the holders of our Class B common stock representing not less than two-thirds (2/3) of the voting power of the outstanding shares of our Class B common stock, voting separately as a single class.

30. The SPO Prospectus stated the following about Defendant Wagner:

**Joseph Wagner.** Joseph Wagner has served as our Chief Financial Officer since the Closing and previously held the same position with Clover since January 2020. Prior to joining Clover, Mr. Wagner served as a Regional Chief Financial Officer at UnitedHealth Group Incorporated, a healthcare organization, from February 2016 to December 2019. Mr. Wagner served as the Chief Financial Officer for Healthcare Interactive, a middleware healthcare company, from October 2014 to January 2016. Mr. Wagner holds a B.B.A. in accountancy from the University of Notre Dame and is a certified public accountant (inactive).

**Defendant Toy**

31. Defendant Toy has served as Clover's President and CTO, and as a Company director since the Merger in January 2021. Prior to the Merger, he held those same positions with Clover Health from March 2019, February 2018, and November 2018, respectively, until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Toy beneficially owned 12,790,323 shares of the Company's Class B stock, which represented 4.7% of the Company's outstanding Class A stock and 4.4% of the total voting power as of that date. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Toy owned approximately $10.3 million worth of Clover stock.

32. For the fiscal year ended December 31, 2020, Defendant Toy received $8,617,885 in compensation from the Company. This included $415,385 in salary, $8,190,695 in option awards, and $11,805 in all other compensation.

33. The SPO Prospectus stated the following about Defendant Toy:

**Andrew Toy.** Andrew Toy has served as our President, our Chief Technology Officer and as a member of our board of directors since the Closing and previously held the same positions with Clover since March 2019, February 2018 and November 2018, respectively. Prior to joining Clover, Mr. Toy served as a Product Director at Google LLC, a multinational technology company, from May 2014 to February 2018. Mr. Toy holds a B.S. and an M.S. in computer science from Stanford University.

We believe that Mr. Toy is qualified to serve as a member of our board of directors due to the perspective and experience he brings as Clover's President and Chief Technology Officer and due to his extensive experience overseeing technology and analytics at other companies.

**Defendant Turner**

34.     Defendant Turner has served as a Company director since the Merger in January 2021. He also serves as a member of the Audit Committee and as a member of the Talent and Compensation Committee. Prior to the Merger, he served as a Clover Health director from April 2015 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Turner beneficially owned 2,565,954 shares of the Company's Class B stock. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Turner owned approximately $41.1 million worth of Clover stock.

35.     For the fiscal year ending December 31, 2021, Defendant Turner is entitled to receive at least $50,000 for serving as a Company director and an additional $10,000 for serving as a member of the Audit Committee. Moreover, Defendant Turner is entitled to at least a grant of restricted stock units valued at $400,000 multiplied by the anticipated number of whole months from the closing of the Merger until the Company's 2022 annual meeting divided by 24.

36.     The SPO Prospectus stated the following about Defendant Turner:

*Nathaniel S. Turner.* Nathaniel S. Turner has served as a member of our board of directors since the Closing and previously held the same position with Clover since April 2015. Mr. Turner co-founded and has served as the Chief Executive Officer of Flatiron Health, Inc., a cancer research and data collection software company, since June 2012. From June 2010 to June 2012, Mr. Turner served as a Product Manager at Google Inc. Mr. Turner holds a B.S. in economics from the Wharton School of the University of Pennsylvania.

We believe that Mr. Turner is qualified to serve as a member of our board of directors because of his extensive experience as an investor in many technology,

high-growth, healthcare companies, his experience as an executive at a healthcare company, and his knowledge of our industry.

**Defendant Shapiro**

37.     Defendant Shapiro has served as a Company director since the Merger in January 2021. He also serves as the Chair of the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee.

38.     For the fiscal year ending December 31, 2021, Defendant Shapiro is entitled to receive at least $50,000 for serving as a Company director, an additional $25,000 for serving as Chair of the Audit Committee, and an additional $15,000 for serving as Chair of the Nominating and Corporate Governance Committee. Moreover, Defendant Shapiro is entitled to at least a grant of restricted stock units valued at $400,000.

39.     The SPO Prospectus stated the following about Defendant Shapiro:

***Lee A. Shapiro.*** Lee A. Shapiro has served as a member of our board of directors since the Closing. Mr. Shapiro co-founded and has served as the Managing Partner at 7Wire Ventures, an early-stage healthcare venture fund, since June 2013. Mr. Shapiro previously served as Chief Financial Officer of Livongo Health, Inc., a mobile health monitoring technology company, from December 2018 to November 2020. Mr. Shapiro served as a director from August 2013 until April 2019. Mr. Shapiro joined Allscripts Healthcare Solutions, Inc., a provider of electronic prescribing, practice management and electronic health record technology, in April 2000 and served as President from April 2002 to December 2012. He previously served as a director of Tivity Health, Inc., a provider of fitness and health improvement programs, from May 2015 to May 2020 and a director of Medidata Solutions, Inc., a global provider of cloud-based solutions for life sciences, from June 2011 to October 2019. He also serves as a director of some of the 7Wire Ventures portfolio companies. He serves on the National Board of the American Heart Association and the advisory board of the Gastro-Intestinal Research Foundation. Mr. Shapiro holds a B.S. in accountancy from the University of Illinois Urbana-Champaign and a J.D. from The University of Chicago Law School.

We believe that Mr. Shapiro is qualified to serve as a member of our board of directors because of his extensive finance background, including service as a chief financial officer of a public company, his experience as a director of a public company, and his knowledge of our industry.

**Defendant Palihapitiya**

40.    Defendant Palihapitiya served as SCH's CEO and as the Chairman of the Board from October 2019 until the Merger in January 2021. Following the Merger, Defendant Palihapitiya has served as a senior advisor to Clover's management. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Palihapitiya beneficially owned 20,500,000 shares of the Company's Class A stock held by SCH Sponsor III LLC ("SCH Sponsor") by virtue of his shared voting and investment control over SCH Sponsor with Defendant Osborne, and 10,000,000 shares of the Company's Class A stock held by CHACHACHA SPAC C LLC ("ChaChaCha") by virtue of his voting and investment control over ChaChaCha. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Palihapitiya owned over $488.6 million worth of Clover stock.

41.    The Company's Schedule 14A filed on Form DEFM14A with the SEC on December 14, 2020 (the "2020 Proxy Statement") stated the following about Defendant Palihapitiya:

> Mr. Chamath Palihapitiya has been SCH's Chief Executive Officer and the Chairman of SCH's board of directors since October 2019. Mr. Palihapitiya served as the Chief Executive Officer and the Chairman of the Board of Directors of IPOA from May 2017 until the consummation of its business combination with Virgin Galactic in October 2019, and continues to serve as the Chairman of the Board of Directors of Virgin Galactic. Mr. Palihapitiya also served as a director of Slack Technologies Inc. from April 2014 until October 2019. Prior to founding Social Capital in 2011, Mr. Palihapitiya served as Vice President of User Growth at Facebook, and is recognized as having been a major force in its launch and growth. Mr. Palihapitiya was responsible for overseeing Monetization Products and Facebook Platform, both of which were key factors driving the increase in Facebook's user base to more than 750 million individuals worldwide. Prior to working for Facebook, Mr. Palihapitiya was a principal at the Mayfield Fund, one of the United States' oldest venture firms, before which he headed the instant messaging division at AOL. Mr. Palihapitiya graduated from the University of Waterloo, Canada with a degree in electrical engineering.

**Defendant Trieu**

42.     Defendant Trieu served as SCH's CFO from January 2020 until the Merger in January 2021.

43.     The Company's registration statement, filed with the SEC on October 20, 2020 on Form S-4, as amended (the "Registration Statement") stated the following about Defendant Trieu:

> Mr. Steven Trieu has been the Chief Financial Officer of SCH since January 2020. Mr. Trieu is a Partner and the Chief Financial Officer of Social Capital, an affiliate of the Company's sponsor, since October 2017 and is responsible for overseeing the operations of Social Capital's family of funds, management company and related entities. Mr. Trieu served as the Chief Financial Officer of IPOA from March 2019 until the consummation of its business combination with Virgin Galactic in October 2019. Prior to joining Social Capital, Mr. Trieu was VP of Finance at Quora, Inc. from October 2011 to June 2016, where he was responsible for its day-to-day finance and legal operations. Prior to that, Mr. Trieu was Director, Finance and Business Operations at Facebook, Inc. from August 2007 to October 2011. Mr. Trieu led the formation of its initial business operations and sales finance teams. Mr. Trieu also previously held a similar role at Yahoo!, Inc., supporting its local markets and commerce divisions. Before that, Mr. Trieu spent time on Wall Street both as an investment banking and alternative investments associate. Mr. Trieu graduated from the University of Massachusetts, Amherst with a degree in finance and economics.

**Defendant Osborne**

44.     Defendant Osborne served as SCH's President from January 2020 and as a director of the Company from October 2019 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Osborne beneficially owned 20,500,000 shares of the Company's Class A stock held by SCH Sponsor by virtue of his shared voting and investment control over SCH Sponsor with Defendant Palihapitiya, and 5,000,000 shares of the Company's Class A stock held by Hedosophia Public Investments Limited ("Hedosophia") by virtue of his voting and investment control over Hedosophia. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Osborne owned over $408.5 million worth of Clover stock.

- 15 -

45.     The Registration Statement stated the following about Defendant Osborne:

Mr. Ian Osborne has been a director of SCH since October 2019 and the President since January 2020. Mr. Osborne is the Co-founder and Chief Executive Officer of Hedosophia, an investment firm, which has invested in leading Internet and technology companies since 2012. Mr. Osborne served as a director of IPOA from May 2017 until the consummation of its business combination with Virgin Galactic in October 2019. Mr. Osborne has advised leading Internet and technology companies, their founders and CEOs, since 2009. Mr. Osborne is also the indirect controlling shareholder and a director of Connaught, a financial advisory firm. From 2010 to 2012, Mr. Osborne was a Partner and Managing Director at DST Global, a family of funds investing in Internet companies, which was established in 2009 and which has notable successes including Alibaba, Airbnb, Facebook, Spotify and Twitter. Mr. Osborne was educated at St Paul's School, King's College London, and the London School of Economics.

**Defendant Reses**

46.     Defendant Reses served as a director of SCH from April 2020 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Reses beneficially owned 300,000 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Reses owned over $4.8 million worth of Clover stock.

47.     The Registration Statement stated the following about Defendant Reses:

Ms. Reses has been a director of SCH since April 2020. Ms. Reses served as a director of IPOA from September 2017 until the consummation of its business combination with Virgin Galactic in October 2019. Ms. Reses has served as Square Capital Lead since October 2015, and continues to serve as Square Capital Lead, and previously served as People Lead of Square, Inc. from February 2016 to July 2018. From September 2012 to October 2015, Ms. Reses, served as Chief Development Officer of Yahoo! Inc. In this role, she focused on leading partnerships, acquisitions and investments, significant corporate tax transactions, as well as human resources. Prior to joining Yahoo, Ms. Reses led the U.S. media group as a Partner at Apax Partners Worldwide LLP, a global private equity firm, which she joined in 2001. Ms. Reses previously served on the board of directors of Alibaba Group Holding Limited and is currently on the board of National Public Radio and the Economic Advisory Council of the Federal Reserve Bank of San Francisco. Ms. Reses holds a BS in Economics with honors from the Wharton School of the University of Pennsylvania.

**Defendant Ryans**

48.     Defendant Ryans served as a director of SCH from 2020 until the Merger in January 2021. He also served as the Chair of the Company's Audit Committee from 2020 until the Merger in January 2021. According to the Company's SPO Prospectus, on January 7, 2021, Defendant Ryans beneficially owned 100,000 shares of the Company's Class A stock. Given that the price per share of the Company's Class A stock at the close of trading on January 7, 2021 was $16.02, Defendant Ryans owned over $1.6 million worth of Clover stock.

49.     The Registration Statement stated the following about Defendant Ryans:

> Dr. Ryans served as a director and the chairman of the audit committee of IPOA from September 2017 until the consummation of its business combination with Virgin Galactic in October 2019, and continues to serve as a member of Virgin Galactic's board of directors. Dr. Ryans is a professor of accounting at London Business School since 2016 and teaches financial accounting at the graduate and post-graduate levels and directs an executive education program on mergers and acquisitions. His current research focuses on topics in mergers and acquisitions, firm disclosure and government oversight of financial reporting. From 2012 until 2016, Dr. Ryans was a graduate student instructor at the University of California Berkeley. From 2003 to 2011, Dr. Ryans oversaw investments and business development at Chelsea Rhone LLC and its affiliate HealthCap RRG, a mutual insurance company. From 1999 until 2001, Dr. Ryans was a consultant with Deloitte & Touche. Dr. Ryans is a CFA charterholder and holds a Ph.D. in business administration from the University of California Berkeley, an MBA from the University of Michigan and a BASc in electrical engineering from the University of Waterloo.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants

were and are required to act in furtherance of the best interests of Clover and its shareholders so as to benefit all shareholders equally.

51.     Each director and officer of the Company owes to Clover and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the officers and directors of Clover were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Clover, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Clover's Board at all relevant times.

55.     As senior executive officers and directors of a publicly-traded company whose

common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE and then the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

56. To discharge their duties, the officers and directors of Clover were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Clover were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, the United States, and pursuant to Clover's own internal guidelines, including its Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Clover conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Clover and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

        (e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Clover's operations would comply with all laws and Clover's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

        (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

        (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

        (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

        (i)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

      57.     Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58. At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

59. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Clover.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act, and the aiding and abetting thereof; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

63. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Clover was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Clover, and was at all times acting within the course and scope of such agency.

## CLOVER'S CODE OF CONDUCT

66.     The Code of Conduct provides that the Company has "adopted this Code to set expectations and provide guidance applicable to all members ('directors') of the Company's Board of Directors (the 'Board') and officers, employees, independent contractors and consultants of the Company (all such persons for purposes of this Code, 'employees')" and that "[a]ll employees are responsible for reading and understanding this Code, and using it as a guide to the performance of their responsibilities for the Company."

67.     The Code of Conduct further states that the Company "expects all of its directors, executive officers, managers and other supervisory personnel to act with honesty and integrity, use due care and diligence in performing responsibilities to the Company, help foster a sense of

commitment to this Code among its employees and foster a culture of fairness, honesty and accountability within the Company." Additionally, the Code of Conduct states that the Company "expects such personnel to ensure that the Company's agents and contractors conform to the standards of this Code when working on the Company's behalf."

68.     The Code of Conduct states that the Company is "committed to promoting high standards of honest and ethical business conduct and compliance with applicable laws, rules and regulations."

69.     The Code of Conduct provides, in the section titled, "Legal Compliance," that:

All directors and employees must always obey the law while performing their duties to the Company. The Company's success depends upon each employee operating within legal guidelines and cooperating with authorities. In addition, each employee is expected to comply with all other Company policies and procedures that may apply to employees, many of which supplement this Code by providing more detailed guidance. It is essential that all employees know and understand the legal and regulatory requirements and other standards that apply to the Company's business and to their specific area of responsibility. To ask questions about whether or how any law applies to Company conduct, employees should contact the legal department.

*          *          *

Directors and employees are expected to comply with all applicable laws wherever they travel on Company business, including laws prohibiting bribery, corruption or the conduct of business with specified individuals, companies or countries.

70.     The Code of Conduct provides, in the section titled, "Competition and Fair Dealing," in relevant part, that:

The Company strives to compete vigorously and to gain advantages over its competitors through superior business performance, not through unethical or illegal business practices. No employee may through improper means acquire proprietary information from others, possess trade secret information or induce disclosure of confidential information from past or present employees of other companies. If an employee becomes aware of the improper acquisition of this type of information, the employee should report it immediately.

Employees are expected to deal fairly and honestly with anyone with whom they have contact in the course of performing their duties to the Company and not engage in unfair business practices. Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on typical commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors. Employees involved in sales have a special responsibility to abide by all Company policies regarding selling activities, including Company policies relevant to revenue recognition. Further, no employee may take unfair advantage of anyone through manipulation, concealment, abuse or privileged information, misrepresentation of facts or any other unfair dealing practice.

71.     The Code of Conduct provides, in the section titled, "Gifts and Entertainment," in relevant part, that:

Business gifts and entertainment are meant to create goodwill and sound working relationships and not to gain improper advantage with customers or facilitate approvals from government officials. All employees must be careful to avoid even the appearance of impropriety in giving or receiving gifts and entertainment. In general, an employee cannot offer, provide or accept any gifts or entertainment in connection with an employee's service to the Company except in a manner consistent with customary business practices, such as customary and reasonable meals and entertainment. Gifts and entertainment must not be excessive in value, in cash, susceptible of being construed as a bribe or kickback, or in violation of any laws. This principle applies to the Company's transactions everywhere in the world, even if it conflicts with local custom. Under some statutes, such as the U.S. Foreign Corrupt Practices Act, giving anything of value to a government official to obtain or retain business or favorable treatment is a criminal act subject to prosecution and conviction. For additional information, please see the Company's Anti-Corruption Policy. Additionally, employees should not accept gifts or entertainment that may reasonably be deemed to affect their judgment or actions in the performance of their duties.

72.     The Code of Conduct provides, in the section titled, "Conflicts of Interest," in relevant part, that:

In order to make good decisions for the Company, directors and employees need to be aware of []their own biases and make sure they counter them. Employees are expected to avoid actual or apparent conflicts of interest between their personal and professional relationships. For directors, this may include recusal from discussions of the Board when their participation could be perceived as creating such a conflict.

A "conflict of interest" occurs when a personal interest interferes in any way (or even appears or could reasonably be expected to interfere) with the interests of the Company as a whole. Sometimes conflicts of interest arise when an employee takes some action or has some outside interest, duty, responsibility or obligation that conflicts with an interest of the Company or the employee's duty to the Company. A conflict of interest can arise when an employee takes actions or has interests that may make it difficult to perform the employee's duties objectively and effectively. Conflicts of interest can also arise when an employee or relative of an employee (including a family member of an employee) receives improper personal benefits as a result of the employee's position at the Company.

73.     In a section titled, "Financial Integrity; Public Reporting," the Code of Conduct

states the following:

The Company strives to maintain integrity of the Company's records and public disclosure. The Company's corporate and business records, including all supporting entries to the Company's books of account, must be completed honestly, accurately and understandably. The Company's records are important to investors and creditors. They serve as a basis for managing the Company's business and are important in meeting the Company's obligations to business partners, suppliers, vendors, creditors, employees and others with whom the Company does business. The Company depends on the books, records and accounts accurately and fairly reflecting, in reasonable detail, the Company's assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

To help ensure the integrity of the Company's records and public disclosure, the Company requires that:

●      no entry be made in the Company's books and records that is intentionally false or misleading;

●      transactions be supported by appropriate documentation;

●      the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in the Company's books and records;

●      employees comply with the Company's system of internal controls and be held accountable for their entries;

●      any off-balance sheet arrangements of the Company are clearly and appropriately disclosed;

- employees work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents;

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund; and

- records be retained or destroyed according to the Company's document retention policies or procedures then in effect.

The Company's disclosure controls and procedures are designed to help ensure that the Company's reports and documents filed with or submitted to the U.S. Securities and Exchange Commission (the "SEC") and other public disclosures are complete, fair, accurate, fairly present the Company's financial condition and results of operations and are timely and understandable. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should be familiar with and adhere to all disclosure controls and procedures and generally assist the Company in producing financial disclosures that contain all of the information about the Company that is required by law and would be important to enable investors to understand the Company's business and its attendant risks. These controls and procedures include, but are not limited to, the following:

- no employee may take or authorize any action that would cause the Company's financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with the Company's finance department, as well as the Company's independent auditors and legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that the Company's books and records, as well as its reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of the Company's reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of such reports accurate in all material respects.

In connection with the preparation of the financial and other disclosures that the Company makes to the public, including by press release or filing a document with the SEC, directors must, in addition to complying with all applicable laws, rules and regulations, follow these guidelines:

- act honestly, ethically, and with integrity;

- comply with this Code;

- endeavor to ensure complete, fair, accurate, timely and understandable disclosure in the Company's filings with the SEC;

- raise questions and concerns regarding the Company's public disclosures when necessary and ensure that such questions and concerns are appropriately addressed;

- act in good faith in accordance with the director's business judgment, without misrepresenting material facts or allowing independent judgment to be subordinated by others; and

- comply with the Company's disclosure controls and procedures and internal controls over financial reporting.

If an employee becomes aware that the Company's public disclosures are not complete, fair and accurate, or if an employee becomes aware of a transaction or development that the employee believes may require disclosure, the employee should report the matter immediately.

74. The Code of Conduct provides, in the section titled, "Conduct of Senior Financial Employees," in relevant part, that:

The Company's Finance Department has a special responsibility to promote integrity throughout the organization, with responsibilities to stakeholders both inside and outside of the Company. As such, the Board requires that the Chief Executive Officer and senior personnel in the Company's finance department adhere to the following ethical principles and accept the obligation to foster a culture throughout the Company as a whole that ensures the accurate and timely reporting of the Company's financial results and condition.

Because of this special role, the Company requires that the Chief Executive Officer, Chief Financial Officer, Director of Actuary and Vice President of Finance and any other persons performing similar functions ("Senior Financial Employees"):

- Act with honesty and integrity and use due care and diligence in performing their responsibilities to the Company.

- avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company, and disclose promptly to the Audit Committee and the Corporate Compliance Officer, any transaction or personal or professional relationship that reasonably could be expected to

give rise to such an actual or apparent conflict. Without limiting the foregoing, and for the sake of avoiding an implication of impropriety, Senior Financial Employees shall not:

> o accept any material gift or other gratuitous benefit from a business partner, supplier or vendor of products or services, including professional services, to the Company (this prohibition is not intended to preclude ordinary course entertainment or similar social events);

> o except with the approval of the disinterested members of the Board, directly invest in any privately-held company that is a business partner, supplier or vendor of the Company where the Senior Financial Employee, either directly or through people in such Senior Financial Employee's chain of command, has responsibility or ability to affect or implement the Company's relationship with the other company; or

> o maintain more than a passive investment of greater that 1% of the outstanding shares of a public company that is a business partner, supplier or vendor of the Company.

● Provide constituents with information that is accurate, complete, objective, relevant, timely and understandable, including information for inclusion in the Company's submissions to governmental agencies or in public statements.

● Comply with applicable laws, rules, and regulations of federal, state and local governments, and of any applicable public or private regulatory and listing authorities.

● Achieve responsible use of and control over all assets and resources entrusted to each Senior Financial Employee.

75.     The Code of Conduct provides, in the section titled, "Protection and Proper Use of Company Assets," in relevant part, that: "[a]ll employees are expected to protect the Company's assets and ensure their efficient use for legitimate business purposes."

76.     The Code of Conduct provides, in the section titled, "Compliance Standards and Procedures," in relevant part, that: "[i]f an employee is aware of a suspected or actual violation of this Code by him/herself or others, it is the employee's responsibility to report it."

It is Corporation policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission and in all other public communications made by the Corporation. As a Senior Officer, you are required to promote compliance with this policy by all employees and to abide by Corporation standards, policies and procedures designed to promote compliance with this policy.

77.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the Deceptive Sales Misconduct and the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act, aiding and abetting thereof, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.     Based in Franklin, Tennessee, Clover touts itself as a next-generation Medicare Advantage insurer that leverages its software platform, the Clover Assistant, to provide America's seniors with highly affordable PPO and HMO health insurance plans that have wide network access with equal cost-sharing for in- and out-of-network providers. The Company's purported mission is to improve clinical decision-making and building a technology-centric ecosystem. Mainly, Clover sells Medicare Advantage insurance plans to seniors and provides physicians with software that is supposed to help aggregate data on patients who are a part of the Clover network. The Company claims to have the highest membership growth rate among Medicare Advantage plans in the United States with more than 50,000 members. Since inception of Clover's business, i.e., the business that Clover Health previously operated, in 2012, the Company has incurred

significant net losses on an annual basis and has accumulated a deficit of approximately $901.6 million as of September 30, 2020.

### Clover Health's Pre-Merger Operations

79.     Medicare Advantage plans are healthcare plans available to those eligible for Medicare (i.e., Americans of 65 years and older). Unlike traditional Medicare, in which an enrollee pays a premium to the government in exchange for coverage, under a Medicare Advantage plan, the participant pays a premium to a private company, which administers the participant's healthcare coverage under stringent rules set out by the Centers for Medicare and Medicaid Services ("CMS"), a government agency.

80.     The goal of Medicare Advantage plans is to incentivize private insurers to figure out how to provide care at lower costs. As such, the program operates by having CMS pay Medicare Advantage plan operators, like the Company, a per-member-per-month amount. Medicare Advantage plan operators then attempt to provide care under this amount in order to make a profit.

81.     Given that sicker and higher-risk patients cost more to care for, CMS will pay a plan operator more money for patients with high "risk assessment scores." The score is based off of diagnoses and symptoms that the patient has, and the higher the score, the more a company will be paid for that patient. Thus, the most profitable patients for a plan operator are those patients with high risk assessment scores who nevertheless utilize very little treatment.

82.     The practice of submitting false information to CMS to increase a patient's risk assessment score in order to receive more money is known as "risk adjustment fraud." In particular, inputting inaccurate medical information to the CMS, or other government payor, system, is called "upcoding."

83.     Upcoding can be accomplished in many ways. Most blatantly, an insurer might just fabricate a condition, or at least fabricate a treatment never performed, for a patient and receive increased payment in this way. Another upcoding practice would be to claim that a past illness that a patient once had is still a present condition, or else that it has recurred when it has not. Moreover, an insurer might overstate the severity of an illness, again improperly increasing a patient's risk assessment score. More subtle ways to upcode include submitting claims to CMS for improper provider or service types, inferring diagnoses from medical records or other evidence without actually diagnosing or providing care to the patient for this inferred condition, or linking complications or related conditions that might stem from an underlying condition, when the physician has not actually confirmed the presence of such complications or related conditions.

84.     The Company's October 20, 2020 Registration Statement revealed that 98.6% of Clover Health's revenue in 2018 and 98.8% of its revenue in 2019 were from Medicare Advantage plan premiums. For the first six months of 2020, 98.9% of Clover Health's revenue was from its Medicare Advantage plan premiums. The Registration Statement acknowledged that "[in] advance of each plan year, we enter into contracts with CMS under which it pays us fixed monthly premiums per member based on our actuarial bid and the CMS risk-adjustment model." As is clear, during the Relevant Period, these Medicare Advantage plans were of critical importance to the Company.

85.     While the Company's market share was tiny compared to its largest competitors, at all relevant times the Company had tens of thousands of Medicare Advantage members while, for example, its largest competitor, UnitedHealth, has approximately 6.3 million, the Company framed this as demonstrating its excellent potential for growth. In particular, the Company highlighted the

purported utility of its Clover Assistant software as an innovative advantage it had over its competitors. For example, the October 6, 2020 press release announcing the Merger stated that:

> **Clover has pioneered a fundamentally different approach to Medicare Advantage** that focuses on driving affordability and partnering closely with physicians to deliver the best possible health outcomes for members. The Company offers affordable Medicare Advantage plans to eligible individuals, giving consumers access to broad and open healthcare networks, rich supplemental benefits and low out-of-pocket expenses.
>
> Technology is at the core of Clover's business – **the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software** to assist physicians with clinical decision-making at the point of care.
>
> **Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points** – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes.
>
> **The Clover Assistant enables a virtuous growth cycle**, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. **In turn, the Company believes its best-in-class plans will continue to deliver market-leading growth**, allowing the Clover Assistant to capture and synthesize more data and ultimately drive better care.
>
> **Medicare Advantage is one of the largest and fastest growing markets in the U.S. healthcare system – but it is one that has seen little innovation and remains ripe for disruption.** Worth $270 billion today and with an estimated value of $590 billion by 2025, the Medicare Advantage market provides a tremendous opportunity for growth.
>
> **Today, Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach, Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets**, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare-eligibles in eight Georgia counties.

(Emphasis added.)

86.     What the Company was not disclosing during this time, was that its revenue figures from its Medicare Advantage plans, which constituted the vast majority of revenue overall, were being inflated by the Company's illegal payment of kickbacks to doctors as well as the Company's software product, Clover Assistant, facilitating upcoding and risk adjustment fraud. Thus, statements concerning the Company's growth were also overstated.

### Direct Contracting

87.     The Company, under the direction and control of the Individual Defendants, was making false and misleading statements about the Deceptive Sales Misconduct, but was also making false and misleading statements with respect to a recent Medicare innovation called "Direct Contracting." Direct Contracting was a program under which the government sought to move traditional Medicare patients onto private plans, similar to Medicare Advantage.

88.     The Company planned to participate in this program, with Defendant Palihapitiya in a conference call announcing the Merger, for example, describing how under Clover's "second phase of growth [meaning the Company's Direct Contracting program], the business already has 200,000 lives under contract for 2021, and they have estimated and forecasted 450,000 lives by 2023."

89.     However, these figures were not accurate at anytime during the Relevant Period. On May 17, 2021, Defendants Garipalli and Wagner would acknowledge on a conference call that only between 70,000 and 100,000 lives were under contract for 2021, *i.e.*, half or less than half of the initially reported figure.

### Clover's Merger and Secondary Public Offering

90.     SCH was initially incorporated in the Cayman Islands in October 2019 as a special purpose acquisition company ("SPAC"). SCH was a "blank check" company that formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with other businesses. On April 24, 2020, SCH went public after completing its initial public offering ("IPO"). In the IPO, SCH raised $720 million after pricing 72 million units at $10 each. Each unit consisted of one share of Class A common stock and one-third of one redeemable warrant, the holder of which is entitled to purchase one share of Class A common stock at an exercise price of $11.50 per share. The units sold in the IPO were listed on the NYSE under the ticker symbol IPOC.U. The Class A shares and warrants were listed on the NYSE under the ticker symbols IPOC and IPOC WS, respectively. After increasing the size of the IPO, SCH had issued 82.8 million shares of its Class A common stock.

91.     Prior to the Merger, Clover Health was a San Francisco-based company that was co-founded in 2012 by Defendant Garipalli. Previously, Defendant Garipalli also founded CarePoint Health System ("CarePoint"), a for-profit, privately held, healthcare system that operated at least three hospitals in New Jersey.

92.     According to the Hindenburg Report, under Defendant Garipalli's leadership, CarePoint had a reputation for charging excessive rates as one of its hospitals had the highest billing rates in the country. Indeed, CarePoint eventually settled a probe by the New Jersey Medicaid Fraud Division for $1 million following an investigation into billing claims that lacked adequate documentation that led to Medicaid's overpaying the company. Moreover, according to a report released by the New Jersey Commission of Investigations in March 2019, Defendant Garipalli, among others, managed to syphon more than $157 million from CarePoint through a

series of management fees and allocations paid by CarePoint hospitals to related parties. This fact was not disclosed leading up to the Merger.

93.     In May 2020, SCH's management team began holding weekly meetings regarding SCH's initial business combination. In June 2020, SCH entered into discussions with Clover Health relating to a proposed business combination and began its extensive due diligence process shortly thereafter before issuing a joint press release announcing that they had entered into the merger agreement in October 2020. Upon the Merger's closing, SCH reincorporated as a Delaware company and renamed itself Clover.

94.     Specifically, on October 6, 2020, the Company filed a current report on Form 8-K announcing that it had entered into an Agreement and Plan of Merger (the "Merger Agreement"). On October 20, 2020, the Company filed the Registration Statement. On November 20, 2020, December 9, 2020, and December 10, 2020, the Company filed amendments to the Registration Statement on Form S-4/A with the SEC. The Registration Statement was declared effective on December 11, 2020.

95.     Subsequently, on December 14, 2020, the Company filed with the SEC a prospectus/proxy statement on both Form 424B3 (the "Prospectus" and, together with the 2020 Proxy Statement, Registration Statemen and its amendments, and the Prospectus, the "Merger Filings") and Form DEFM14A. The Company's stock began trading publicly on the NASDAQ under its new ticker symbol, "CLOV" on January 8, 2021.

96.     On January 13, 2021, the Company filed a registration statement on Form S-1 with the SEC (the "SPO Registration Statement"). The SPO Registration Statement was declared effective on January 27, 2021. Subsequently, on January 29, 2021, the Company filed the SPO Prospectus (together with the SPO Registration Statement, the "SPO Offering Documents").

**The Deceptive Sales Misconduct**

97.     Prior to and during the Relevant Period, the Clover Health Defendants allowed multiple violations of Clover's corporate governance policies and applicable laws to occur that have injured the Company. These violations included, but were not limited to, engaging in or allowing the Deceptive Sales Misconduct and widespread violations of the Company's Code of Conduct. As a result, the Clover Health Defendants caused the Clover Health and the Company to engage in the Deceptive Sales Misconduct by failing and allowing the Company to fail to take meaningful action in response to the aforementioned violations and to take wrongful action in response. Moreover, the Clover Health Defendants' actions aided and abetted the scheme of the SCH Defendants to issue false and misleading statements about Clover Health and the Company. The Deceptive Sales Misconduct resulted in, among other things, adverse news reports, including the Hindenburg Report, costly litigation, including the Securities Class Action, costly investigations commenced by the DOJ and SEC, and consequently, a decline in the value of the Company.

*Medicare-Related Regulations*

98.     Given the great financial stake the government has in administering the Medicare system, it is subject to numerous laws and regulations to prevent abuse and wasteful spending.

99.     In 1972, Congress enacted the Federal Anti-Kickback Statute to prevent plan administrators and medical providers from colluding to maximize their profits at the expense of patients' best interest and to the detriment of federal health care programs' finances. The statute provides, in relevant part:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which

payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42. U.S.C. § 1320a-7b(b).

100.    In addition to the penalties listed above, violation of the Federal Anti-Kickback Statute can result in exclusion from state and federal healthcare programs, like Medicare. This punishment would be particularly damaging to a company like Clover, which, as mentioned, derives upwards of 95% of its revenue from participation in Medicare.

101.    Of note, the Office of the Inspector General ("OIG") has issued guidance that "business courtesies and other gratuities" can be violative of the Federal Anti-Kickback Statute if given to physicians to make or influence referrals or if any one purpose is to generate business for the company.

102.    Also related to the Medicare program is the Federal False Claims Act, which makes it unlawful for any person to knowingly present a false or fraudulent claim, record or statement to the government for payment or approval. See 31 U.S.C. § 3729. Thus for example, submitting a claim to CMS for treatment not rendered would be violative, as would submitting false statements regarding a patient's medical history to induce greater remuneration under the Medicare Advantage risk assessment score system.

103.    Other applicable laws include the Physician Payments Sunshine Act of 2009 and the Patient Protection and Affordable Care Act in 2010 ("PPACA"). These laws broaden the scope of the Federal Anti-Kickback Statute and Federal False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning March 31, 2013. The PPACA also renders violations of the Federal Anti-

Kickback Statute per se violations of the Federal False Claims Act. In addition, Congress removed the requirement that a person have actual knowledge of the law or specific intent to commit a violation. See 42 U.S.C. § 1320a-7b(h). Therefore, the PPACA makes it so that even an unwitting and non-benefitting party within the stream of a reimbursement claim to Medicare is liable for fraud if unlawful kickbacks are involved.

104. The Company and the Individual Defendants were well aware of these applicable statutes and regulations, as evidenced, as just one example, by this risk disclosure in the Registration Statement:

> As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

> The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-

Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

105. Moreover, in 2016, Clover Health was fined $106,095 by CMS for engaging in misleading marketing and failing to correct the marketing material at issue even after receiving notifications from CMS.

106. The Hindenburg Report would later assert that the comparatively small amount of the fine encouraged Defendants Garipalli and Wagner to "push the envelope further" when it came to engaging in potentially illegal conduct, and quoted a Company employee as saying: "[W]hen I got there the thought process was 'well the penalty was so small we're not worried about it.'"

*The Clover Assistant*

107. As stated in the October 6, 2020 press release, the Company's Clover Assistant software was touted as "us[ing] machine learning to synthesize [] data with member-specific

- 39 -

information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes."

108.     However, Clover Assistant was actually a tool designed intended to maximize patients' risk assessment scores and thus to maximize the Company's revenue from CMS. However, the Clover Assistant went beyond *legally* maximizing patients' risk assessment scores and instead used a variety of measures to upcode patients and perpetrate risk adjustment fraud.

109.     Clover Assistant utilized a checkbox interface to collect data about a patient. While the Company marketed Clover Assistant as a real-time diagnostic tool for use by physicians during patient exams, as will be discussed more below, in reality very few physicians used it this way. Instead, physicians, and often, instead, their staff, would input data into Clover Assistant well after an exam. When not done contemporaneously, as was the norm, the answers input would be based on notes or recollection rather than direct responses from the patient. Clover Assistant might prompt a data-inputter with certain treatment suggestions while a person used it, but often these suggestions were immaterial given that the actual facetime with the patient, and thus the opportunity to consider with the patient the suggested course of treatment, had already passed. To continue to more relevant data entry, a user might agree, or reject, a proposed course of treatment merely to get to the next screen rather than to indicate what, if anything, had been decided on the issue raised.

110.     However, the "clicks" a user input into Clover Assistant not only recorded information, but also revised a patient's risk assessment score based on the input data. Thus, users could increase a patients' risk assessment score by inputting incorrect data, or selecting after-the-fact—and thus immaterial—course of treatment options in order to continue using the software for

more germane data entry. As Clover benefitted from this feature, it was financial incentivized to allow this known, defect to continue unaddressed in order to grow its revenue. In fact, Clover went so far as to contractually obligate physicians to use Clover Assistant, and to pay them $200 per visit, twice the standard Medicare reimbursement rate, for each time it was used

111.    In fact numerous former employees of the Company interviewed by plaintiffs' counsel in the Securities Class Action attested to the fact that the Company was aware that Clover Assistant fraudulently increased patients' risk assessment scores, and therefore was being used by the Company to upcode patients and commit risk adjustment fraud. The statements attributed to confidential witnesses, below, come from statements attributed to these former employees in the first amended complaint in the Securities Class Action.

112.    One former Company employee interviewed by plaintiffs' counsel in the Securities Class Action, identified as CW2, was the Senior Manager of Partnerships and Development for Clover Health from August 2016 to May 2019. CW2 worked in the Company's San Francisco office and reported to the Company's then-Chief Development Officer ("CDO"), Ethan Lipkind ("Lipkind"), who in turn reported to Defendant Garipalli. CW2 was initially responsible for managing contracted vendors' relationships with the Company, which processed claims and collected premiums. Over time, CW2 become responsible for overseeing all third-party relationships. She noted that her job involved contract negotiations and project management and further noted that Lipkind was overseeing the rollout of Clover Assistant to providers outside of New Jersey.

113.    CW2 noted that it was important to the Company that physicians use the Clover Assistant software during patient exams because having them follow Clover Assistant's recommendations could have them make upward risk adjustments that would benefit Clover's

revenue. CW2 stated in the Securities Class Action complaint: "That really was the model or the philosophy of the Clover Assistant." "When it was talked about internally, it was both that hopefully [Clover Assistant] provides better care but also that it has this additional effect that it gives us more revenue."

114.     CW2 further relayed that Defendants Garipalli and Toy, on numerous occasions, stated that the Company was "willing to pay doctors twice as much to do this because [of the] increased revenue [for Clover]." "It was no grand secret," according to CW2. "In fact, it was the opposite. It was the rallying cry for the company: 'This is what we think the model of the future's going to be.'" CW2 further stated: "There was a lot of talk internally about driving higher reimbursement or driving higher revenue . . . . For people who understood the business of Medicare Advantage [like CW2], that was one of the express benefits of the technology."

115.     CW2 also stated that Clover Assistant was designed to sift through a patient's past claims "and find anything that has a risk adjustment benefit," meaning any condition that would increase a patient's risk adjustment score.

116.     Another former employee interviewed by plaintiffs' counsel in the Securities Class Action, identified as CW3, corroborated CW2's statements. CW3 served as a Provider Engagement Manager in Savannah, Georgia from November 2017 to June 2019. She reported to, *inter alia*, the Company's Director of Network Engagement, Zoe Farrell, the Vice President of Network Management and Operations, Carl Rathjen, and the Vice President of Network Engagement, Ankit Patel. These supervisors reported to CDO Lipkind, who in turn reported to Defendant Garipalli.

117.     CW3 described her job responsibilities as follows: "I was the sole employee stationed down there [in Savannah, Georgia] to build out our initial market offering, as well as

strategy and growth of the market in the Southeast." CW3's responsibilities included convincing physicians to sign contracts requiring them to use Clover Assistant. CW3 was a member of the initial team that built the alpha and beta versions of Clover Assistant.

118.    CW3 described how using Clover Assistant could lead to upcoding, noting that after a doctor input their initial diagnosis into Clover Assistant, it "would highlight which [diagnoses] could go together to put together a high-complexity code." It would then ask "Do you agree?" At which juncture, doctors would check either a "Yes" or "No" box to proceed. On the backend, Clover Assistant, based on the doctor's response to this query, would amend the patient's original "medical note" and the amendment or addendum would be sent to CMS, potentially resulting in an upcode.

119.    CW3 stated that: "Whichever [diagnoses] could go together—whichever high-complexity codes the system would flag that were pertinent—it would ask the doctor if it wanted to add those." CW3 also stated: "The whole thing is designed to be checkboxes, binary questions," and that "Clover's system does a check to make sure high-complexity codes [are being shown to physicians], and if not, they promote them. Those are the pop-ups that come up in the system."

120.    CW3 acknowledged that Clover Assistant might suggest an old or no longer relevant diagnoses because "[t]he system wasn't really removing anything as much as it was trying to consolidate to the higher complexity codes." For example, if a patient came to their doctor with cold symptoms and was diagnosed with the flu, and then returned to the doctor four months later, Clover Assistant might still show a flu diagnosis for that patient, despite "the flu being a short-term virus." In addition, when Clover Assistant reset on January 1 of every year, CW3 noted that while "[t]he doctor [would have] to go back and do all this stuff all over again," that "Clover

Assistant would [only have] in a sense reset, but would promote the [old or irrelevant] codes again if it doesn't see them on the doctor's chart the next time in that calendar year."

121. CW3 acknowledged that this design could, in certain circumstances result "in more accurate coding. That's good—when it's a physician doing it, it's a great opportunity to have more accurate coding." Then the changes are sent to CMS, which reviews "the original note and then sees the amendment signed by the doctor [stating], 'I've made these changes.'" However, often inputting data was not done by a doctor, but instead by office staff. As CW3 noted, "They're not clinically-trained. They're not licensed to diagnose anything."

122. According to CW3, Clover's practice of attempting to classify patients into higher risk categories in order to secure more revenue was caused in part by the U.S.'s 2015 decision to adopt the 10th revisions of the International Statistical Classification and Related Health Problems ("ICD-10"). The ICD-10 permitted the combination of separate diagnoses into complex diagnoses. Whereas, prior to ICD-10, a person suffering from kidney disease, diabetes, and acute hypertension would be diagnosed under three, separate codes, under ICD-10, they would be classified under one "high complexity code" accounting for all three conditions and entitling Clover to more reimbursement from CMS. According to CW3, Clover Assistant "is built to identify all codes identified by all claims Clover has access to," and therefore Clover's business strategy was to get as many physicians as possible to utilize Clover Assistant.

123. CW3 also recognized that it was Clover's strategy to target more vulnerable doctors for enrollment with Clover Assistant. For example, CW3 stated that independent physicians, not affiliated with larger physician groups, who were "interested in the monetary compensation model" were a target of the Company's employees. CW3 continued: "They were looking for doctors that were struggling to get a little extra money to stay afloat." CW3 also stated: "They

wanted independent doctors because they would be able to influence them more." CW3 also explained that doctors affiliated with larger health systems "don't have the same business decision power" as independent doctors.

124. CW3 described the doctors who signed contracts requiring them to use Clover Assistant as typically "lower-rated doctors," according to the rating system on CMS's website, whose "biggest concern was how much money we could give them or how much money they could make." CW3 noted that for many of these lower-rated doctors, positive reviews often contained language similar to: "This doctor gets me on my Adderall all the time and doesn't even ask questions[.]" CW3 noted that "[w]e keep getting these . . . doctors that just want to cheat the system" and acknowledged that "[u]nfortunately, they kind of forced [Clover Assistant] forward to drive revenue. They incentivized doctors to use it, but they didn't care what kind of doctor [used it.] . . . They didn't put any checks and balances in place."

125. These description by CW2 and CW3 of the innerworkings of the Company would jibe with the statements of other former Company employee contained in the Hindenburg Report.

126. For example, the Hindenburg Report noted that multiple "former employees explained that **Clover's software is primarily a tool to help the company increase coding reimbursement. We provide detail on how the software captures and retains irrelevant diagnoses**, which we believe deceives the healthcare system, and poses a significant regulatory risk." (Emphasis added.)

127. Moreover, the Hindenburg Report noted that: "While Clover claims its software tool, Clover Assistant, is aimed at helping doctors improve patient care, former employees told us that it was first and foremost a coding tool. According to one former employee: '**The core feature of the platform is it increases revenue by identifying chronic conditions that people have and**

*CMS will pay that . . . That's the core business proposition.*'" Another former employee quoted in the Hindenburg Report stated that: "*If you make this patient look really, really sick, you are going to get more money from the government . . . I think the government may say it's not bad if a patient really is that sick. It gets dicey when you have a program that you are paying doctors straight up crazy amount of money to log in to and do this for you*" (Emphasis added.)

128. In a similar vein, another former employee quoted in the Hindenburg report stated that: "If you are paying doctors $200 for a click but you are able to increase the severity of patients that you've diagnosed, *it's worth it because you are drawing down thousands of dollars (from Medicare) for a couple of clicks. To me that's why they have this.*" (Emphasis added.)

129. Similarly, another former employee quoted in the Hindenburg Report noted that: "What [Clover Assistant is] doing is saying [that Clover has] your claims and in your claims at some point some doctor diagnosed your hypertension. The doctor that's sitting in front of you right now, we want them to say that you have hypertension. The doctor can say 'yes' or 'no' based on their findings. But *it's a sort of a nudge to the doctor to identify these potential chronic conditions* you have." (Emphasis added.)

130. Doctors quoted in the Hindenburg Report described the other side of these transactions. One stated that Clover Assistant "is like constantly throwing those codes back in our face for everything that's ever come up when they are irrelevant now." Another doctor stated that in their experience, patient records in Clover Assistant were inaccurate between 10% and 25% of the time, noting: "Let's say somebody came in with diabetes. They lost a bunch of weight. They exercise. They don't have diabetes anymore. That diabetes is still on the record." Other doctors referenced in the Hindenburg Report similarly reported that they were limited by Clover Assistant in their ability to remove inapplicable diagnoses from the system.

131.    Defendant Wagner himself corroborated these statements in a November 20, 2020 statement he made at the Company's "Analyst Day," in which he acknowledged that CMS paid Clover more for returning, rather than new, patients.  He explained "the differential between returning and new members" by noting that "new members tend to have worse margin profiles than returning members, in part **because of the lack of information about new member disease burden**." (Emphasis added.)

132.    Once Clover Assistant had information about a patients "disease-burden" even if the information was old, incorrect, or irrelevant, it was more able to upcode patients and thus increase their "margin profile" for the Company.

### Physicians' Use of Clover Assistant was Not as Touted

133.    Aside from Clover Assistant being designed in such a way as to promote the filing of fraudulent claims, and the Individual Defendants' failure to disclose or address this, throughout the Relevant Period the Company touted the high usage rate of Clover Assistant. This high usage rate was highlighted to imply that Clover was a worthwhile investment making a novel contribution to the Medicare Advantage space. However, Clover Assistant was at no time used by as great a number of physicians as the Individual Defendants claimed.

134.    As one example, and recounted in greater detail below, the Company made false and misleading claims regarding Clover Assistant like this one in the Registration Statement:

> The Clover Assistant aggregates and structures millions of data points per day, derived from a variety of data sets, such as claims data, medical charts, medication data, diagnostic data and EHR-generated data, across dozens of typically siloed and inconsistently formatted data feeds. It connects this data with up-to-date, evidence-based protocols and member-specific plan information **to drive real-time, personalized, and actionable insights to PCPs at the point of care. These real-time, data-rich insights inform physicians' decision-making at the moment that they are interacting with and treating their patients.**

(Emphasis added.)

135.     Moreover, the Registration Statement highlighted that, "onboarded physicians are highly engaged, ***using the Clover Assistant for 92% of their member visits*** in 2019." (Emphasis added.) As recounted in greater detail below, this figure or a substantially similar one, i.e., greater than 90%, was repeated throughout the Relevant Period.

136.     However, physicians' actual use of Clover Assistant did not match these descriptions, which was known internally. A former employee of the Company, interviewed by plaintiffs' counsel in the Securities Class Action and identified as CW1, worked as a Clinical Data Operations Specialist for Clover from June 2018 until July 2019; CW1's responsibilities in that role included gathering data from Clover-affiliated care providers to upload it into Clover Assistant.

137.     CW1 stated that "less than 10%" of "onboarded" physicians used Clover Assistant and of those less than 10% who used it "not many of those were actively using it[.]" CW1 stated that this "less than 10%" figure was based on her experience from reaching out to physicians' offices to collect data for Clover Assistant. CW1 and the team she worked on called "thousands of offices" annually and could tell whether or not an office used Clover Assistant, because those that did could send the data through Clover Assistant, while those that did not use Clover Assistant could not. Likewise, certain doctors would inquire about Clover Assistant while on the phone with CW1.

138.     Another former employee, interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as CW4, noted that Company executives would have been aware of these numbers. CW4 worked in Clover's Network Expansion and Growth department from April 2018 until August 2019. This job involved evaluating the prospect of Clover expanding into new markets and introducing physicians in those markets to Clover Assistant. CW4 noted that once

Clover Assistant was rolled out, her responsibilities changed, with a halt on expansion into new markets and a renewed focus on expanding in and around existing markets. CW4 worked in Jersey City, New Jersey and reported to Vice President of Network Management and Operations, Carl Rathjen, as well as CDO Lipkind.

139.    CW4 stated that the number and identities of physicians not using Clover Assistant would have been known to certain of Clover's executives, including at least Defendants Garipalli, Toy and Wagner, because the Company's Data Science Team built reports using data in the Company's data warehouse. These reports were then sent to the Operations team through Google Docs. The reports would, according to CW4, "break it down – how many physicians were signed up and didn't use it, how many used it once and didn't use it again."

140.    The Hindenburg Report would also corroborate the account of CW1, noting that two former employees of Clover contacted by *Hindenburg Research* explained that only doctors classified as "Clover Preferred" used Clover Assistant. The Hindenburg Report added that, for example, according to the Company's database, 45% of Clover-enrolled doctors in Passaic County, New Jersey, and 25% of Clover-enrolled doctors in Morris County, New Jersey were Clover Preferred.

141.    The Hindenburg Report quoted another former Company employee who stated that Clover "had a good portion of doctors in the state but not a great portion of doctors were using [Clover Assistant] if they enrolled." This comported with a survey that *Hindenburg Research* conducted and included in the Hindenburg Report, in which only 18% (4 of 22) of Clover-enrolled doctor's offices confirmed that they used Clover Assistant, with 64% (14 of 22) explicitly stating they did not.

142.     Beyond New Jersey, Clover Preferred doctors were even more rare. In El Paso,
Texas, it was eight of 110, according to the Hindenburg Report. In the entire states of Tennessee
and Arizona combined, it was *zero* of 426.

143.     Moreover, the Hindenburg Report contained statements from doctors in the Clover
network who had negative things to say of Clover Assistant. One said: "I know that all the doctors
in my office, basically, they just feel annoyed by it. We just try to check it and get it closed as
quickly as possible so that we get paid and move on to actual patient care." Another said, "Sick
and tired of yet another website, another log in, another system we are responsible for updating for
some big data; another care consideration to respond to. We no longer have time to take care of
our patients. Someone thinks this system will—what? It is not something that helps family doctors
take care of their patients."

144.     The Hindenburg Report also noted that according to doctors and Clover's former
employees, one of the main obstacles to higher adoption by doctors was that Clover Assistant did
not integrate with doctors' existing Electric Medical Records ("EMR") systems. Most doctors did
not want to simultaneously run and input data into their own EMR system and Clover Assistant.

145.     CW2, interviewed in the Securities Class Action and referenced above,
acknowledged this shortcoming by stating that "of course providers are going to have trouble using
[Clover Assistant]. It's a worthless system if it can't connect to their system of records."

146.     Even of the doctors who did use Clover Assistant, the Company's statements to the
effect that Clover Assistant provided "real time" insight were false and misleading. CW2 stated
that in 2019, Clover's data demonstrated that half of those doctors who did use Clover Assistant
*did not use it during patient exams*. Either they, or a non-physician member of staff, would input
data later based on their notes and recollections. CW2 learned this from the Company's Vice

- 50 -

President of Development, who reported to CDO Lipkind. CW2 was also informed about this by Chief Medical Officer Mark Spektor in the first or second quarter of 2019. CW2 noted that Mark Spektor was privy to this data given that he was "doing all the roadshows" promoting Clover Assistant.

147.    CW2 said this information was gleaned from "timestamp[s] for when the visits were recorded in Clover Assistant. And there were a bunch that might occur at 8 p.m., and you know that they're most likely not seeing patients at that time and they're doing transcription after." CW2 further stated that this data was stored in the Company's data warehouse and thus was available to Company executive.

148.    CW3, interviewed in the Securities Class Action and referenced above, also stated that this data was stored in the Company's data warehouse and that it came from a "standard reporting table" generated from a system called "Mode," a reporting database that allowed Clover to pull data from all the different data tables stored in the data warehouse.

149.    CW4, interviewed in the Securities Class Action and referenced above, further corroborated that Clover could match data submission to the time of patient visits, and thus know whether Clover Assistant was used at the "point of care" as the Company told investors it was.

150.    Given that the Individual Defendants were telling, or causing or permitting the Company to tell, investors that Clover Assistant was being utilized at the point of care, knowledge to the contrary posed a problem internally. CW2 stated that Company executives continued falsely "touting that the vast majority [of providers] were using [Clover Assistant] during the visit." Asked by plaintiffs' counsel in the Securities Class Action if Defendants Garipalli and Toy knew of the data, CW2 answered that they had access to "dashboards" that would have shown it to them and that "I'm sure they would have been familiar with the trends and utilization of [Clover Assistant]."

151. CW2 also noted that it was crucial to the Company's business model that doctors contemporaneously use Clover Assistant, rather than using it after the fact, because following Clover Assistant's recommendations increased risk assessment scores and thus improved the Company's revenue. CW2 said: "That really was the model or the philosophy of Clover Assistant." "When it was talked about internally, it was both that hopefully [Clover Assistant] provides better care but also that it has this additional effect that it gives us more revenue." CW2 noted that Defendants Garipalli and Toy had remarked more than once that Clover was "willing to pay doctors twice as much to do this because [of the] increased revenue [for Clover]."

152. CW3 also acknowledged that only a small number of "onboarded" doctors used Clover Assistant contemporaneously. Moreover, CW3 stated that the Company contracted with doctors who would assign non-licensed staff the role of inputting data into Clover Assistant, and that these staff members would nevertheless sign entries as if they were the doctor. CW3 stated that this was a breach of contract and "fraud" because "in the[ir] contract, it states that the doctor or a licensed medical professional had to complete the visit. . . . At the very least, it needs to be signed off by the doctor." CW3 noted that she was aware of this occurring with doctors using Clover Assistant in Georgia, New Jersey, North Carolina, South Carolina, and Texas.

153. CW3 learned of this practice as early as the second half of 2018, and stated that doctors in Georgia, North Carolina, and South Carolina, the markets she was responsible for, regularly delegated to their staff because they found the process to be extra work they did not want to take on. CW3 stated: "I on a regular basis was in physician offices engaging with them, making sure the plan was supporting them. . . . They would report and show me their process when using it. They were like, 'Yeah, I don't have time for it. I just give it to whoever is up front.'"

154. CW3 learned that in many offices, it was *only* the non-licensed staff members who knew how to use Clover Assistant, and that it was there practice to use it at the end of the day, identify which patients were Clover patients, and then sign an electronic signature for each of those patients as if they were the doctor. According to CW3, the information input by the non-licensed staff constituted "a medical note that's being completed in Clover's system" and submitted to CMS.

155. CW3 also knew doctors in New Jersey were engaged in this practice, because she would occasionally be in New Jersey and help out because the Company was short-staffed. In New Jersey, she would go on "ride-alongs" with colleagues to doctors' offices. CW3 reported that on these trips doctors said things like, "Suzy Q up front will take care of [entering information into Clover Assistant]. I have no problems about this." CW3 said that one Clover employee who worked in Texas, Olivia Istrate, told CW3 that providers in Texas were also having non-licensed staff input data into Clover Assistant. Olivia Istrate told CW3 that she had reported this internally but that nothing was done about it.

156. CW3 stated that she also reported this internally, in emails and in meetings, to Clover leadership and the Compliance Department. "I needed the doctors to sign these contracts," CW3 said, "But they were committing to commit fraud. So, to keep myself clear of it, I made sure to report it to my leadership and Compliance." According to CW3, on a "couple dozen" occasions, she reported the problem via email to Vice President of Network Management and Operations Carl Rathjen, CDO Lipkind, and Clover's Compliance department's email address. CW3 said that despite these reports, it was never dealt with.

157. Moreover, CW3 stated that Lipkind was indifferent as to whether Clover Assistant was actually used *during* patient exams and "was like, 'I don't care. Every doctor needs to sign

this and be on [Clover Assistant]." CW3 stated that Lipkind was "an attorney by education" and therefore typically sought to communicate over the telephone. Still, CW3 said Lipkind "must have gotten tired of repeating himself on the phone" and "slipped up" a few times by communicating this indifference via email. CW3 stated that she also raised the issue of how doctors were using Clover Assistant in meetings with Carl Rathjen and Lipkind and that when she did so Lipkind "would want to talk offline about it." CW3 further recalled bringing up this issue at Network Engagement department meetings and to Provider Alignment Associate Justus Ruff and Manager – Network Development Sammy Gershon.

158.    Defendants finally acknowledged the truth in in a February 5, 2021 article published on *Medium* (the "Medium Article"), more than two years after CW3 first encountered the problem. In that article, the Company described that physicians were "onboarded" when "the physicians have received their initial training and have created their accounts, and we have answered their questions. Basically, they're ready to use the software. We also refer to the physicians as the 'Live' physicians. . . . We typically have a pipeline of Contracted physicians waiting to be onboarded at any given time, and our goal is to go from Contracted to Live within 60 days." Defendants then disclosed, for the first time, "currently 22% of all in-network Primary Care Physicians are Live. This correlates to 4% of the total in-network physicians (including PCPs, specialists, etc.)." Thus, by February 2021, only 22% of primary care physicians, and 4% of total physicians, were "ready to use" Clover Assistant, far below the 90+% repeatedly touted. Of those, per the above, the amount who would use Clover Assistant at all was smaller, and those who would use it contemporaneously during patient exams was smaller still.

*Illegal Kickbacks*

159.    More than just paying doctors $200 to use Clover Assistant, Clover deployed other tactics both to get physicians to sign contracts with the Company and to direct patients their way, in violation of the Federal Anti-Kickback Statute.

160.    For example, CW3, the former employee interviewed in the Securities Class Action and referenced above herein, noted that CDO Lipkind, her supervisor who himself reported to Defendant Garipalli, directed her on multiple occasions to purchase about $250 in gift cards and to deliver them to doctors' offices.

161.    CW3 stated that the first time this occurred was in 2018, when Lipkind asked CW3 to buy about $250 in gift cards, to deliver them to SouthCoast Health in Savannah, Georgia, and to ensure that SouthCoast Health knew it was from Clover.

162.    CW3 stated that initially she did not want to fulfill this directive because she knew this transaction was not going to be reported to the government. She told CDO Lipkind: "This isn't compliant. We shouldn't do this." However, CW3 reported that this prompted a phone conversation with Lipkind in which he threatened to fire her if she did not comply, and so she did. CW3 stated, "I took them directly there [to SouthCoast Health]" and that Lipkind "wanted to know once it was done." CW3 also stated that Lipkind's threats of termination were his "go-to for a lot of things," and that she recalled being threatened with termination by Lipkind about five times during her time at Clover.

163.    CW3 related another time she was instructed by Lipkind to deliver gift cards to BCG Medical Group, "another major practice that [Lipkind] was trying to get buy-in from." CW3 stated she did not perform this delivery because she had already emailed Director of Network Engagement, Zoe Farrel, ("Farrel") regarding the gift cards sent to SouthCoast Health after which, CW3 stated, "Zoe called me immediately [and said], 'You can't do that. It's fraud.'"

164.     CW3 related how Farrel filed a complaint with Clover's compliance department which contained CW3's initial email to Farrel. CW3 then spent about a week answering questions from Clover's internal lawyers, including "Did [Lipkind] tell you to do this?" and "Can someone corroborate this?" CW3 stated that she informed the lawyers that Lipkind had directed her to do this, that he had threatened to fire her, and the Farrel could corroborate this, as CW3 had contemporaneously informed her.

165.     CW3 also stated that she knew of a colleague in Texas, Olivia Istrate, who had received similar instructions to deliver gift cards from Lipkind.

166.     CW4, another former employee of the Company interviewed by plaintiffs' counsel in the Securities Class Action and referenced above, also recalled hearing in the Network Expansion and Growth Department that Clover was engaged in giving gift cards to office staff of doctors' offices. CW4 stated that what she heard made it sound like this was something Lipkind was doing. CW4 also noted that Lipkind had "cozied up to" Defendant Garipalli and was known around the office to be close to Defendant Garipalli.

167.     CW3 stated that Clover' response to her and Farrel's complaint did not include sending "a formal PSA to the organization" or otherwise sending any official notice to Company employees regarding giving gift cards or other illegal payments. On the contrary, CW3 stated that in a few months Lipkind was promoted, which CW3 saw as evidence that Defendants Garipalli and Toy knew about the gift cards. CW3 stated: "I can't see a world where they didn't get notified of it[.]" "They had a senior leader [i.e., Lipkind] do this, and then less than a few month's later he's promoted to the executive team. That would be something that must have come up on her review of when they were talking about bringing him on board."

168.     Moreover, CW3 noted that Farrel was fired in 2019, after having reported the illegal payments, and that in response Farrel filed a wrongful termination lawsuit.

169.     The Hindenburg Report corroborated these descriptions by CW3 and CW4, noting that: "In addition to soliciting potential members through brokers and websites with undisclosed conflicts, Clover also skirted regulations by recruiting members through physicians' practices, according to a former employee." The former employee in the Hindenburg Report is quoted as saying that Clover distributed gift cards "all over the freaking map" to induce providers to direct patients to Clover. The former employee told Hindenburg that gift cards were used because they were untraceable.

170.     The Hindenburg Report contained other details concerning the Company's illicit payments. A former Company employee quoted in the report described a "confidential program" where Clover enlisted "Clover Ambassadors" at doctors' officers, for example receptionists or secretaries, who were paid to direct patients to Clover but who were instructed not to reveal that they worked for Clover. The former employee described this program in the Hindenburg Report as follows: "The receptionist would notice that a patient checking in was enrolled in, say, United Healthcare, and would mention to the patient that there was another plan that might meet their needs better – 'Do you want more information? No problem. I'll have them give you a call.'"

171.     The above described conduct, both of furnishing doctors' office staff with gift cards and hiring undisclosed "Clover Ambassadors," expressly violated the Federal Anti-Kickback Statute's prohibition against "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or

in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.[.]" As mentioned above, violations of the Federal Anti-Kickback Statute are per se violations of the Federal False Claims Act.

### Deceptive Marketing Practices

172.     During the Relevant Period, Clover's wholly owned subsidiary, Seek Insurance misleadingly advertised itself to unwitting consumers, while failing to disclose its connection to Clover. Specifically, Seek Insurance's website held itself out as an "independent" and "unbiased" source of information concerning the selection of Medicare plans. In fact, the website specifically stated that it was "privately owned and operated" and made no mention of the fact that it was really owned by Clover. Instead, Seek Insurance deceptively marketed to seniors that it is "ready to help you compare your options and find the best Medicare plan – no matter which insurance company offers it." Notably, despite Clover's ownership of it, Seek Insurance's website explicitly stated "[w]e don't work for insurance companies. We work for you."

173.     Astonishingly, Seek Insurance's website even had a blog post criticizing other insurance brokers as "incentivized to steer clients towards a plan that is tied to their own financial interest" while characterizing itself as remaining "neutral" and its approach as "impartial" before it implores consumers to "trust" them to be "objective[.]"

### Undisclosed Related Party Transactions

174.     A significant amount of the Company's and its predecessor's sales was and remains attributable to an undisclosed relationship the Company has with an outside insurance brokerage firm, B & H Assurance, LLC ("B&H"), controlled by the Company's Head of Sales, Hiram

Bermudez ("Bermudez"). Although Bermudez supposedly left his position as VP of Sales Operations with B&H in September 2012, Bermudez is still listed as B&H's sole agent according to the most recent New Jersey corporate records.

175. One former employee that *Hindenburg Research* interviewed explained that Bermudez never left B&H, but rather, Clover Health brought him on to use his field marketing organization, which is designed to negotiate sales deals with insurers that a network of brokers can then offer and sell to customers, to grow its sales. According to another former employee that *Hindenburg Research* interviewed, Bermudez took steps to actively conceal the relationship by "hand[ing] his business over to a partner," i.e., his wife.

176. The Hindenburg Report also noted a former employee's estimation that Bermudez generated "~68% of Clover's total sales." In addition, the Hindenburg Report noted that Bermudez self-described his role with Clover, on his personal LinkedIn profile, as involving the negotiation of "aggressive contracts with FMOs ['field marketing organizations']." However, given that B&H was a field marketing organization that did business with Clover, yet was an undisclosed related party due to Bermudez's affiliation with both, the Hindenburg rightly pointed out the conflict of interest this posed by asking, "Does he play hardball with himself?"

177. Although B&H listed Clover as a partner on its website, it did not list Clover under its formal relationship disclosures with the National Association of Insurance Commissioners ("NAIC"). Notably, NAIC records indicated that the only business entity affiliation listed for B&H is with Yesenia Rivera, who is Bermudez's wife.

178. Former employees interviewed by plaintiffs' counsel in the Securities Class Action corroborate this account. CW2, referenced previously above, stated that Clover's Regional Vice President and General Manager, Jeff Ross, or Vice President of Growth and Strategy Operations,

Chris Watson, had once informed her that Bermudez was "well connected" to New Jersey insurance brokers. CW2 learned this information in the course of being "involved in Clover's initial expansion outside of New Jersey [and] . . . hav[ing] a bit more exposure to how sales worked and stuff like that." CW2 further stated of Bermudez that "everyone knew that Hiram was well-connected with brokers in New Jersey. Sort of like an old-school union boss. He was buddies with these guys. He could bring in a lot of brokers." CW2 also noted that Bermudez "was one of those people, he had been at Clover from the beginning, which was by the time I was there fairly rare."

179.    Another former employee interviewed by plaintiffs' counsel in the Securities Class Action, CW3, referenced previously above, stated that Bermudez owned multiple insurance brokers that had business in Pennsylvania and had a "strong hold" on the Northeast insurance market. According to CW3, in 2017 training sessions CW3 attended, a colleague "pulled up a portal where all the insurance licensures live—the business organizations . . . and it showed the difference between someone that was tied directly to Clover as a captive sales agent versus someone that was directly under a field marketing organization," including a field marketing organization belonging to Bermudez. CW3 learned that Bermudez was among the first group of employees at Clover, and that his "huge footprint of sales agents on the ground" help Clover market. CW3 also reported that more than half of the sales managers employed at the Company came from Bermudez's organization.

180.    CW3 worked personally with Bermudez beginning in 2017 and by 2018 their professional relationship had developed to the point where Bermudez "started sharing stuff about the early days of Clover." Moreover, Bermudez "always touted [that he was compensated] a great sum" and told CW3 that "he didn't care much for his stock options. He wanted hard money now. He always talked about his multiple houses."

181.    In addition, CW3 reported regularly being around Bermudez when he handled business calls related to B&H. On occasion, he would "get off the phone and say, 'That was my business partner.'" CW3 noted that that "was the way [Bermudez] would manage that business remotely, especially when Clover had him traveling to other markets."

182.    CW3 further noted that the majority of the Company's New Jersey sales derived from B&H or otherwise from Bermudez, his agents, or agents working at one of his field marketing organizations. CW3 determined that the reason Clover struggled to gain ground in other markets outside New Jersey was that the Company was not "adjusting the playbook" for these markets, and that the "playbook" was merely using Bermudez's extensive connections.

183.    Eventually, the Company would acknowledge this relationship in the February 5, 2021 Medium Article. In the article, the Company admitted the undisclosed related party transaction and stated that "Clover has paid approximately $160k directly to B&H since 2017," but that Bermudez, aside from hits 50% ownership interest in B&H, did "not receive any compensation, direct or indirect, from B&H Assurance for any work related to Clover[.]"

184.    This would prove untrue, with the Company later revealing in a March 29, 2021 8-K filed with the SEC that B&H had actually received about $1.36 million from the Company since 2017 with Bermudez personally receiving $500,000 from B&H during the same time, in addition to his $160,000 in compensation directly from Clover. Moreover, Bermudez received another $1.2 million in payments for Clover-related products between 2017 and 2020.

*Investigations*

185.    By early 2019, if not earlier, the DOJ was investigating the Company for the above misconduct. CW3 stated that she was contacted in October 2020 by the DOJ in relation to this investigation, and that she was informed in her communications with the DOJ that she was not the

only employee contacted and that the investigation had been occurring for "months" by that point. Moreover, the DOJ informed CW3 that her contact information had been provided to them by Clover, and that Clover had been alerted to the investigation's existence "right away."

186. Moreover, CW3 stated that the DOJ informed her that the investigation "originated from some complaints made by physicians in the Pennsylvania area," and "that the physicians felt that Clover was trying to entice providers to refer patients to Clover." CW3 recalled a November 2020 interview over the phone in which the DOJ was "asking about Clover's actions in getting doctors to sign on to their networks and what means they would go to do so." CW3 related her story to investigators concerning Lipkind directing her to purchase gift cards, deliver them to SouthCoast Health, and inform them that they were from Clover.

187. The Hindenburg Report would reveal that around the same time CW3 was contacted, October 2020, the DOJ sent the Company a Civil Investigative Demand to determine if the False Claims Act had been violated, stating: "The False Claims Act investigation generally concerns whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal Agencies."

188. Moreover, the Civil Investigative Demand stated:

The general purpose for which this Civil Investigative Demand is issued is to discover your knowledge concerning the topics below. . . .

- ***Clover's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans***;

- Clover's activities intended to encourage providers to refuse to accept patients with non-Clover coverage;

- ***Clover's payments to providers' staff and employees (receptionists, office managers) for conveying any information relating to Clover plans to patients in providers' offices***;

- ***Clover's payments to providers' staff and employees for generating prospective patient leads for Clover plans;***

- *"Clover ambassadors;"*

- Clover's payments of $5 per referral of a prospective patient not already covered by a Clover plan;

- *Clover's distribution of gift cards to retail merchants for referral of prospective patients not already covered by a Clover plan;*

- *Clover's payments to providers for services rendered to patients and/or to Clover;*

- *Payments related to "Clover Assistant;"*

- Clover's patient recruitment efforts;

- Clover's activities relating to matching patients with Medicare Advantage plans;

- *An online platform known as "Seek Medicare."*

(Emphasis added.)

\*                \*                \*

189.    Thus, per the recollection of former employees, as reiterated in the Hindenburg Report, and as the Company later corroborated in the Medium Article, Clover Health and then the Company were engaged in Deceptive Sales Misconduct for years prior to the truth emerging. Moreover, Clover Health, and then the Company, knew it was the subject of an DOJ inquiry resulting from the Deceptive Sales Misconduct, at least as early as October 2020 and thus well before this became a matter of public knowledge in February 2021, yet chose not to disclose it in numerous SEC filings despite the clear materiality of the investigation to shareholders and potential investors.

190.    On February 5, 2021, the Company filed a current report on Form 8-K with the SEC disclosing that Clover had received a letter from the SEC indicating that it commenced an investigation into the Deceptive Sales Misconduct, as detailed herein and in the Hindenburg

Report, and requested that the Company preserve documents and data for the period from January 1, 2020 to the present.

**<u>The Individual Defendants' Duty to Disclose</u>**

191.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Clover's, with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that registration statements filed either on S-1 or S-4 filed with the SEC include a "Management's discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3)(ii) provides that the MD&A section must:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

192.    Additionally, Item 503 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Merger Filings "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

193.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the Deceptive Sales Misconduct and the DOJ investigation, as these facts constituted: (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Clover speculative or risky.









Case 3:21-cv-00311   Document 23   Filed 11/30/21   Page 68 of 126 PageID #: 298



███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████

**<u>False and Misleading Statements Made During the Relevant Period</u>**

***October 6, 2020 Tweet, Press Release, Conference Call, CNBC Interview, and Form 425 Prospectus***

207.    On October 6, 2020, Defendant Palihapitiya tweeted an announcement of the Merger. His tweet contained a picture of a list titled, "Investment Thesis for Clover Health – Disrupting Healthcare by Delivering Better Outcomes at Lower Cost. This list stated, in relevant part, "Clover Health's proposition of better outcomes and lower costs has ***resulted in strong initial growth***" and "Clover Health is ***the fastest growing*** MA plan in the US" In addition it said, "[Clover Health] typically take[s] ***over 50% of the net membership growth*** in each of their established markets."

208.    Also on October 6, 2020, Clover Health issued a joint press release which announced its plans for going public by way of reverse merger with SCH at a $3.7 billion valuation. The press release highlighted the Clover Assistant and the benefits Clover Health's technological approach provides, stating:

> Today, ***Clover is the fastest growing Medicare Advantage insurer in the United States*** – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. ***Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach, Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets,*** including to historically underserved and rural communities.

(Emphasis added.)

209.     Also in the press release, Defendants Palihapitiya provided reaction to the news and took the opportunity to relentlessly tout Clover Health's many purported virtues. The press release quoted Defendant Palihapitiya, in relevant part, as saying: "***The Company's rapid growth is a testament to the effectiveness of its tech-enabled approach***, which resonates powerfully with consumers and physicians alike." (Emphasis added.)

210.     That same day, Defendants Palihapitiya, Garipalli, and Toy held a conference call with investors to tout the forthcoming merger. On that call Defendant Palihapitiya stated:

> Already, Clover is the fastest growing Medicare Advantage plan in the United States. ***It's growing two to three times faster than their next nine competitors. It is also a business that not only is doing very well in new markets when it launches, but in existing markets where it already has share***. In fact, just like many other best-in-class software and technology companies, what you see here is a characteristic that we call land and expand, or negative churn.
>
> *                *                *
>
> We have this incredible first beachhead market called Medicare Advantage, ***proving the value day in day out that Clover Assistant and Clover delivers better outcomes at a lower cost, grabbing share from incumbents, predictably growing by 25% to 30% compounding. And then this technology platform allows us to embrace and become a first mover in these very disruptive new forms of growth like direct contracting***.
>
> *                *                *
>
> [W]hat I have seen through the diligence is that this is the first technology company who is having a meaningful impact in disrupting healthcare***. The reason is because they have built software that allows them to improve outcomes and lower costs***. ***What that is allowing them to do is quickly capture share from slower incumbents that are non-technology centric, and it is differentiated in a way that I believe will make it very hard for these legacy businesses to copy. And because it's technological, it has the ability to embrace new forms of growth that can supercharge the business and create low-cost acquisition channels to scale the value that they provide people***. And the great thing is that it has started in a part of a market, in a sector of the economy, that is just growing incredibly fast.

(Emphasis added.)

211.    Defendant Garipalli also said on this call: "So, why do consumers choose Clover? Put simply, *we have designed our plans to be obviously attractive to consumers*, Medicare eligibles, which is why we call it obvious. . . . [W]hat we did at Clover was take the best of both and we offer wide network choice, with low-cost plans." Defendant Garipalli continued by saying, "we remove friction for consumers to see their primary care physician, with zero dollar primary care co-pays and an extremely low cost to see their specialists. And then when you compare us against other options, we provide significant savings relative to original Medicare. We estimate 41% lower and 17% lower than the top other plans in the market."

212.    Moreover, Defendants Palihapitiya, Garipalli and Toy utilized a slide deck during the call, Slide 21 of which stated: "*92% of eligible member visits utilize Clover Assistant*." Defendant Toy also said on the call: "*Over 2,000 PCPs are contracted to use the Clover Assistant*. And what that means is over 60% of our membership goes to one of these doctors. *Our engagement rate is an impressive 90%* and our net promoter score as of Q2 2020 is in the positive 60 range, and we are really happy with that."

213.    During an interview on *CNBC*'s "Squawk Box" later that same day, October 6, 2020, Defendant Palihapitiya touted Clover Health's growth stating, "when you're a technology business that's cheaper, faster and better than all of your incumbent competitors in a market this dynamic, *what happens is you start to grow really fast*, and this is exactly what's happening with Clover. *Clover is already growing two to three times faster than their next nine nearest competitors.*" He continued that "what's great is [that Clover's] gross margins start better because they're a technology business, and we think it's going to get better and better over time, and the reason why is because *they create transparency*. They don't play games. **They don't motivate**

*doctors to upcode or do all kinds of things in order to get paid. They've created an extremely transparent business*" (Emphasis added.)

214.    The same day, Clover Health, together with SCH, also filed a prospectus on Form 425 with the SEC that attached the Merger Agreement as an exhibit. The Merger Agreement was signed by Defendants Garipalli and Palihapitiya and stated the following with regard to "Healthcare Compliance": "*[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws*, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program [.]" (Emphasis added.) Notably, "Health Care Laws," is defined within the Merger Agreement to include, Federal False Claims Act, the Federal Anti-Kickback Law, and many other related laws.

215.    Additionally, the Merger Agreement stated, "[s]ince January 1, 2018 . . . (iii) each of [Clover] and its Subsidiaries has implemented and maintained a compliance program, including policies, procedures and training, intended to ensure compliance with all applicable Health Care Laws…"

216.    Concerning "Litigation and Proceedings," the Merger Agreement, stated the following:

> Section 4.10. <u>Litigation and Proceedings</u>. Except as set forth on Section 4.10 of the Company Disclosure Letter, as of the date hereof, (a) *there are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions (including any investigations or inquiries initiated, pending or threatened) by any Governmental Authority, or other proceedings at law or in equity (collectively, "Legal Proceedings"), against the Company or any of the Company's Subsidiaries or their respective properties or assets*; and (b) there is no outstanding Governmental Order imposed upon the Company or any of the Company's Subsidiaries; nor are any properties or assets of the Company or any of the Company's Subsidiaries' respective businesses bound or subject to any Governmental Order, except in the case of each of clauses (a) and

(b), as would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole.

(Emphasis added.)

217.    The statements made on October 6, 2020 by the Company and Defendants Garipalli, Toy, and Palihapitiya were false and misleading because they failed to disclose the following material facts: (1) the Company's engagement in the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare Advantage plans; (3) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (4) the Clover Assistant software was rudimentary, aided Clover in committing fraud, and was not as widely used as the Company publicly maintained; and (5) the Company's consolidated financial statements did not accord with GAAP and improperly omitted related party transactions; and (6) the Company failed to maintain internal controls.

### October 7, 2020 Letter to Employees

218.    On October 7, 2020, the Company filed a letter to employees on Form 425 with the SEC. It was signed by Defendants Garipalli and Toy and stated to employees and investors that the Company's "product gets smarter every day, improving recommendations to providers, which leads to better outcomes for members and, thus, improved provider and member satisfaction. This, *in turn, further drives member growth*." (Emphasis added.)

219.    This statement was false and misleading because it failed to disclose the Company's engagement in the Deceptive Sales Misconduct and that Clover's growth was artificially inflated by the Deceptive Sales Misconduct, including new members being directed to the Company via illegal kickbacks and undisclosed "Clover Ambassadors."

### October 20, 2020 Registration Statement

220.    On October 20, 2020, Clover filed the Registration Statement with the SEC in connection to the Merger. Defendants Palihapitiya, Trieu, Osborne, Reses, and Ryans signed or authorized the signing of the Registration Statement. In it they represented that they had:

> [C]onsidered the scope of the due diligence investigation conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to Clover, including:
>
> a.  extensive virtual meetings and calls with Clover's management team regarding its operations, projections and the proposed transaction; and
>
> b.  review of materials related to Clover and its business, made available by Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

221.    This statement was repeated in Registration Statement as amended on November 20, 2020 (the "First Amended Registration Statement"), the Registration Statement as amended on December 9, 2020 (the "Second Amended Registration Statement"), the Registration Statement as amended on December 10, 2020 (the "Third Amended Registration Statement), as well as the December 14, 2020 Prospectus and the January 13, 2021 SPO Registration Statement.

222.    Pertaining to Clover Health's business model, the Registration Statement highlighted the following:

> • We broadly disseminate the Clover Assistant free-of-charge to primary care physicians ("PCPs") who use it at the point of care while treating our members.
>
> • The Clover Assistant provides essential information and personalized care recommendations to PCPs, driving real-time, data-driven decision-making, which results in better care for our members and strong plan performance.

*          *          *

> ***We have succeeded with this approach in our established markets and seek to replicate it in all markets that we enter.***

(Emphasis added.)

223.    This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

224.    The Registration Statement continued its description of the Company's business model by noting:

> We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of June 30, 2020, *over 2,100 PCPs, who already treat our members and are responsible for caring for 61% of our total membership, had contracted to use the Clover Assistant to manage our members' care.* In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 64 for the three months ended June 30, 2020. . . . *Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.*

(Emphasis added.)

225.    The First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement stated something substantially similar by noting:

> We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020 *over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care.* In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. . . . *Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.*

(Emphasis added.)

226.     Regarding Clover Health's growth, the Registration Statement also stated the following, in relevant part:

> As a result of our "Obvious" plans*, we have achieved significant organic membership growth*. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. *This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period.*

227.     This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

228.     With regard to the Company's "Value Proposition," the Registration Statement stated the following, in relevant part:

> Because we drive this clinical improvement with technology, *we believe we can scale in virtually any market,* including traditionally underserved markets that are generally not viable for others, as demonstrated by the fact *that we had 25% more low-income members and nearly twice the number of minority members as a percentage of our plan population than are generally served in MA [Medicare Advanatge] as of June 30, 2020.*

229.     This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

230.     Regarding the Company's "Growth Strategy," the Registration Statement stated, in relevant part: "We have designed our platform to be easy to adopt and use, *resulting in rapid adoption of the Clover Assistant since its launch in July 2018. In particular, the number of PCPs who have adopted our Clover Assistant platform has grown by more than 500% from January 1, 2019, to June 30, 2020.*" (Emphasis added.)

231. The First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement similarly stated: "We have designed our platform to be easy to adopt and use, *resulting in rapid adoption of the Clover Assistant since its launch in July 2018. In particular, the number of PCPs contracted to use the Clover Assistant that care for our members has grown by more than 500% from January 1, 2019, to September 30, 2020.*" (Emphasis added.)

232. The "Growth Strategy" section of the Registration Statement continued:

> We currently offer MA plans in 34 markets in the United States, and we are launching in 74 additional MA markets in 2021. *We principally scale by deploying the Clover Assistant software to PCPs. We contract with providers simply to use the Clover Assistant at the point of care for a flat fee rather than, for example, negotiating contracts involving risk-sharing arrangements under which the provider assumes financial responsibilities for patient care. We plan to leverage our rapidly scalable business model to enter into new markets* nationally in order to offer our "Obvious" plans to a greater percentage of the over 60 million Medicare-eligible beneficiaries. Accordingly, *we plan to seek opportunities to create differentiated and enhanced plans for Medicare-eligible beneficiaries across the United States, including underpenetrated and traditionally underserved markets.* For example, we recently announced a new partnership with Walmart to make co-branded Clover-Walmart plans available in eight Georgia counties that represented over 370,000 Medicare eligible beneficiaries in 2019. *We also intend to increase spending for new market development and expansion of our sales channels and in-person or remote clinical care capabilities.*

(Emphasis added.)

233. This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

234. In a section titled, "Government Regulation," the Registration Statement stated that "[w]e work diligently to ensure compliance with all applicable laws and regulations." The Registration Statement further stated:

Our operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, **and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.**

(Emphasis added).

235.    This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

236.    Regarding "Legal Proceedings," the Registration Statement stated:

**From time to time, we are involved in various legal proceedings arising from the normal course of business activities. We are not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition.** Defending such proceedings is costly and can impose a significant burden on management and employees, we may receive unfavorable preliminary or interim rulings in the course of legal proceedings, and there can be no assurances that favorable final outcomes will be obtained.

(Emphasis added.)

237.    This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

238.    Under the heading "**From time to time we are and may be subject to litigation or investigations, which could be costly and time-consuming to defend**," the Registration Statement stated the following as to Clover's risk of litigation:

[F]rom time to time, **we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other**

***state, federal and international governmental authorities.*** In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. ***Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.***

\*            \*            \*

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. ***While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse.*** See the section entitled "Risk factors—Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

(Emphasis added; original emphasis removed.)

239. This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

240. Regarding "Sales and Marketing," the Registration Statement stated the following:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

241. This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

242. The Registration Statement also maintained that Clover's "consolidated financial statements are prepared in accordance with GAAP."

243. This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

244. The Registration Statement also made the following disclosure of "Related party transactions," which entirely omitted any reference to B&H and Bermudez:

The Corporation has various contracts with IJKG Opco LLC (d/b/a CarePoint Health—Bayonne Medical Center), Hudson Hospital Opco LLC (d/b/a CarePoint Health—Christ Hospital) and Hoboken University Medical Center ("HUMC") Opco LLC (d/b/a CarePoint Health—Hoboken University Medical Center), which collectively do business as the CarePoint Health System ("CarePoint Health") and are in-network Clover providers in New Jersey. CarePoint Health is ultimately held and controlled by Mr. Vivek Garipalli, the Chief Executive Officer and stockholder of the Corporation. The Corporation has entered into contracts, similar to those with

many of its other hospitals, with CarePoint Health for the provision of inpatient and hospital-based outpatient services. Expenses and fees incurred related to these contracts, recorded in net medical claims incurred, were $12.6 million and $9.7 million for the years ended December 31, 2018 and 2019, respectively.

***Securities payable to related parties***

The Corporation has entered into various securities payable with certain related parties as further discussed in Note 12 "Notes and securities payable".

245.     This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement.

246.     The Registration Statement made an additional disclosure about "Related party transactions," still omitting any reference to Bermudez and B&H, as follows:

The Corporation has various contracts with IJKG Opco LLC (d/b/a CarePoint Health—Bayonne Medical Center), Hudson Hospital Opco LLC (d/b/a CarePoint Health—Christ Hospital) and Hoboken University Medical Center ("HUMC") Opco LLC (d/b/a CarePoint Health—Hoboken University Medical Center), which collectively do business as the CarePoint Health System ("CarePoint Health"). CarePoint Health is ultimately held and controlled by Mr. Vivek Garipalli, the Chief Executive Officer and stockholder of the Corporation. The Corporation has entered into contracts, similar to those with many of its other hospitals, with CarePoint Health for the provision of inpatient and hospital-based outpatient services. Expenses and fees incurred related to these contracts, recorded in net medical claims incurred, were $5.8 million and $3.4 million for the six month periods ended June 30, 2019 and 2020, respectively.

***Securities payable to related parties***

The Corporation has entered into various securities payable with certain related parties as further discussed in Note 10 "Notes and securities payable".

247.     This statement was repeated in the First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement, though the sentence, "Expenses and fees incurred related to these contracts, recorded in net medical claims incurred, were $5.8 million and $3.4 million for the six

month periods ended June 30, 2019 and 2020, respectively" was replaced by "Expenses and fees incurred related to these contracts, recorded in net medical claims incurred were $9.4 million and $5.3 million for the nine month periods ended September 30, 2019 and 2020, respectively."

248.    The statements identified above in the Registration Statement, First Amended Registration Statement, Second Amended Registration Statement, Third Amended Registration Statement, the Prospectus, and the SPO Registration Statement were false and misleading because they failed to disclose the following material facts: (1) the Company's engagement in the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare Advantage plans; (3) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (4) the Clover Assistant software was rudimentary, aided Clover in committing fraud, and was not as widely used as the Company publicly maintained; (5) the Company's consolidated financial statements did not accord with GAAP and improperly omitted related party transactions; and (6) the Company failed to maintain internal controls.

### November 19, 2020 Fireside Chat and Presentation

249.    On November 19, 2020, the Company held a virtual "Fireside Chat" with investors. During this conversation, Defendant Garipalli was asked, "You guys, very strong growth in New Jersey, Vivek. You branched out to a few new markets. When you talk about that 30% growth rate for the next few years, are you talking about the existing four or five markets that you have today, and how much of that comes from New Jersey versus the new markets that you've entered into?" Defendant Garipalli replied, "A majority of that growth will still come from our established markets, which is all the counties in New Jersey and adjacent ones beyond that and then a minority of growth from some of the newer markets. So when we look at our capital deployment,

historically, very, ***very little of our capital deployment went to anything growth related. So our growth is essentially, not due to clever marketing, but really just due to attractive plan design as we call our obvious plan design.***"

250. Defendant Wagner stated during the "Fireside Chat:"

> And so we believe there's a tremendous opportunity, upwards of 1500 basis points of savings, that are available out there in the Medicare fee for service system. We're not saying we're going to get all of those and capture all of those next year by any stretch of the imagination, but we think there's a lot out there that we can capture through the use of software, partnering with our physicians. And the great thing about the technology and the way that we've designed the program is ***all the physicians that are participating with us have to use Clover Assistant as part of their contract.*** And so that's going to allow us to achieve these medex savings that will allow . . . . Again, we're not going to comment on exactly what we believe the margins could be because the economics are still moving, but there is, at the gross margin line, there was a tremendous opportunity out there that we believe we can capture.

(Emphasis added.)

251. Defendant Toy later stated during the "Fireside Chat" that: "Clover Assistant is our platform, and just a reminder, we use Clover Assistant for Medicare Advantage and we're going to use it for direct contracting, right. . . . ***As you can see here, stats, we're very proud of our engagement, our engagement rate's 90% above, above 90%, which means that for people, doctors, who have signed up to use Clover Assistant, they're using Clover Assistant above 90% at the time when one of our members comes in for an office visit.***" Defendant Toy continued stating "We are able to cover a wide range of physicians ranging from independent practitioners, all the way to large health systems, and not just the most technologically savvy, either. 11% of our CA physicians don't even have an EHR. ***Clover Assistant is the actual first technology tool that they're using, and we're really proud of that.***" (Emphasis added.)

252. The statements identified above from November 19, 2020 were false and misleading because they failed to disclose the following material facts: (1) the Company's

engagement in the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare Advantage plans; (3) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (4) the Clover Assistant software was rudimentary, aided Clover in committing fraud, and was not as widely used as the Company publicly maintained; and (5) the Company failed to maintain internal controls.

### *November 20, 2020 Analyst Day*

253.     The Company hosted an "Analyst Day" on November 20, 2020 featuring Defendants Garipalli, Toy, and Wagner. Analyst Day began with a video containing, *inter alia*, this statement from Defendant Toy: "The Clover Assistant is a web application and ***a physician uses it every visit they have with one of our members and it's tuned to show them clinically useful, personalized relevant information that helps them give better care during that visit.***" Defendant Toy went on, "And now for every PCP visit, every doctor visit that PCP is seeing exactly the information they need and technology is powering all of that." (Emphasis added.)

254.     Defendant Garipalli also described Clover Assistant, during Analyst Day, by noting that Clover had: "been able to scale [Clover Assistant] broadly and rapidly with contracts with over 2,000 primary care physicians, a myriad of different practice types across all 34 of our current markets. What you see here is a small representation of the statistics we track for the Clover Assistant . . . . So ***92% is, is the percentage of visits where onboarded PCPs used the Clover Assistant for eligible visits in 2019***."

255.     Asked by an analyst, "[W]hat's the process of going back, I guess in maybe your more core markets, in terms of the interaction with the physicians that are not utilizing the platform? What are those discussions and is there any type of conversion rate that you can talk

about people that are not using it and then they end up switching over?" Defendant Garipalli answered, "*for physicians that have 10 or more Clover members, we're at about a 90 plus percent conversion rate. If they're not on Clover Assistant, we can bring them onto Clover Assistant. Even physicians that are not on Clover Assistant that have less than 10 Clover members, we're still at about a 50% close rate on getting them to agree to use the Clover Assistant*.

256.    Also at the event, an analyst asked, "in the example you gave about market share over time, you got to 20% market share in the market before 2018, I guess, before Clover Assistant actually was kind of fully launched out. Can you just talk a little bit about how you were able to do that, and how you think about other dynamics that can help you drive market share, outside of Clover Assistant?" Defendant Garipalli replied to the question by stating, "*the historical growth in our markets has been driven by the plan design attractiveness*. So from a perspective of low copays, max supplemental benefits, again relative to the competition, and then wide physician choice . . . . We have the lowest co-pays, most supp benefits, and then also not just widest choice, but the out of network cost sharing for primary care and specialists is equivalent to what it is in network. *And so that combined is what has driven a lot of the attractiveness and growth. The Clover Assistant is what allows those plans to be economically affordable.*"

257.    Analyst Day also featured a presentation titled, "Clover Health A Deeper Dive," slide 14 of which misleadingly titled "Step 3: Physicians value the Clover Assistant." The slide stated, "[i]n ~2 years since product launch, *we've built a broad base of engaged physicians*. Given our software-driven approach, we believe we can scale these results rapidly within existing and new markets." The slide reiterated the figure of **"~92% – Onboarded PCPs used the CA for 92% of eligible visits in 2019.**"

- 86 -

258.    The statements identified above from "Analyst Day" were false and misleading because they failed to disclose the following material facts then known to the Individual Defendants: (1) the Company's engagement in the Deceptive Sales Misconduct; (2) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (3) the Clover Assistant software was rudimentary, aided Clover in committing fraud, and was not as widely used as the Company publicly maintained; and (4) the Company failed to maintain internal controls.

### December 14, 2020 Proxy Statement

259.    On December 14, 2020, the Company filed the 2020 Proxy Statement for the purposes of soliciting shareholder approval of the Merger. Defendants Palihapitiya, Osborne, Reses, and Ryans solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

260.    The 2020 Proxy Statement called for shareholder approval of, among other things: (1) the Merger; (2) the election of five directors, including Defendants Garipalli, Toy, Turner, and Shapiro, and non-party Clinton; and (3) the issuance of shares of Clover Class A or Class B common stock pursuant to the Merger agreement; (4) the 2020 Equity Incentive Plan, which provided that Class A common stock shares of up to 5.5% of the total outstanding capital stock of the Company could be issued, increasing each fiscal year beginning with 2022, so that the Company may attract and retain the best available personnel and incentivize employees, directors, and contractors with long-term equity-based compensation to align their interest with shareholders; (5) the 2020 Management Incentive Plan, which provided that Class B common stock shares of up

---

[3] Plaintiffs' allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

to 6% of the total outstanding common stock of the Company could be issued to award Defendants Garipalli and Toy with grants of time-based and performance-based restricted stock units to enhance the Company's ability to incentivize them and promote success of the Company's business; and (6) the 2020 Employee Stock Purchase Plan, which provided that Class A common stock shares of up to 0.5% of the total outstanding capital stock of the Company could be issued to grant a series of purchase rights to eligible employees and service providers to incentivize and retain both new and old eligible employees and service providers (collectively, the "Proposals").

261.    With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated that Clover "will have a code of ethics that applies to all of its executive officers, directors and employees, including its principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions."

262.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the Individual Defendants engaging, and/or causing or permitting the Company to engage, in the Deceptive Sales Misconduct, the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

263.    The Individual Defendants also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's valuation was artificially inflated as a result of false and misleading statements alleged herein.

264.    Pertaining to Clover Health's business model, the 2020 Proxy Statement highlighted the following:

- We broadly disseminate the Clover Assistant free-of-charge to primary care physicians ("PCPs") who use it at the point of care while treating our members.

- The Clover Assistant provides essential information and personalized care recommendations to PCPs, driving real-time, data-driven decision-making, which results in better care for our members and strong plan performance.

\* \* \*

*We have succeeded with this approach in our established markets and seek to replicate it in all markets that we enter.*

(Emphasis added.)

265. The 2020 Proxy Statement continued its description of the Company's business model by noting:

We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, *over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care.* In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. . . . *Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.*

(Emphasis added.)

266. Regarding Clover Health's growth, the 2020 Proxy Statement also stated the following, in relevant part:

As a result of our "Obvious" plans*, we have achieved significant organic membership growth*. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. *This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period.*

267. With regard to the Company's "Value Proposition," the 2020 Proxy Statement stated the following, in relevant part:

> Because we drive this clinical improvement with technology, *we believe we can scale in virtually any market,* including traditionally underserved markets that are generally not viable for others, as demonstrated by the fact *that we had 25% more low-income members and nearly twice the number of minority members as a percentage of our plan population than are generally served in MA [Medicare Advanatge] as of June 30, 2020.*

268. Regarding the Company's "Growth Strategy," the 2020 Proxy Statement stated, in relevant part: "We have designed our platform to be easy to adopt and use, *resulting in rapid adoption of the Clover Assistant since its launch in July 2018. In particular, the number of PCPs contracted to use the Clover Assistant that care for our members has grown by more than 500% from January 1, 2019, to September 30, 2020.*" (Emphasis added.)

269. The "Growth Strategy" section of the 2020 Proxy Statement continued:

> We currently offer MA plans in 34 markets in the United States, and we are launching in 74 additional MA markets in 2021. *We principally scale by deploying the Clover Assistant software to PCPs. We contract with providers simply to use the Clover Assistant at the point of care for a flat fee rather than, for example, negotiating contracts involving risk-sharing arrangements under which the provider assumes financial responsibilities for patient care. We plan to leverage our rapidly scalable business model to enter into new markets* nationally in order to offer our "Obvious" plans to a greater percentage of the over 60 million Medicare-eligible beneficiaries. Accordingly, *we plan to seek opportunities to create differentiated and enhanced plans for Medicare-eligible beneficiaries across the United States, including underpenetrated and traditionally underserved markets.* For example, we recently announced a new partnership with Walmart to make co-branded Clover-Walmart plans available in eight Georgia counties that represented over 370,000 Medicare eligible beneficiaries in 2019. *We also intend to increase spending for new market development and expansion of our sales channels and in-person or remote clinical care capabilities.*

(Emphasis added.)

270.     In a section titled, "Government Regulation," the 2020 Proxy Statement stated that

"[w]e work diligently to ensure compliance with all applicable laws and regulations." The 2020

Proxy Statement further stated:

> Our operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by*, and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.*

(Emphasis added).

271.     Regarding "Legal Proceedings," the 2020 Proxy Statement stated:

> *From time to time, we are involved in various legal proceedings arising from the normal course of business activities. We are not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition.* Defending such proceedings is costly and can impose a significant burden on management and employees, we may receive unfavorable preliminary or interim rulings in the course of legal proceedings, and there can be no assurances that favorable final outcomes will be obtained.

(Emphasis added.)

272.     Under the heading "*From time to time we are and may be subject to litigation or

investigations, which could be costly and time-consuming to defend*," the 2020 Proxy Statement

stated the following as to Clover's risk of litigation:

> [F]rom time to time, *we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities.* In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights.

The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. ***Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.***

*         *         *

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. ***While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse.*** See the section entitled "Risk factors—Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

(Emphasis added; original emphasis removed.)

273.    Regarding "Sales and Marketing," the 2020 Proxy Statement stated the following:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed

sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

274. The 2020 Proxy Statement also maintained that Clover's "consolidated financial statements are prepared in accordance with GAAP."

275. The 2020 Proxy Statement also made the following disclosure of "Related party transactions," which entirely omitted any reference to B&H and Bermudez:

> The Corporation has various contracts with IJKG Opco LLC (d/b/a CarePoint Health—Bayonne Medical Center), Hudson Hospital Opco LLC (d/b/a CarePoint Health—Christ Hospital) and Hoboken University Medical Center ("HUMC") Opco LLC (d/b/a CarePoint Health—Hoboken University Medical Center), which collectively do business as the CarePoint Health System ("CarePoint Health") and are in-network Clover providers in New Jersey. CarePoint Health is ultimately held and controlled by Mr. Vivek Garipalli, the Chief Executive Officer and stockholder of the Corporation. The Corporation has entered into contracts, similar to those with many of its other hospitals, with CarePoint Health for the provision of inpatient and hospital-based outpatient services. Expenses and fees incurred related to these contracts, recorded in net medical claims incurred, were $12.6 million and $9.7 million for the years ended December 31, 2018 and 2019, respectively.

> ***Securities payable to related parties***

> The Corporation has entered into various securities payable with certain related parties as further discussed in Note 12 "Notes and securities payable".

276. The 2020 Proxy Statement made an additional disclosure about "Related party transactions," still omitting any reference to Bermudez and B&H, as follows:

> The Corporation has various contracts with IJKG Opco LLC (d/b/a CarePoint Health—Bayonne Medical Center), Hudson Hospital Opco LLC (d/b/a CarePoint Health—Christ Hospital) and Hoboken University Medical Center ("HUMC") Opco LLC (d/b/a CarePoint Health—Hoboken University Medical Center), which collectively do business as the CarePoint Health System ("CarePoint Health"). CarePoint Health is ultimately held and controlled by Mr. Vivek Garipalli, the Chief Executive Officer and stockholder of the Corporation. The Corporation has entered into contracts, similar to those with many of its other hospitals, with CarePoint Health for the provision of inpatient and hospital-based outpatient services. Expenses and fees incurred related to these contracts, recorded in net medical claims incurred were $9.4 million and $5.3 million for the nine month periods ended September 30, 2019 and 2020, respectively

***Securities payable to related parties***

The Corporation has entered into various securities payable with certain related parties as further discussed in Note 10 "Notes and securities payable".

277.    The 2020 Proxy Statement was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the 2020 Proxy Statement failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (4) the Clover Assistant software was rudimentary; (5) the Company's consolidated financial statements did not accord with GAAP and improperly omitted related party transactions; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

278.    As a result of the material misstatement and omissions contained in the 2020 Proxy Statement, Company shareholder, voted, *inter alia*, to: (1) approve the Merger; (2) elect Defendants Garipalli, Toy, Turner, and Shapiro, to the Board, allowing them to breach their fiduciary duties to the Company; (3) approve the issuance of shares of Clover Class A or Class B common stock pursuant to the Merger agreement; (4) approve the 2020 Equity Incentive Plan, under which the Individual Defendants could receive unjust compensation; and (5) approve the 2020 Management Incentive Plan, granting Defendants Garipalli and Toy unjust compensation in light of their breaches of fiduciary duty.

***January 12, 2021 Form 8-K***

279.    On January 12, 2021, filed a current report on Form 8-K with the SEC. Attached to the current report were numerous documents, including a press release noting that "unaudited pro

forma condensed combined financial information of SCH and Clover as of September 30, 2020 and for the year ended December 31, 2019 and the nine months ended September 30, 2020 is set forth in Exhibit 99.1 hereto and is incorporated herein by reference."

280. This attached financial information was false and misleading because it failed to comply with GAAP rules by failing to disclose a series of related party transactions, between Clover and Bermudez/B&H, under which and a significant percentage of the Company's members were enrolled as the result of this undisclosed relationship, B&H received approximately $1.2 million from the Company, and Bermudez received about $170,000 annually from B&H while also receiving a salary from Clover.

### January 21, 2021 J.P. Morgan Healthcare Conference

281. On January 21, 2021, Defendants Garipalli, Toy, and Wagner represented the Company at the J.P. Morgan Healthcare Conference. At the conference, Defendant Garipalli stated:

> So now that you have a bit of intuition of what the platform does. ***Let's discuss the most important part, physician usage.*** We believe that the Clover Assistant is a compelling platform for physicians for a few reasons. Number one, it's a standalone platform outside of the low NPS, EHRs that we believe is easy to use and provides clinically useful content as we just discussed. Two, we pay providers an enhanced rate that we estimate is about two times the fee-for-service Medicare rate, we make that payment extremely rapidly . . . . These two reasons serve as the activation energy to get physicians excited to contract with us and engage with the platform on an ongoing basis***. Because of that, we've been able to scale the Clover Assistant platform broadly and rapidly with contracts with over 2,000 primary care physicians in a myriad of different practice types across various markets.***

(Emphasis added.)

282. Defendant Toy later addressed the conference and stated: ""Firstly, they have broad engagement. ***Onboarded PCPs used the CA for 92% of eligible visits in 2019.***" During a question-and-answer session Defendants Garipalli, Toy, and Wagner were asked: "How would you want

investors think about what's most differentiated about Clover Assistant?" Defendant Toy responded:

> [T]he thing that I think is truly differentiated is what we've delivered, where Vivek and myself have discussed is, ***how do we drive action by a primary care physician to improve the care plan, consider a care plan where they didn't before in a novel way*** and I get some stats about that, right, where we are showing interesting information that drives different decision-making via PCP and that is not speculation and it's not me saying I'm a tech person, I think my platform can do this. Because we're in a payer, I'm in a payer, ***we can actually deploy that software and immediately see the results for a payer. . . . We can iterate really fast on that, so when we get feedback from a physician, when we see different behaviors in the physician community what we can launch it ML model and we see that it's got a certain level of engagement.***

(Emphasis added.)

283.    Defendant Wagner added to this answer noting: "***we have not seen anything else scale in healthcare 2,000 plus providers across a myriad of different practice types, myriad of different markets with over 90% utilization rate*** and a positive 59 NPS score, and most EHRs have a negative NPS."

284.    When a conference attendee asked, "why are the star ratings lower than you'd like them to be right now? What's your confidence in bringing those up over what time period?" Defendant Toy sought to assuage these concerns by stating: "I think we have a lot of content that loaded to Clover Assistant that will help close that adherence gaps and . . . care gap, these are things that—how that star ratings are based upon. We do think that as we launch those, we have high confidence because as Vivek said, ***it's a very high engagement by a PCP with CA will naturally bring those up.***" (Emphasis added.)

285.    The statements made at J.P. Morgan Healthcare Conference were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, they failed to disclose, *inter alia*: (1) the Deceptive Sales

Misconduct; (2) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (3) the Clover Assistant software was rudimentary, aided Clover in committing fraud, and was not as widely used as the Company publicly maintained; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

286.    On February 4, 2021, *Hindenburg Research* published the Hindenburg Report titled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation," that revealed the truth regarding the Deceptive Sales Misconduct. The report indicated that after a four-month long investigation of the Company that included "more than a dozen interviews with former employees, competitors, and industry experts, dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials," *Hindenburg Research* had concluded that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

287.    The Hindenburg Report stated that: "While Clover claims its software tool, ***Clover Assistant***, is aimed at helping doctors improve patient care, former employees told us that ***it was first and foremost a coding tool***. According to one former employee: '***The core feature of the platform is it increases revenue*** by identifying chronic conditions that people have and ***CMS will pay that*** . . . That's the core business proposition.'" Another employee told Hindenburg, "If you make this patient look really, really sick, ***you are going to get more money from the government***." (Emphasis added.)

288. The Hindenburg Report stated that "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained" and that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor." The Hindenburg Report stated that based on it its research, "the [DOJ] investigation has merit."

289. According to the partly redacted version of the Civil Investigative Demand issued by the DOJ to Clover, access to which was provided in the Hindenburg Report, the DOJ had commenced a "False Claims Act investigation" generally regarding "whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal agencies." According to the Civil Investigative Demand, the DOJ requested information from Clover and Clover Health[4] in connection to, *inter alia*: (i) Clover's and Clover Health's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans; (ii) Clover's and Clover Health's activities intended to encourage providers to refuse to accept patients with non-Clover and non-Clover Health coverage; (iii) the Company's and Clover Health's payments to providers' staff and employees for conveying any information relating to Clover and Clover Health plans to patients in providers' offices; (iv) Clover's and Clover Health's payments related to Clover Assistant; (v) Clover's and Clover

---

[4] The Civil Investigative Demand defines "Clover" to mean "Clover Health Investment Corporation, Clover Health LLC, Clover Health Corp., Clover Insurance Company, and Clover health Holdings, Inc., including their affiliates, subsidiaries, predecessors, and successors."

Health's patient recruitment efforts; (vi) the Company's and Clover Health's activities relating to matching patients with Medicare Advantage plans; and (vii) the "Seek Medicare" online platform.

290.    The Hindenburg Report further revealed the existence of the "confidential [Clover Ambassador] program." The Hindenburg Report contained the following statement by a former employee describing the role of an undisclosed "Clover Ambassador:" "The receptionist would notice that a patient checking in was enrolled in, say, United Healthcare, and would mention to the patient that there was another plan that might meet their needs better – 'Do you want more information? No problem. I'll have them give you a call.'"

291.    Additionally, the Hindenburg Report revealed the illegal use of gift cards by the Company to generate business, stating: "In addition to soliciting potential members through brokers and websites with undisclosed conflicts, Clover also skirted regulations by recruiting members through physicians' practices, according to a former employee." That employee said Clover was handing out gift cards "all over the freaking map" to induce doctors' offices to direct their patients to Clover. The Hindenburg Report indicated that gift cards were used because they were untraceable.

292.    The Hindenburg Report also finally disclosed the related party transactions with B&H and other third-party brokers owned by Bermudez, stating:

> Multiple former employees explained that much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez. One former employee estimated Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship. One of the former employees explained that Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name "for compliance purposes". Insurance filings confirm this. The Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement.

293.    The Hindenburg Report continued by revealing how few doctors really used Clover Assistant. The Hindenburg Report quoted two former Clover employees who described how only "Clover Preferred" doctors used Clover Assistant. However, only about 45% of all in-network doctors in Passaic County, New Jersey, were "Clover Preferred;" in Morris County, New Jersey, this fell to about 25%. A former employee stated that though 70% to 80% of New Jersey primary care physicians were in-network only "a good portion of doctors in the state but not a great portion of doctors were using it if they enrolled."

294.    Moreover, the Hindenburg Report included the results of its own survey of 22 physician's practices in New Jersey from Clover's 2019 Provider Directory. All 22 offices accepted Clover's insurance. However, 14 (64%) did not use Clover Assistant, four were unsure whether or not they did, and only the remaining four (18%) confirmed that they used Clover Assistant. The Hindenburg Report revealed that outside of New Jersey, the number of Clover Preferred doctors, and therefore the number using Clover Assistant, was much worse. In El Paso, Texas, Clover's directory included 110 doctors, of which only eight (7%) were Clover Preferred. Of the 220 primary care doctors in Tennessee and 206 doctors in Arizona—426 doctors combined—*zero* were Clover Preferred.

295.    In addition, the Hindenburg Report revealed just how lucrative the Merger was for Defendant Palihapitiya personally. Though SCH invested just $25,000, Defendant Palihapitiya's promotion of the Clover SPAC was in exchange for 20.5 million in "founders shares. These shares, were, according to the Hindenburg Report, worth around $290 million at the time it was published.

296.    On this news, the Company's share price dropped $1.72 drop, or approximately 12.3%, from its closing price of $13.95 per share on February 3, 2021, to close on February 4, 2021 at $12.23 per share. Additionally, the Company's warrant price closed on February 4, 2021

at $3.39 per warrant, a $0.18 drop, or approximately 5%, from its closing price of $3.57 per warrant on February 3, 2021.

297.    On February 5, 2021, prior to the market's open, Clover filed a current report on Form 8-K. Attached as an exhibit to the Form 8-K was the Medium Article, responding to the Hindenburg Report.

298.    The Medium Article made clear that the Individual Defendants knew of the DOJ investigation prior to the Merger, but knowing what they did chose not to disclose it because they decided it was not "material." Defendants Garipalli and Toy wrote that: "Clover does not believe it is, or has been, in violation of any rules or regulations related to the inquiry." Still, they also revealed that the SEC was now conducting an "investigation and requesting document and data preservation for the period from January 1, 2020, to the present, relating to certain matters that are referenced in the [Hindenburg Report]."

299.    Also on February 5, 2021, Defendant Palihapitiya tweeted his own response to the Hindenburg Report, also confirming his knowledge of the DOJ investigation. Defendant Palihapitiya stated:

> I think Clover is building something important in healthcare that ties together value and care – otherwise costs will continue to escalate and outcomes will continue to decline. ***As explained by Clover, in forging new ground and being a part of a regulated industry, they expect to receive requests for information from governmental entities and respond in the ordinary course.*** For Hindenburg to take such a request or information and use it to paint a case of malfeasance and fraud is spurious.
>
> While I may have my own views on short-sellers, I do believe they should remain a part of the capital markets and recognize the perspective that in some cases they can identify real anomalies. That is not the case here.
>
> I wish that Hindenburg had contacted me or Clover. We would have been happy to sit down with them so they could have gotten to the truth and evaluated things firsthand. Instead, they chose to take the cheap path of screaming into the ether.

I will let Clover's long-term goals and performance speak for themselves going forward. That is what I underwrote, and still stand behind.

(Emphasis added.)

300.     The Medium Article also finally revealed the Company's previously undisclosed related party transaction involving Bermudez and B&H, stating that "Clover has paid approximately $160k directly to B&H since 2017," but that Bermudez "does not receive any compensation, direct or indirect, from B&H for any work related to Clover." However, the Medium Article acknowledged that Bermudez "maintains a 50% ownership interest in B&H, which he has owned since before he joined Clover." The Medium Article later states that "[a]pproximately 8,200 of our current members were referred by B&H to Clover." At that time, Clover had over 57,000 members, so the member referred by B&H represented at least 14% of Clover's total membership—clearly a material amount.

301.     The Medium Article further confirmed the Hindenburg Report's finding that only a small number of physicians used Clover Assistant. The Medium Article defined "[O]nboarding" as a situation "[w]here the physicians have received their initial training and have created their accounts, and we have answered their questions. Basically, they're ready to use the software. We also refer to the physicians as the 'Live' physicians. . . . We typically have a pipeline of Contracted physicians waiting to be onboarded at any given time, and our goal is to go from Contracted to Live within 60 days." Thus, the time between a physician being "contracted" and "onboarded" was short. The Medium Article continued that, "*currently 22% of all in-network Primary Care Physicians are Live. This correlates to 4% of the total in-network physicians* (including PCPs, specialists, etc.).." Thus, a very small number of physicians, overall, merely agreed to use Clover Assistant. Even fewer *were using* Clover Assistant. Notably, the Medium Article did not represent how many "Live" physicians actually used Clover Assistant.

302.     On this news, the Company's share price fell an additional $0.53 per share in intraday trading on February 5, 2021, or approximately 4.3%. Additionally, the Company's warrant price fell an additional $0.28 per warrant in intraday trading on February 5, 2021, or approximately 8.2%.

303.     Later, on March 29, 2021, the Company filed another Form 8-K with the SEC, that corrected some of statements concerning B&H and Bermudez contained in the Medium Article. The Form 8-K said, in relevant part:

> As described in the Original Post, Clover directly contracts with a Field Marketing Organization (FMO) named Ritter Insurance Marketing. B&H Assurance is one of many "downline" agencies from Ritter, which means that B&H and its agents sell Clover plans through Ritter, as well as other non-Clover Medicare Advantage plans. ***We understand from Ritter that, from 2017 through 2020, B&H Assurance received from Ritter roughly $400,000 a year for Clover-related products.*** As noted in the Original Post, from the period 2017 to present, ***Clover has paid roughly $160,000 directly to B&H Assurance*** ($125,000 of which is an incentive payment made in 2021 for hitting a preset enrollment bonus pursuant to an incentive plan in which other agencies also participate) ***We understand from Mr. Bermudez that, over the last several years, he reported an average of roughly $170,000 a year in net income from B&H Assurance.*** The Company has concluded that the income received by Mr. Bermudez as a result of his work for Clover is compliant with applicable CMS rules and regulations.

(Emphasis added.)

304.     While posturing as if this was all "compliant" in the above statement, the Company nevertheless revealed that "[b]ased on discussions with the Company, Mr. Bermudez ***has agreed to divest himself from all interests in B&H Assurance*** to avoid any potential conflict of interest." (Emphasis added.)

305.     Finally, on May 17, 2021, the Company held an earnings call with investors and analysts regarding Clover's financial results for the first quarter of 2021. Defendant Wagner stated that, by the end of 2021, the Clover expected between 70,000 and 100,000 lives managed under the Direct Contracting program. This was dramatically below Defendant Palihapitiya claimed

200,000 lives already under contract as part of the Direct Contracting program. This did not go unnoticed by analysts. For example, MedCity News published an article titled, "In analyst call, Clover reveals it doesn't have the customers it said it did during IPO."

## DAMAGES TO CLOVER

306.     As a direct and proximate result of the Individual Defendants' conduct, Clover will lose and expend many millions of dollars.

307.     Such expenditures include, but are not limited to costs associated with the costs of legal fees associated with the Securities Class Action and other lawsuits filed against the Company, the CEO, CTO, former CFO, and SCH's former CEO and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

308.     Such expenditures include, but are not limited to costs associated with the costs of defending lawsuits arising out of and/or investigations of the Deceptive Sales Misconduct, including investigations conducted by the DOJ and SEC, and for fines paid in connection thereto.

309.     Such expenditures include, but are not limited to costs arising out of the Deceptive Sales Misconduct, including but not limited to payments made to healthcare providers and related parties, like Head of Sales Bermudez and his company, B&H.

310.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

311.     As a direct and proximate result of the Individual Defendants' conduct, Clover has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

312. Plaintiffs bring this action derivatively and for the benefit of Clover to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Clover, waste of corporate assets, unjust enrichment, the Clover Health Defendants' gross mismanagement and abuse of control, the SCH Defendants' violations of the Exchange Act, as well as the Individual Defendants' aiding and abetting thereof, and against Defendants Garipalli, Toy, Wagner, and Palihapitiya for contribution under Section 10(b) and 21D of the Exchange Act.

313. Clover is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

314. Plaintiffs are, and have been at all relevant times, Clover shareholders. Plaintiffs will adequately and fairly represent the interests of Clover in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

315. Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

316. A pre-suit demand on the Board of Clover is futile and, therefore, excused. At the original time of filing of this action, and at the time of filing of this consolidated complaint, the Board consists of the following seven individuals: Defendants Garipalli, Toy, Turner, and Shapiro (the "Director-Defendants") along with non-parties Clinton, William G. Robinson, Jr., and Demetrios L. Kouzoukas (together with the Director-Defendants, the "Directors"). Plaintiffs need

only to allege demand futility as to four of the seven Directors who were on the Board at the time this action was commenced.

317.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

318.   Demand is also excused as to all of the Director-Defendants and director Clinton because the Deceptive Sales Misconduct was an unlawful business strategy that the Company and Clover Health engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company and Clover Health, the Board, including the Director-Defendants and director Clinton, made and/or allowed the Company and Clover Health to engage in the schemes outlined herein.

319.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the conduct alleged herein including, *inter alia*, by breaching their fiduciary duties to the Company and also aiding and abetting the SCH Defendants' breaches of their fiduciary duties to the Company. The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.





Case 3:21-cv-00311   Document 23   Filed 11/30/21   Page 108 of 126 PageID #: 338





325.     Additional reasons that demand on Defendant Shapiro is futile follow. Defendant Shapiro has served as a Company director since the Merger in January 2021. He also serves as the Chair of the Audit Committee and as the Chair of the Nominating and Corporate Governance Committee. As a Company director he conducted little, if any, oversight of the Deceptive Sales Misconduct (which Defendant Shapiro permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Shapiro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

327.  Additional reasons that demand on the Board is futile follow.

328.  Demand in this case is excused because the Director-Defendants, all of whom are named as defendants in this action, and two of whom are defendants in the Securities Class Action, control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

329.  Defendants Garipalli, Turner, and Shapiro (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. The Audit Committee Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

330. Clover has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants and director Clinton have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Clover any part of the damages Clover suffered and will continue to suffer thereby. Thus, any demand on the Director-Defendants and director Clinton would be futile.

331. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal Deceptive Sales Misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors—each of the Director-Defendants—face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

332. The acts complained of herein constitute violations of fiduciary duties owed by Clover's officers and directors, and these acts are incapable of ratification.

333. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Clover. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves

or certain of the officers of Clover, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

334.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Clover to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

335.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, certainly at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Defendants Palihapitiya, Osborne, Reses, and Ryans for Violations of Section 14(a) of the Exchange Act

336.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

337.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

338. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

339. Under the direction and watch of the Defendants Palihapitiya, Osborne, Reses, and Ryans, the 2020 Proxy Statement failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (4) the Clover Assistant software was rudimentary; (5) the Company's consolidated financial statements did not accord with GAAP and improperly omitted related party transactions; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

340. Defendants Palihapitiya, Osborne, Reses, and Ryans also caused the 2020 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ performance based compensation elements while failing to disclose that the Company's revenues and profits, and therefore its financial performance, were based on the Deceptive Sales Misconduct and misrepresented as a result of false and misleading statements, causing the Company's share price and financial performance to be artificially inflated and allowing the Defendants Palihapitiya, Osborne, Reses, and Ryans to wrongfully benefit from the fraud alleged herein.

341. Moreover, the 2020 Proxy Statement was false and misleading when it discussed

the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Defendants Palihapitiya, Osborne, Reses, and Ryans' failures to abide by them and their engagement in or tolerance of the Deceptive Sales Misconduct and the scheme to issue false and misleading statements and omissions of material fact.

342. Defendants Palihapitiya, Osborne, Reses, and Ryans also caused the 2020 Proxy Statement to be false and misleading with regard to the Board's risk oversight, which was inadequate in light of the Deceptive Sales Misconduct.

343. In the exercise of reasonable care, the Defendants Palihapitiya, Osborne, Reses, and Ryans should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, election of directors, allowing them to breach their duties to the Company, and the approval the Proposals, under some of which the Individual Defendants were able to received unjust compensation.

344. The misrepresentations and omissions set forth herein were material to shareholders in voting on the Proposals who would not have approved, among other things, the election of Defendants Garipalli, Toy, Turner, and Shapiro and director Clinton, the 2020 Equity Incentive Plan, and the 2020 Management Incentive Plan, had they been informed about the Deceptive Sales Misconduct.

345. The false and misleading elements of the 2020 Proxy Statement led to, among other things, the approval of the Proposals, including those which granted the Individual Defendants unjust compensation, and the election of the Defendants Garipalli, Toy, Turner, and Shapiro and director Clinton, which allowed them to breach their fiduciary duties to Clover.

346. The Company was damaged as a result of the Defendants Palihapitiya, Osborne, Reses, and Ryans' material misrepresentations and omissions in the 2020 Proxy Statement.

347. Plaintiffs, on behalf of Clover, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

348. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

349. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Clover's business and affairs.

350. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

351. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Clover.

352. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

353. In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Deceptive Sales Misconduct.

354. Also in breach of their fiduciary duties owed to Clover, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*: (1) the Deceptive Sales Misconduct; (2) Clover had received a Civil Investigative Demand

from the DOJ, which posed an existential threat to the Company as it generated a substantial portion of its revenue from Medicare; (3) Clover's growth figures were artificially inflated by the Deceptive Sales Misconduct; (4) the Clover Assistant software was rudimentary; (5) the Company's consolidated financial statements did not accord with GAAP and improperly omitted related party transactions; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

355.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

356.    The Individual Defendants also breached their fiduciary duty to the Company by causing the Company to pay the Individual Defendants their annual bonuses and/or stock awards each year that they violated the Company's policies.

357.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Clover's securities.

358.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Clover's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

359.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

360.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Clover has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

361.    Plaintiffs on behalf of Clover have no adequate remedy at law.

### THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

362.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

363.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Clover.

364.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Clover that was tied to the performance or artificially inflated valuation of Clover, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

365. Plaintiffs, as shareholders and representatives of Clover, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

366. Plaintiffs on behalf of Clover have no adequate remedy at law.

<b><u>FOURTH CLAIM</u></b>

<b>Against Clover Health Defendants for Abuse of Control</b>

367. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

368. The Clover Health Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Clover, for which they are legally responsible.

369. As a direct and proximate result of the Clover Health Defendants' abuse of control, Clover has sustained significant damages. As a direct and proximate result of the Clover Health Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Clover has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Clover Health Defendants are liable to the Company.

370. Plaintiffs on behalf of Clover have no adequate remedy at law.

<b><u>FIFTH CLAIM</u></b>

<b>Against Clover Health Defendants for Gross Mismanagement</b>

371. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

372. By their actions alleged herein, the Clover Health Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

with regard to prudently managing the assets and business of Clover in a manner consistent with the operations of a publicly-held corporation.

373.     As a direct and proximate result of the Clover Health Defendants' gross mismanagement and breaches of duty alleged herein, Clover has sustained and will continue to sustain significant damages.

374.     As a result of the misconduct and breaches of duty alleged herein, the Clover Health Defendants are liable to the Company.

375.     Plaintiffs, on behalf of Clover, have no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

376.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

377.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Clover to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

378.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

379.     Plaintiffs, on behalf of Clover, have no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Garipalli, Toy, Wagner, and Palihapitiya for Contribution Under Sections 10(b) and 21D of the Exchange Act

380.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

381. Clover, along with Defendants Garipalli, Toy, Wagner, and Palihapitiya are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Garipalli's, Toy's, Wagner's, and Palihapitiya's willful and/or reckless violations of their obligations as officers and/or directors of Clover.

382. Defendants Garipalli, Toy, Wagner, and Palihapitiya, because of their positions of control and authority as officers and/or directors of Clover, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Clover, including the wrongful acts complained of herein and in the Securities Class Action.

383. Accordingly, Defendants Garipalli, Toy, Wagner, and Palihapitiya are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

384. As such, Clover is entitled to receive all appropriate contribution or indemnification from Defendants Garipalli, Toy, Wagner, and Palihapitiya.

## EIGHTH CLAIM

### Against the Clover Health Defendants for Aiding and Abetting
### Breach of Fiduciary Duty

385. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

386. The Clover Health Defendants aided and abetted the SCH Defendants who breached their fiduciary duty to Clover.

387. The Clover Health Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

388. Specifically, the Clover Health Defendants engaged in the Deceptive Sales Misconduct and also promoted the Merger by issuing false and misleading statements concerning Clover's operations and business prospects, the status of regulatory and legal proceedings against Clover Health and the Clover Assistant. Moreover, the Clover Health Defendants controlled and operated Clover Health, Clover's functional and operational predecessor, and caused Clover Health to jointly issue press releases and file SEC filings which contained materially false and misleading statements promoting Clover's future operations and prospects.

389. The Clover Health Defendants are jointly and severally liable to the same extent as the SCH Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

390. As a direct and proximate result of the Clover Health Defendants' aiding and abetting of the SCH Defendants' breaches of duty alleged herein, Clover has sustained and will continue to sustain substantial damages.

391. Plaintiffs on behalf of Clover have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiffs may maintain this action on behalf of Clover, and that Plaintiffs are adequate representatives of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Clover;

(c)      Determining and awarding to Clover the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Clover and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Clover and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.      a provision to permit the shareholders of Clover to nominate at least three candidates for election to the board; and

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Clover restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 30, 2021             Respectfully submitted,

*/s/ Wade B. Cowan*
Wade B. Cowan (SC#9403)
**WADE B. COWAN, ATTORNEY AT LAW**
P.O. Box 50617
Nashville, Tennessee 37205
Telephone: (615) 352-2331
Email: wcowan@dhhrplc.com

*Liaison Counsel for Plaintiffs*

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

## **VERIFICATION**

I, Yuechuan Sun am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _11/15/2021_, 2021.

_Yuechuan Sun_
A88A5098640F421
Yuechuan Sun